UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| KIMBERLY L. PORTER,<br><br>              Plaintiff,<br><br>   vs.<br><br>NANCY A. BERRYHILL, Deputy<br>Commissioner for Operations,<br>performing the duties and functions not<br>reserved to the Commissioner of Social<br>Security,[1]<br><br>             Defendant. | 5:17-CV-05028-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## Table of Contents

INTRODUCTION.............................................................................................. 1
FACTS ............................................................................................................ 2
   A.   Procedural History.......................................................................... 2
   B.   Background..................................................................................... 3
   C.   Vocational Evidence........................................................................ 4
   D.   Medical Evidence – Chronological ................................................. 4
   E.   Claimant and Lay Witness Statements........................................ 69
   F.   Opinion Evidence ........................................................................ 76
   G.   ALJ's Decision ............................................................................. 78
   H.   Issues Before This Court.............................................................. 79

DISCUSSION ................................................................................................. 80
   A.   Standard of Review....................................................................... 80
   B.   The Disability Determination and the Five-Step Procedure................. 82

---

[1] Nancy Berryhill is no longer the Acting Commissioner of Social Security. The revised title is necessary until the President appoints another executive to serve as Acting Commissioner, or there is a nominee for the position of Commissioner of Social Security, at which time the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3346(a)(2), would allow Nancy Berryhill to resume the position of Acting Commissioner of Social Security while the nomination is pending.

C.    Burden of Proof. ................................................................ 83

D.    Did the ALJ Err in Determining the Alleged Disability Onset Date? .... 84

  1.    Why Does the Disability Onset Date Matter? ................................. 84

  2.    The Law Applicable to Determining Alleged Onset Date .................. 87

    a.  Onset Date After Denial of an Earlier Application ........................... 87

    b.  *Res Judicata* ................................................................ 90

    c.  Determination of Onset Date Without Consideration of the Fact That There Was a Prior Application ................................. 92

E.    Did the ALJ Err at Step Two in Determining Severe Impairments? ....... 95

  1.    Applicable Law and ALJ Findings.................................................. 96

  2.    Mental Impairment ...................................................................... 98

  3.    Left Knee ................................................................................... 109

  4.    Sacroiliitis ................................................................................. 113

  5.    Myofascial Pain Syndrome ........................................................... 115

F.    Did the ALJ Fail to Develop the Record as to Pulmonary and Psychological Impairments? ............................................................ 117

  1.    Duty to Obtain 12 Months' of Pre-Application Records ................. 118

  2.    Consultative Examination on Mental Impairments ....................... 119

  3.    Consultative Examination on COPD............................................. 125

G.    Was the ALJ's RFC Assessment Supported by Substantial Evidence?.... 133

  1.    The Law Applicable to Formulation of RFC................................... 134

  2.    Physical RFC .............................................................................. 137

    a.  Back, Hip, Myofascial Pain Syndrome, Complaints of Pain, and Absenteeism for Physical Therapy Appointments.......................... 137

    b.  Left Knee ................................................................................ 141

    c.  COPD ..................................................................................... 143

    d.  Nontreating Nonexamining Physicians' Opinions.......................... 146

  3.    Mental RFC ............................................................................... 147

H.    Did the ALJ's Step Five Decision Comply with the Law?................. 148

I.    Type of Remand ............................................................................ 152

CONCLUSION ......................................................................................... 154

**INTRODUCTION**

Plaintiff, Kimberly Porter,[2] has filed a complaint seeking judicial review of the Commissioner's final decision denying her Title II application for a period of disability and disability insurance benefits and her Title XVI application for supplemental security income.[3]

Ms. Porter now moves this court for an order reversing the Commissioner's final decision and remanding for further consideration. <u>See</u> Docket Nos. 18, 19 and 21. Nancy Berryhill, Deputy Commissioner for Operations ("Commissioner") urges the court to affirm her decision below. <u>See</u> Docket 20.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge pursuant to the consent of both parties in accordance with 28 U.S.C. § 636(c). Based on the facts, law and analysis

---

[2] Plaintiff's first name was spelled "Kimberley" in the complaint. The caption is changed herein to reflect the correct spelling is "Kimberly."

[3] Title II benefits are sometimes called SSD or DIB benefits. A claimant's entitlement to Title II benefits, unlike Title XVI (aka SSI) benefits, is dependent upon one's "coverage" status (calculated according to one's earning history—Ms. Porter was insured through December 31, 2016), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. Both types of benefits are dependent upon the claimant being disabled and the definition of disability is the same under both Titles. There are corresponding and usually identical regulations for each type of benefit. <u>See, e.g.</u> 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). For simplicity's sake, the court will cite herein to only one group of regulations unless there is a difference between the two.

discussed in further detail below, the court reverses and remands for further consideration.

**FACTS**[4]

**A.    Procedural History**

Kimberly L. Porter filed for concurrent disability benefits on November 17, 2011, went to hearing on May 29, 2013, and was denied on June 4, 2013. AR30, 98.

She reapplied on August 27, 2013.  AR212.  The SSA field office's explained reason for selecting a potential onset date of June 5, 2013:  "prior claim denied by ALJ 06/04/2013."  AR228.

The state agency initial denial was dated January 2, 2014.  AR145. The reconsideration denial was dated August 1, 2014.  AR152.  On August 14, 2014, claimant a requested hearing.  AR166.

Hearing was accorded on December 30, 2015, with the claimant and her attorney, Josh Decker, appearing in Rapid City, SD, and ALJ Michael A. Kilroy presiding from the Billings, Montana, ODAR location.  AR55.  On January 22, 2016, the ALJ issued a step five denial.  AR14-23.

---

[4] The following statement of facts is taken from the parties' joint stipulated statement of facts. See Docket No. 15. The court has made minor modifications such as grammar, punctuation, and incorporating the defined terms from the parties' glossary into footnotes at the appropriate place in the text.  There was a separate statement of one disputed medical record.  See Docket No. 15-1. The court has incorporated that statement chronologically with the rest of the facts, but indicated it is disputed.

Porter, by current counsel, Catherine Ratliff, requested Appeals Council review despite failing to timely appeal the ALJ's decision. AR10. Porter also submitted a January 17, 2017, MRI of her knee. AR8, 309.

On February 23, 2017, the Appeals Council declined review, after finding good cause for the claimant's untimely request for review. AR1. The Appeals Council found that a one-page medical record, referring to the MRI, from Rapid City Regional Hospital was dated January 17, 2017, and the ALJ decided the case through January 22, 2016; therefore, the evidence did not affect the ALJ's decision. AR2. Porter's date-last-insured for SSD was December 31, 2016. AR228.

## B.    Background

Porter was born in 1970. AR212, 214. Her father suffered from alcoholism and heart disease. A brother suffered from alcoholism and diabetes. A sister suffered from diabetes.[5] AR546. Porter did not state the highest grade she attended in school and merely reported she obtained a "GED," in January 1996. AR64, 233. She never married. AR212, 214. She had three children born in 1990, 1992, and 1996, and one child was born prematurely.[6] AR545.

---

[5] The parties disagree these facts are relevant but admit they appear in the record at AR546.

[6] The parties disagree these facts are relevant but admit they appear in the record at AR545.

## C.    Vocational Evidence

Porter has work experience as a childcare provider.  AR233, 277.  Porter stated that she performed childcare from 2001 to 2012.  AR277.

From age 18 (1988) to age 32 (2002), Porter's approximate reported regular earnings were in 1988 ($285), 1989 ($535), 1992 ($463), 1993 ($2307), and 1994 ($49).  She had earnings in 2003 ($7081), 2004 ($9306), 2006 ($7903), 2007 ($8956), 2008 ($7670), 2009 ($9967), 2010 ($9003), 2011 ($5569), and 2014 ($1154).  AR220-21.

The detailed earnings report shows names of employers since 2000.  AR222.  Porter worked for "Maid to Order" in 2003-04, Barry Burgess in 2004, and was self-employed from 2006-2011.  AR222-23.  She reported that she was a childcare provider January 2008 to September 2011, working 40 hours a week, and earning $50 a day.  AR233.

She described this work in her disability report:  she watched, fed, and taught children.  She lifted them, and the heaviest weight she lifted was 20 pounds.  AR234.

## D.    Medical Evidence – Chronological

Disputed statement of fact:  On February 7, 2013, Porter had a cervical spine soft-tissue neck series, using soft-tissue technique, which showed straightening of the cervical spine and degenerative changes particularly at C5-C6.  AR776-77.  End disputed statement of fact.

On March 14, 2013, Porter saw Jennifer Thielen, PA[7] at the community health center, for heartburn, smoking cessation, and left knee pain. AR564. She stated that Prilosec did not help even when she doubled the dose. Id. She was interested in stopping smoking. Id. She reported smoking for 20 years, one-half pack a day on average. She denied depression, but acknowledged irritability at times. Id. She complained of left knee pain (pointed to the lateral collateral ligament), going back 5 years when Dr. Den Hartog did surgery on this knee and shortened the ligament on the outside of the knee. Id. "She brings my hand to exactly the area that is hurting her, and it is her IT band."[8] Id. She described a feeling of extreme tightness here.

Porter told PA Thielen that she recently had engaged in 4 months of physical therapy, ordered by Christina Cote, DO, physiatrist,[9] and said that she was diligent about going to therapy and following directions, and it did not help; she still dealt with the pain and stiff feeling. Id. Objectively PA Thielen noted some tightness of the left IT band compared to the right, but no instability, pain to palpation or swelling. Id. PA Thielen assessed esophageal

---

[7] https://www.doximity.com/pub/jennifer-theilen-pa. Last checked May 4, 2018.

[8] Iliotibial band syndrome is a common injury to the knee generally associated with running, cycling, etc. Your IT band is a thick bunch of fibers that runs from the outside of your hips to the outside of your thigh and knee down to the top of your shinbone. https://www.webmd.com/pain-management/it-band-syndrome#1, accessed May 4, 2018.

[9] http://www.vitals.com/doctors/Dr_Christina_Cote.html, accessed May 4, 2018.

reflux and left knee joint pain. AR565. She planned a consult with Bryan Den Hartog, MD, orthopedic surgeon, and an EGD by a gastroenterologist. Id. PA Thielen prescribed Dexilant[10] for reflux, and Chantix[11] for smoking cessation. Id.

On April 17, 2013, Porter saw Bryan Den Hartog, MD, orthopedic surgeon, for her persistent left knee problems. AR825. Dr. Den Hartog reported, "We have scoped that twice and debrided the fairly significant full- or partial-thickness cartilage defects of both femoral condyles, the trochlear groove, and the patella." Id. The last operation was in 2008 and provided fairly good pain relief for at least 3 years. The last year and a half the pain had been gradually recurring and was more significant. Id.

Dr. Den Hartog noted that Dr. Cote had injected cortisone into the knee 3-4 months earlier and it did not help much, but gave a little relief. AR825. The knee hurt mostly when Porter tried to kneel or squat. Dr. Cote had placed her on "those kinds of restrictions." Id. Objectively, she was a thin, well-developed, well-nourished female in no acute distress. She had a positive patellofemoral grind test. She did not have instability or effusion. Id. The x-rays, 4 views, showed "some significant arthritic changes and change in

---

[10] Dexilant (Lansoprazole) is a proton pump inhibitor used to treat GERD. https://medlineplus.gov/druginfo/meds/a695020.html, accessed May 4, 2018.

[11] Chantix (Varenicline) is a smoking cessation aid that blocks the pleasant effects of nicotine on the brain.
https://medlineplus.gov/druginfo/meds/a606024.html, accessed May 4, 2018.

contour of the femoral condyles on the left knee. The patella femoral joint is involved as well." Id.

Dr. Den Hartog assessed mild to moderate degenerative joint disease (DJD) of the left knee. AR825. He injected Euflexxa.[12] Id. He explained the medical reason for Euflexxa was Porter's somewhat refractory response to cortisone. AR826. She would see Dan Palmer, PA-C, for the second and third set of injections. Id.

On April 25, 2013, Porter saw PA Thielen to discuss smoking cessation. AR563. Chantix had made her sick. She complained of moodiness and anxiety issues and presented for evaluation of possible bipolar disorder. Id.

She told PA Thielen, "everyone tells her that she is moody. She says that her moods are up and down. One minute she can be happy and the next minute 'I'm crabby and cussing everyone out.'" Id. She had been on Prozac[13] when very young. Chantix worsened these symptoms. She felt really down some days, but not all the time. She complained of anhedonia and social withdrawal. "She says, 'I come in to town to do what I gotta do' and gets back home." Id.

---

[12] Euflexxa is an injectable medication used to relieve knee pain due to osteoarthritis. http://www.euflexxa.com/, accessed May 4, 2018.

[13] Prozac (Fluoxetine) is an SSRI that increases the brain's serotonin, used to treat depression, obsessive-compulsive disorder, and panic attacks. https://medlineplus.gov/druginfo/meds/a689006.html, accessed May 4, 2018.

She denied suicidal thoughts.  She had had some feelings of hopelessness.  She denied flight of ideas, reckless behaviors, inability to sleep and excessive energy.  Id.  She scored 33 on Beck's depression inventory, placing her in the severe depression category.  She had high irritability, depression with feelings of hopelessness, anhedonia, and social withdrawal. Id.  PA Thielen reported that eye contact and affect were appropriate, and that Porter was well-groomed, had well organized and articulate speech, and had no abnormalities of movement, thought content, perception, or process.  AR563-564.

PA Thielen counseled Porter on tobacco cessation and encouraged her to "seek additional medical attention if depression worsens, or if they begin feeling suicidal."  Id.  PA Thielen stated, "Her symptoms don't really sounds like bipolar disorder to me.  I think she has more mood lability."  Id.  She prescribed Zyban[14] [Bupropion] to see if it would help depression, mood lability, and smoking cessation.  If that did not work, PA Thielen stated that she would try a different antidepressant or add a mood stabilizing medication such as Abilify.[15]  Id.

On April 26, 2013, Porter saw PA-C Palmer for Euflexxa #2 injection of the left knee.  AR824.

---

[14] Zyban (see Wellbutrin, footnote 17, *infra*).

[15] Abilify (Aripiprazole) is an atypical antipsychotic used to treat symptoms of schizophrenia.  It is also used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone. https://medlineplus.gov/druginfo/meds/a603012.html, accessed May 4, 2018.

On May 3, 2013, Porter saw PA-C Palmer for Euflexxa #3 injection of the left knee.  AR823.

On May 31, 2013, Porter saw PA Thielen to follow up her complaints of depression.  AR561.  She had been on Zyban almost a month.  At first, it helped with smoking cessation.  She was down to a half-pack but was back up from this now.  Id.  PA Thielen noted the patient's thought that she smoked from "boredom.  She smokes because she doesn't want to get out and do anything and just sits a[t] home....She cries frequently.  She reports that her moods are up and down. She is very irritable.  She does have a lot going on right now."  Porter had had a disability hearing, cried in front of the judge, and was very anxious about the situation.  "She feels anxious much of the time."  Her symptoms were anxiety, high irritability, and depression with feelings of hopelessness, anhedonia, social withdrawal, and loss of interest in friends and family.  Id.  She woke frequently at night and thought she got about 4½ hours of sleep.  AR562.

On auscultation, her lungs were clear and respiration was normal.  AR562.  PA Thielen reported unremarkable physical and psychiatric clinical examination except for depressed affect.  She assessed depression with anxiety and emotional lability.  Id.  She encouraged Porter to seek additional medical attention "if depression worsens, or if they begin feeling suicidal."  Id.  She prescribed Viibryd[16] and told Porter to continue Zyban.

---

[16] Viibryd (Vilazodone) is a selective serotonin reuptake inhibitor (SSRI) and a 5HT1A partial agonist, used to treat depression.

On July 5, 2013, Porter returned to PA Thielen to follow up her depression.  AR328.  PA Thielen noted that she had added Viibryd to Porter's Wellbutrin[17] the previous month in an attempt to better control her depression.  "She states that this medication combination is working wonderfully for her.  Her boyfriend says 'You're like a different person.' " She previously had been on other antidepressants:  Prozac had adverse side effects, and Cymbalta[18] didn't work.  Id.  She stated that she had not quit smoking completely.  Porter said that the first week or so Viibryd helped with smoking cessation and now she was smoking a little more again, but less than before.  She was continuing to work on this.  Id.

On this day her Beck depression inventory was 12, consistent with mild mood disturbance.  She woke easily.  She had anhedonia but endorsed no other symptoms of depression.  Id.  She was well groomed, had no abnormal movements, an appropriate affect, and no abnormalities in thought content, perception, or process.  AR329.  PA Thielen diagnosed depression with anxiety, and emotional lability.  AR329.

---

https://medlineplus.gov/druginfo/meds/a611020.html, accessed May 4, 2018.

[17] Wellbutrin (Bupropion, Zyban) is an antidepressant used to treat depression, SAD, and to help people stop smoking.
https://medlineplus.gov/druginfo/meds/a695033.html, accessed May 4, 2018.

[18] Cymbalta (Duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) used to treat depression and generalized anxiety disorder (GAD).  https://medlineplus.gov/druginfo/meds/a604030.html, accessed May 4, 2018.

On August 6, 2013, Porter sought ER treatment for severe low back pain with radiation into both legs and saw Kelly Manning, MD. AR758. Porter told Dr. Manning that she'd had this for a long time and saw Dr. Cote regularly for the condition. Id. She felt that the pain was worse. Id. On exam, her lower back and paraspinals were tender. Id. Her extremities had no edema, or evidence of gross weakness. Id. She was alert, oriented and had normal mood, affect, memory and judgment. Id. Dr. Manning's impression was radicular low back pain that was recurrent. She provided analgesics and encouraged Porter to see her outpatient physician. AR759.

On August 23, 2013, Christina Cote, DO, Rapid City Regional Hospital saw Porter upon Community Health Center's referral pursuant to contract with the South Dakota Department of Human Services. AR316. Porter's chief complaint was chronic pain. Her problem list included chronic postoperative pain; pain in her ankle and foot; degeneration of lumbar or lumbosacral disc; other disorders of muscle, ligament and fascia; myalgia and myositis unspecified; neuralgia, neuritis and radiculitis, unspecified, acquired deformities of the knee; lesion of the plantar nerve; hallux rigidus; and insomnia. Her medications were Bupropion, Dexilant, Ibuprofen,[19]

---

[19] Ibuprofen is an NSAID used to relieve the pain, tenderness and swelling of osteoarthritis. Nonprescription Ibuprofen is used to reduce fever and relieve minor aches and pain from headaches, muscle aches, etc. https://medlineplus.gov/druginfo/meds/a682159.html, accessed May 4, 2018.

Nortriptyline,[20] Pennsaid[21] topical drops for the right knee, and vitamin D. AR316.

She had a surgical history of arthroscopy in both knees. AR317. On exam, Porter was five-feet-six and 155.5 pounds. She reported a pain level of 10. AR318. She reported eight months of chronic pain, the worst pain today. Id. It was located in her left hip and left low back, described as a deep ache and stabbing pain, worse (10/10) with activity. She had just moved into a new house and had been unpacking and cleaning. Id. Any activity such as mowing, mopping, sweeping made pain worse. AR318. Dr. Cote reported that the patient was oriented, with appropriate mood and affect, and intact recent and remote memory.

Dr. Cote performed a detailed cranial nerve examination and assessment of tenderness, spasm, bony abnormalities, strength and reflexes of the cervical and lumbar spine, and observation of gait and posture. All findings were normal, and Dr. Cote reported full range of motion, 5/5 muscle strength, and normal sensation. AR319. Porter's back had no tenderness or spasms. Id. She assessed myofascial pain syndrome, neuropathic pain, and chronic postoperative pain of the right knee. Id. Dr. Cote prescribed topical Pennsaid

---

[20] Nortriptyline is a tricyclic antidepressant used to treat depression. https://medlineplus.gov/druginfo/meds/a682620.html, accessed May 4, 2018.

[21] Pennsaid (Diclofenac, Volaren) is an NSAID for relief of osteoarthritis pain in the knees. https://medlineplus.gov/druginfo/meds/a611002.html, accessed May 4, 2018.

for the myofascial pain syndrome and right knee pain, and Nortriptyline for neuropathic pain. Id.

On August 29, 2014, PA Thielen saw Porter for complaints of left hip pain radiating down her leg for a week, when up and moving. AR327. Porter reported pain in her low back and, for 2-3 weeks, numbness intermittently down the left leg. The past week she had had significant pain into her left buttock. Id.

On examination, PA Thielen found tenderness to palpation in the left paraspinous lumbar region, some difficulty with ambulation secondary to pain, and left sciatic notch tenderness. AR328. PA Thielen found that straight-leg-raising on the left was limited by stiffness. Strength and reflexes were normal. Id. She assessed lumbago with sciatica and planned an MRI of the lumbar spine. Id. PA Thielen prescribed Prednisone 40 mg. a day for 5 days; rest, alternating heat and ice 20 minutes at a time 2-3 times a day. She prescribed Viibryd, 40 mg. and physical therapy. Id. PA Thielen noted that Porter saw Dr. Cote for pain management and encouraged her to discuss this again with her. Id.

On September 4, 2013, Leo Flynn, MD, of Dakota Radiology, interpreted a non-contrast MRI of the lumbosacral spine, reporting that degenerative changes at L5-S1 had increased since 2009 imaging. AR331. At L4-L5, Dr. Flynn saw mild facet joint degenerative changes and possible minimal left foraminal disc protrusion. At L5-S1, he reported degenerative disc changes, loss of disc space height, mild diffuse bulge, mild left facet arthrosis, posterior

annular tearing and a small left foraminal disc protrusion causing mild foraminal encroachment which could affect the exiting L5 nerve root.  His overall impression was:

1. Moderate chronic degenerative disc and endplate changes at L5-S1 with a small left foraminal disc protrusion.  This appears to be contacting the left L5 nerve root.  No high-grade spinal stenosis.

2. Suspicious for a very small left foraminal disc protrusion at L4-L5 close to the existing left L4 nerve root.

AR331, dup. AR641.

On September 13, 2013, PA Thielen dispensed Vicodin[22] for pain. AR327.

On September 24, 2013, Porter saw PA-C Palmer for her left knee pain. AR821.  She reported mild relief from the Euflexxa series and some relief with physical therapy.  Id.  She said the pain was mostly in the distal lateral knee. Id.  On examination she had crepitance and a positive grind test.  She had mostly mild tenderness with the most specific tenderness at distal insertion of the iliotibial band on the lateral femoral condyle.  Id.  She had no instability with varus and valgus stress, or anterior and posterior drawer.  Id.

X-rays showed mild medial joint space narrowing and degenerative changes within the patellofemoral joint.  PA-C Palmer assessed the IT band tendinitis and mild DJD of the left knee.  Id.  PA-C Palmer injected cortisone

---

[22] Vicodin (Hydrocodone/Acetaminophen) is an opiate used to relieve moderate to moderately severe pain.
https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/, accessed May 4, 2018.

into the insertions of the IT band.  AR822.  Following the injection Porter reported marked relief of pain.  Id.

On October 15, 2013, Amber Davidson, PA student under PA Thielen's supervision, saw Porter to follow up her depression.  AR326.  Porter stated that she was doing well on her current medications.  She had minimal feelings of depression and her moods were stable.  Id.  She had started Wellbutrin to help her stop smoking but had not had much luck with this.  She had used Quitline in the past and would try to use it again. Id.

Subjectively, Porter reported continued low back pain with left side radiculopathy.  AR326.  Her MRI showed some impingement on the L5 nerve root.  Id.  Ms. Davidson said she would refer Porter to neurosurgery.

Ms. Davidson reported her examination showed Porter was in no acute distress, was oriented to person, place and time, had normal respiration, normal cardiovascular clinic examination, and no psychiatric disturbance of note.  AR326.  Porter was well groomed, well developed, well nourished, in no acute distress, alert and oriented.  Id.  She had well organized and articulate speech, she answered questions and readily divulged information, eye contact was appropriate, there were no abnormal movements, her affect was appropriate, and she had no abnormalities in thought content, perception or process.  Id. Davidson planned a neurology consult, encouraged the patient to find a place to walk indoors, and encouraged her to quit smoking again.  AR326.

On October 22, 2013, Ashley Pfeiffer, DPT (doctor of physical therapy), reported an initial evaluation for chronic left knee and low back pain.  AR409. DPT Pfeiffer reported that Porter presented with significant IT band and lateral quad tightness and restrictions.  AR410.  DPT Pfeiffer observed decreased lumbar active range of motion in all planes, and poor frontal plane hip weakness.  Id.  Anterior drawer and Lachman's tests[23] were negative.  Porter had zero degrees of knee extension, 94 degrees of left knee flexion, 4/5 left knee extension strength, and 4+/5 left knee flexion strength.  Id.

DPT Pfeiffer believed Porter's left knee pain appeared secondary to arthritic symptoms along with restricted lateral muscle complex and decreased hip and core strength.  AR410.  She planned therapy 3 times a week for 6 to 8 weeks, to include therapeutic exercise, neuromuscular re-education, and manual therapy, plus modalities for pain control in order to improve flexibility, range of motion, strength, and function for Porter's bilateral hips, knees and low back. Id.

Also on October 22, 2013, Porter saw PA-C Palmer for follow-up of left knee pain.  AR820.  She said she was markedly better post injection.  She was starting physical therapy.  She now complained more of pain in the anterior knee.  "She has known patellofemoral arthritis, chondromalacia patella.  She completed a Euflexxa series nearly six months ago, and this did give her some

_____

[23] Anterior drawer and Lachman tests: Tests for detecting ACL tear.
Arc Bone Jt Surg. 2013 Dec; 1(2): 94-97. "Accuracy of Lachman and Anterior Drawer Tests for Anterior Cruciate Ligament Injuries"
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4151408/, accessed May 4, 2018.

relief … but she is getting recurrent symptoms." Id.  On exam, she had a positive patella grind test and crepitance in the patellofemoral joint, no instability of the knee, and minimal tenderness at the distal IT band insertion laterally.  Id.  PA-C Palmer assessed patellofemoral arthritis and IT band syndrome, improved.  He planned a repeat Euflexxa series, and noted that she would see a physical therapist for quad and VMO (vastus lateralis oblique) strengthening and patellar stabilization.  Id.

Porter had physical therapy sessions on October 23 (75 minutes), October 28 (70 minutes), October 29 (75 minutes), November 1 (75 minutes), November 5 (90 minutes), and November 6 (75 minutes), 2013.  AR414, 415, 417, 419, 421, 423.

On November 8, 2013, Porter underwent a left L5-S1 transforaminal epidural steroid injection for her L4-L5 radiculopathy by Dr. Trevor Anderson at Black Hills Surgical Hospital.  AR367, dup. at AR396.

On November 12, 2013, Porter saw PA-C Palmer at Black Hills Orthopedic & Spine for her second set of Euflexxa injections, the first series in the set in her left knee.  AR818.

On November 12 and 14, 2013, Porter had 70-minute physical therapy sessions.  AR425, 427.

On November 13, 2013, Porter sought ER treatment for left knee and left hip pain after a fall, and saw John Hill, MD.  AR748.  Her back was not tender. She had mild tenderness with range of motion of the left knee and left hip.  Id. X-rays of the left knee were normal.  AR749.  Left hip x-rays showed

calcification in the pelvic soft tissues on the left side, also shown on a prior CT scan (at AR 751), which were likely phleboliths. Id. Dr. Hill discharged her with a prescription for anti-inflammatories and pain medications. AR750.

On November 16, 2013, Porter sought ER treatment for hip pain after she had fallen and landed on her left hip. AR740. She saw Donald Neilson, MD. She reported a history of chronic left hip pain. There was no weakness or edema, she had normal pulses, and mild tenderness over the right greater trochanter. Dr. Neilson treated her with Toradol in the ER and gave her a prescription for Naprosyn. Id.

On November 19, 2013, Porter underwent her second series in the second set of Euflexxa injections. AR816.

On November 20, 2013, Porter had a 70-minute physical therapy session with DPT Pfeiffer. AR430. She told DPT Pfeiffer that after another injection she had no change in pain. AR429. DPT Pfeiffer stated that if no physical therapy gains were seen after a week she would be discharged. AR430.

On November 26, 2013, Porter had a 70-minute physical therapy session. AR431. DPT Pfeiffer said she would be discharged after 2 more visits due to no further gains. AR432.

On November 26, 2013, Porter saw PA-C Palmer to complete the Euflexxa series to her left knee and also evaluate left elbow pain, which she had had for several weeks. AR814. Porter reported that her elbow was stiff and painful in the morning and that her left knee was somewhat improved from the Euflexxa treatment. Id. She reported that a bulging disc caused some radicular left leg

18

pain, and PA-C Palmer commented that a bulging disc could also produce left knee pain.

On examination, PA-C Palmer found a tender lateral epicondyle, pain with resisted wrist extension, pronation, and supination. Porter had full range of motion of the left elbow. PA-C Palmer assessed lateral epicondylitis of the left elbow and osteoarthritis of the left knee. Id. He completed the Euflexxa series. AR815. He discussed treatment for lateral epicondylitis: stretches, elbow pad, ice, heat, NSAIDs, and pain cream. Id.

On November 27, 2013, Crystal Walton, PA at The Rehab Doctors, saw Porter after her transforaminal epidural steroid injection. AR366. Porter stated that "she still cannot stand or walk or do dishes without having severe pain. The injection did resolve her pain when she is lying down ... [S]he is in physical therapy and that has not helped ... Her Nortriptyline helps her at night." The diagnosis was left L4 and L5 radiculopathy. Id.

On November 27, 2013, DPT Pfeiffer wrote a discharge summary. AR511. DPT Pfeiffer noted Porter could perform home exercises properly. And the anterior drawer test and Lachman's test were negative. AR511-12. Subjectively, the patient felt "confident doing exercises at home." She also reported she had had knee surgery with arthroscopic debridement; she ascended and descended stairs with significant pain; she was able to walk <5 minutes without significant pain; she scored 23 on the lower extremity functional scale; and she was unable to squat without pain. Id.

Knee extension was 0 degrees bilaterally, knee flexion was 120/125 degrees bilaterally.  AR512.  Knee strength was 4- to 5-/5.  DPT Pfeiffer said the patient had been seen for 12 sessions with no gains in pain levels or improvement in function.  The one goal she had met was the ability to perform home exercises properly.  Goals for stairs, walking, and squatting were not met.  Since she had plateaued, she was discharged.  Id.

December 20, 2013, Porter saw Kristie Waddell, CNP at community health for gastroenteritis.  AR476-77.  Her medications were Ibuprofen, Vicodin, Dexilant, Nortriptyline, Bupropion, and Viibryd.  AR 476.  CNP Waddell reported a review of systems and clinical examination that were unremarkable, including gastrointestinal symptoms.  AR477.  She prescribed medications and diet for diarrhea.  Id.

On December 27, 2013, Porter saw Anne Fisher, MD, at the ER for low back pain after slipping and falling on a patch of ice.  AR722.  She smoked half a pack a day.  Id.  On physical examination she was sitting in a semi-Fowler's[24] position, had diffuse lower back tenderness, and reported paresthesias of her feet.  DTRs were 2+ at the knees and 0 at both ankles.  She had no weakness, normal sensation, and normal mood, affect, memory, and judgment.  Id.

---

[24] In medicine, Fowler's position is a standard patient position where the patient reclines on an exam bed and the head of the bed is elevated.  It is an intervention used to promote oxygenation via maximum chest expansion and is implemented during events of respiratory distress.  Fowler's position facilitates the relaxing of tension of the abdominal muscles, allowing for improved breathing.  Semi-Fowler's features the head of the bed raised to 30-45 degrees. https://en.wikipedia.org/wiki/Fowler%27s_position, accessed May 4, 2018.

Dr. Fisher compared lumbar spine series (report at AR725) with the September 2013 lumbar MRI.  AR723.  She noted narrowing of the L5-S1 disc space, which was a change.  Id.  Dr. Fisher treated Porter with IV Morphine on top of Fentanyl that she received prehospital and she was able to ambulate.  Id.  She was discharged improved.  Id.

On January 5, 2014, Porter underwent a sacroiliac joint injection at Black Hills Surgery Center.  AR525.

On January 9, 2014, Porter saw Trevor Anderson, MD, at The Rehab Doctors on referral from Jonathan Wilson, MD.  AR362. Dr. Anderson reported the history: 9 years ago she woke with back and leg pain, left greater than right.  She had gone to physical therapy, experienced some improvement, but had recurrent flare-ups since then.  Id.  In August 2013 she had to go to the ER with significant pain. Id.

On the pain diagram Porter indicated aching in her left buttocks; burning, tingling and numbness in her posterior legs to the bottom of her feet; and low back pain. AR362.  She reported that pain levels ranged from 4 to 10, affected her sleep, and that pain was worse with sitting, standing, lifting, bending, twisting, and walking.  Pain was relieved by lying down, ice, and medications. She described sensations of weakness, tingling, and numbness in her legs and feet.  Activities of daily living were limited: walking, stairs, picking up objects off the floor, lifting, reaching, shopping, working and exercise. Id.

She had seen Drs. Anderson, Wilson, Cote, and Community Health for this complaint.  AR362.

Dr. Anderson noted the radiologist's findings on the September 2013 lumbar spine MRI.  AR362.  He noted the November 2013 epidural that allowed Porter to sleep better and lie down afterward but overall was not terribly helpful.  Id.  In further discussion, however, Porter said she thought she had benefit later on; she said she would consider a repeat injection. Id.

Dr. Anderson noted that Porter had undergone trials of Tylenol, Ibuprofen, Meloxicam,[25] Celebrex,[26] Prednisone, Tramadol,[27] Hydrocodone,[28] Gabapentin,[29] Nortriptyline, Pennsaid gel, epidurals, ice, and physical therapy multiple times, and a TENS unit.  AR362.  He noted her history of arthroscopic knee surgery.  Id.  She had smoked for 20 years, one-half pack a day.  Id.  She denied alcohol use.  Id.

---

[25] Meloxicam is an NSAID used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis. https://medlineplus.gov/druginfo/meds/a601242.html, accessed May 4, 2018.

[26] Celebrex (Celecoxib) is an NSAID. https://medlineplus.gov/druginfo/meds/a699022.html, accessed May 4, 2018.

[27] Tramadol (Ultram) is an opiate used to relieve moderately to moderately severe pain.  https://medlineplus.gov/druginfo/meds/a695011.html, accessed May 4, 2018.

[28] Hydrocodone is an opiate available in combination with other ingredients, which are used to relieve moderate to severe pain. https://medlineplus.gov/druginfo/meds/a601006.html, accessed May 4, 2018.

[29] Gabapentin is an anticonvulsant used to relieve the pain of post-herpetic neuralgia and restless leg syndrome. https://medlineplus.gov/druginfo/meds/a694007.html, accessed May 4, 2018.

Porter's review of systems was negative except for depression, low back and bilateral leg pain. AR363. On examination, she was able to walk on toes and heels; squat, perform tandem gait, and had a normal Romberg test. Strength, sensation, and reflexes were normal. Lumbar range of motion was very limited throughout with midline lumbar spine pain. Dr. Anderson observed a left "up-slip."[30] Id.

Dr. Anderson reported normal smooth lumbar pelvic rhythm. AR364. Porter was tender to palpation over the L5 spinous process, and over the sacroiliac (SI) joint and piriformis, left greater than right. Id. The supine piriformis test[31] provoked on the left greater than right. The Faber[32] test provoked groin pain. Id. Straight-leg-raising at 45 degrees caused bilateral calf pain. Prone extension and reverse straight-leg-raise[33] did not change her

[30] "Up-slip" refers to the posterior iliac subluxation, which occurs on the left side. An on-line athletic medicine article discusses pelvis upslip that results in "a cascade of altered arthrokinematics, changes length tension relationships, and reworks normal neurological feedback loop." http://stoneathleticmedicine.com/2014/05/pelvic-upslip-and-rotation-evaluation-and-treatment, last checked May 4, 2018.

[31] The piriformis test is used to screen for piriformis muscle and to detect tightness or other discomforts of the sciatic nerve as it passes through or under the piriformis muscle. https://www.physio-pedia.com/Piriformis_Test, accessed May 4, 2018.

[32] FABER (Patrick's) stands for Flexion, Abduction and External Rotation. The FABER test is a passive screening tool for musculoskeletal pathologies in the middle region of the human body, like hip, lumbar, or SI joint dysfunction, or an iliopsoas spasm. https://www.physio-pedia.com/FABER_Test, accessed May 4, 2018.

[33] Straight-leg-raise (SLR) is a neurodynamic test. Neurodynamic tests check the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression. SLR is a neural tension test that can be

pain.  Id.  Dr. Anderson diagnosed L5-S1 radicular symptoms with an SI joint component.  Dr. Anderson recommended a repeat left L5-S1 transforaminal epidural and physical therapy.  Id.

Dr. Anderson wrote to Dr. Wilson stating, "As you know, she has stenosis at L5-S1 and bilateral radicular symptoms.  She also has some secondary S1 and piriformis pain."  AR365.  He recommended repeating the epidural and physical therapy.  Id.

On January 13, 2014, Dr. Anderson performed a left L5-S1 transforaminal epidural steroid injection into the spinal canal for left L5 radiculopathy.  AR338; dup. at AR361, 813.

On January 14, 2014, Molly Schwab, PA at community health, saw Porter to follow up on her Viibryd and Dexilant, which Porter said were working very well.  AR475.  Clinical examination was unremarkable.  AR475.  The gastrointestinal examination showed her appetite was not decreased, and she had no nausea, vomiting, abdominal pain, diarrhea, or constipation.  Id. PA Schwab assessed depression with anxiety, and esophageal reflux.  AR476.

On January 24, 2014, Porter reported to PA-C Palmer that she had been using the TENS and it helped significantly especially with night pain.  AR812. She had been doing PT and had gotten good strength out of her knee.  With the TENS unit she was able to control her symptoms.  The Euflexxa injections seemed to help better this last series.  Id.  On exam, PA-C Palmer found

---

used to rule in or out neural tissue involvement as a result of a space occupying lesion, often a lumbar disc herniation.  https://www.physio-pedia.com/Straight_Leg_Raise_Test, accessed May 4, 2018.

tenderness at the distal insertion of the IT band on the lateral knee and markedly improved tenderness along the mid substance and proximal IT band. Id. PA-C Palmer assessed osteoarthritis of the left knee and IT band pain, improved. PA-C Palmer told Porter to continue the TENS and home exercises. She could repeat the Euflexxa series after May or June if pain recurred. Id.

On January 31, 2014, Kevin Sobolik, physical therapist at ProMotion Physical Therapy, reported a comprehensive evaluation for Porter, who said she had insidious, progressive, L5-S1 HNP and radiculitis, with onset 8 years earlier. AR374. She reported intensification of radiation to the lower extremities, with exacerbations caused by lifting, walking too much, twisting, turning wrong, and sleeping wrong. She reported that she used a home TENS unit, ice, and relaxation. She reported that she had been to physical therapy "very often over the last 10 years" and found some relief from the exercise. Id.

PT Sobolik reported that Porter stood with no apparent asymmetry; but supine, her left leg was 1 cm. longer. AR374. Extension caused low lumbar "pressure" pain. Bilateral side-bending caused ipsilateral "pressure." Forward flexion with hands to knee increased hip radicular complaints, and with fingertips to floor she had complete radicular complaints in her left lower extremity. Id. He found positive left-lower-extremity neurotension symptoms at 60 degrees on the straight leg raise. Lumbar range of motion with side-bending was reduced by 50 percent. Id.

She had 5/5 strength in her bilateral lower extremities, but reported weakness in the left lower extremity. AR375. Bilateral heel rise increased her

posterior leg radicular complaints. On the biomechanical evaluation, the left SI joint appeared slightly reduced in mobility, both superior and inferior glide, which could be from myofascial guarding. Id. Most all other lumbar mobility testing was painful. Flexion of the lower segments increased Porter's radicular complaints, more so on the left. Sacroiliac testing for pain was negative. Id.

PT Sobolik's impression was that flexion greater than extension exacerbated her discogenic[34] radicular symptoms. AR375. He instructed Porter in 5 exercises for stabilization and range of motion, and applied inversion traction. Porter reported "benefit from traction, but not after performance of this." Id.

PT Sobolik listed functional goals that included an "ODI score" of 25 or less and 75 percent reduction in her radicular complaints within an eight-week time frame. AR375. The foundation of care would be progression of core stabilization. Id. "We will incorporate primarily extension-based lumbar range of motion and lower extremity range of motion and neuromobility exercises." Id. PT Sobolik listed modalities to introduce at the next session to address the sacroiliac joint. Id.

He reported Porter's most recent disability index scores: Pain level 8, lumbar Oswestry score 52. AR375. Porter's "ODI" (Oswestry disability) assessment is at AR 386-87. Porter reported pain levels of 8-9 over the past 24

---

[34] Discogenic back pain: Pain that originates in the disc, as opposed to nerve root compression. Stem Cells Int. 2016; 2016: 3908389. Zeckser, Wolff, Tucker, and Goodwin. "Multipotent Mesenchymal Stem Cell Treatment for Discogenic Low Back Pain and Disc Degeneration." Accessed May 4, 2018.

hours, mild pain at the moment, said that washing and dressing increased her pain, said she could not lift or carry anything at all ("have to watch how I move and lift"), said that pain prevented walking long distances (AR386), that she could sit "as long as I like providing that I have my choice of seating surfaces," that pain prevented standing more than 10 minutes (in addition to other answers related to standing),[35] and that she slept only ¼ of her normal amount (AR387). Porter stated that pain prevented more energetic activities like sports and dancing, that traveling caused increased pain ("as long as I can have breaks I can travel but need to stretch…"), and said she could perform most homemaking duties but pain prevented physically stressful activities like lifting and vacuuming. AR387.

On February 3, 2014, Porter sought ER care for cough and congestion. AR711. James Gilbert, MD, assessed bronchitis with reactive airway disease. AR712. He discharged her with Albuterol inhaler, Phenergan with Codeine, and Prednisone for 5 days, with Zithromax. AR711. He encouraged her not to smoke. Id.

On February 4, 2014, Porter saw Crystal Walton, PA, at The Rehab Doctors. AR360, dup. at AR380, 398. PA Walton recorded the patient's report of effects of epidural infusion: pain was 8/10 before the epidural infusion, 3/10 immediately after, 6/10 the next morning, and ranged from 4-6 through day eleven post-injection. Id. Currently Porter reported her pain level as 4/10.

---

[35] Responses to the ability-to-stand questions were ambiguous because Porter checked all responses except the first and last. AR387.

She said she was very pleased.  She had seen a physical therapist at ProMotion for an evaluation and was no worse after.  Id.  PA Walton noted Porter had a diagnosis of left L5 radiculopathy, and low back pain significantly improved.  PA Walton said that Porter would continue advancing her PT program as she was able to tolerate.  AR360.

PA Walton discussed the disability form that Porter had brought in for Dr. Anderson to complete, and said "the disability company could either order an IME with Dr. Anderson, an FCE with no guarantee that he could address all of the questions and that would require a follow-up visit as well, or he could fill out one of our work forms for the disability company."  AR360.  PA Walton recorded "Dr. Anderson felt that it would be in her best interest to contact Myler Disability who sent her this form and ask them how she should proceed."  AR360.

On February 19, 2014, Porter returned to DPT Pfeiffer at the Physical Therapy Center.  AR433.  DPT Pfeiffer stated that the patient had had PT, chiropractic, and injections with little to no relief.  She was not a surgical candidate at this time so she was looking to therapy to try to offer some relief in pain and get her core as strong as possible.  Id.  Porter told DPT Pfeiffer that she could tolerate sitting 30 minutes or less, standing 15 minutes or less, and walking 20 minutes or less. Id.

On PT examination, Porter had fair "TrA [Transverse Abdominis] and multifidi"[36] strength testing. She was unable to lift and was unable to perform her home exercise program ("HEP") properly. She had positive compression, distraction, and Faber tests, negative tests for lumbar radiculopathy or herniated discs, and normal or slightly restricted lumbar movements. AR434. Upon palpation, she had tightness/trigger points in her lumbar paraspinals, glutes, and piriformis bilat. Lumbar spine movement was mostly normal and hip and knee strength were 5/5. Her pain rating was 8, and Oswestry score 58 (meaning, moderate activity causes significant pain). Id.

She said she was unable to perform ADLs without moderate to severe pain in her back. AR435. DPT Pfeiffer assessed signs and symptoms consistent with SI dysfunction, her referral diagnosis. She demonstrated lack of dynamic core stability especially with higher-level activities, and this contributed to her symptoms. DPT Pfeiffer noted that trigger points throughout the lumbosacral region contributed to pain. Due to Porter's inability to get relief with previous PT intervention, her rehabilitation potential was low. Id. DPT Pfeiffer planned "alternative treatments this round including PRI corrective exercises." Id. She planned to also include lumbar traction and extensive core stabilization in the therapy program. Id.

---

[36] The multifidus is a deep muscle located along the back of the spine close to midline. The multifidus functions with the transverse abdominis and pelvic floor muscles to stabilize the low back and pelvis; these must activate before movement of arms/legs. If the muscle contraction delay or absence is not corrected, it increases the incidence of reinjury. http://dianelee.ca/article-training-deep-core-muscles.php#mutifidus. Last checked May 4, 2018.

On February 21, 2014, Porter had 50 minutes of physical therapy. AR438. On February 24, 2014, she had 63 minutes of therapy. AR441.

On February 28, Kevin Sobolik reported a physical therapy evaluation. AR372, dup. at AR391. The patient reported progressive lumbar spine pain for the last 8 years with intensification of radiation to lower extremities. She now had constant tingling in the left lateral extremity and bilateral foot numbness, with exacerbations caused by lifting, walking too much, twisting, turning wrong or sleeping wrong. Id. She reported the worst pain level as 10/10 and the best as 3/10. She had a home TENS unit, and ice and relaxation and more awareness would reduce exacerbations. She had been to physical therapy at the PT Center "very often over the last 10 years with some temporary relief." Id.

She had a history of left knee osteoarthritis and depression. She was on antidepressants and Nortriptyline. AR372.

PT Sobolik described Porter's pain diagram: aching in her left knee; pins, needles, numbness in the left low lumbar region and bilateral lower extremities, to the left heel and right posterior knee. AR372. Porter had no apparent asymmetry while standing, but when supine, her left leg was 1 cm. longer. Extension caused low lumbar "pressure" pain. Bilateral side bending causes ipsilateral "pressure." Id. Forward flexion with hands and knee increased hip radicular complaints. Fingertips to floor increased left lower extremity "complete" radicular complaints. Id. Porter had positive left-lower-

extremity neurotension symptoms at 60 degrees in the straight leg raise. She had 50 percent of normal lumbar side-bending. Id.

She had full strength in both lower extremities and subjective weakness in the left lower extremity. AR372. Bilateral heel rise induced an increase in posterior lower extremity radicular complaints. Id. PT Sobolik reported results of his biomechanical evaluation: the left SI joint appeared slightly reduced in mobility, both the superior and inferior glide, which could be myofascial guarding. Most all other lumbar mobility testing was painful. Id. Flexion of the lower segments increased radicular complaints, left greater than right. AR372-73. Sacroiliac testing for pain was negative. AR373. PT Sobolik stated the physical therapy impression: Flexion greater than extension exacerbating discogenic radicular complaints. Id. He instructed Porter in 5 exercises for stabilization and range of motion, and applied inversion traction. Porter reported benefit from traction. AR373.

On March 11, 2014, Molly Schwab, PAC at community health, dispensed Viibryd 40 mg. AR475.

On March 12, 2014, DPT Pfeiffer noted that Porter had missed physical therapy for 2 weeks due to her son having mononucleosis. She had 45 minutes of therapy on that date. AR444.

On March 13, 2014, Porter saw Stephen Dick, MD, at the ER, for complaints of feeling weak, run down, persistent cough, and persistent problems breathing. AR704. Her lungs were clear, and she improved

considerably after a duo nebulizer.[37]  AR705.  Dr. Dick "suspect[ed] her

symptoms are related to the … reactive airway scenario with her bronchitis."

Id.  Her chest x-ray was read as negative.  AR708.

On March 19, 2014, DPT Pfeiffer recorded that Porter had missed her

Friday appointment because she was sick and vomiting.  AR447.  Porter had

45 minutes of therapy on this day, 45 minutes on March 26, 55 minutes on

April 2, 45 minutes on April 4, 45 minutes on April 8, and 45 minutes on April

18, 2014.  AR448-62.

On March 29, 2014, a chest-x-ray was interpreted as showing no

abnormalities.  AR703.

On April 9, 2014, PA Schwab dispensed Viibryd 40 mg. AR474.

On April 18, Porter reported trying to do exercises on her own but said it

was difficult to do them consistently.  Her sitting tolerance continued to be 30

minutes or less, standing tolerance 15 minutes, and walking tolerance 20

minutes.  AR462.  DPT Pfeiffer again noted "fair TrA and multifidi strength

testing. Unable to lift." Id.  Sacroiliac joint integrity tests – compression,

distraction, and Patrick's Faber – were positive.  DPT Pfeiffer observed

tightness/trigger points of the lumbar paraspinals, glutes, and piriformis B and

normal lumbar spine movements except for extension, which was slightly

---

[37] Nebulizer:  In medicine, a nebulizer is a drug delivery device used to
administer medication in the form of a mist inhaled into the lungs.  Nebulizers
are commonly used for the treatment of cystic fibrosis, asthma, COPD, and
other respiratory diseases or disorders.
https://en.wikipedia.org/wiki/Nebulizer, accessed May 4, 2018.

restricted.  AR463.  Porter had full strength of hips, knees and ankles, and negative tests for lumbar radiculopathy or herniated discs.  Id.

On April 19, 2014, Porter sought ER care for respiratory complaints.  She was noted to be a smoker.  AR693.  She had a barky cough and said, "I have been trying to quit smoking and now my coughing is worse."  AR695.  The impression was acute bronchitis and tobacco abuse.  AR694.  She was treated with an Albuterol inhaler, Tessalon Perles,[38] and a Z-Pak.[39]  AR693.  She had a full range of motion in all extremities, no gross weakness or edema, and normal mood, affect, memory, judgment, grooming and hygiene.  AR693, 695.

On April 22, 2014, Porter saw CNP Grimsrud for her depression.  AR473.  Her medications were Vicodin, Ibuprofen, Dexilant, Bupropion, Nortriptyline, and Viibryd.  Id.  CNP Grimsrud said that Porter had previously seen Molly Schwab, PA, for depression and GERD.  The patient denied concerns about her current medication.  She said she was being treated for upper respiratory infection with a Z-pak and Tessalon Perles and was not feeling better.  She complained of chest tightness and wheezing.  AR473.  Clinical exam, including psychiatric exam, was negative except for tight, diffuse wheezes throughout the lungs.  AR473-74.  CNP Grimsrud ordered a nebulizer treatment.  AR474.  She added Prednisone and Advair Diskus[40] to the medication regimen.  Id.

---

[38] Tessalon Perles (Benzonatate) is a non-narcotic cough medicine. https://www.drugs.com/mtm/tessalon-perles.html, accessed May 4, 2018.

[39] Z-Pak (see Azithromycin).

[40] Advair Diskus is a combination of fluticasone and salmeterol and is used to prevent wheezing, shortness of breath, coughing and chest tightness caused by

On May 13, 2014, Porter saw Karron Zopp at community health for sore throat cough, and tenderness under the neck and pain when swallowing. AR560. Porter still smoked every day. Id.

On May 27, 2014, DPT Pfeiffer wrote a physical therapy discharge summary. AR508. She stated that Porter had been doing her HEP regularly, and reported no change in leg or back symptoms. Id. Objectively she had "fair" strength testing of the TrA and multifidi. She was able to perform her HEP properly. Id.

The physical therapy examination was normal except for slightly restricted lumbar extension. AR509. The patient had been seen for 11 sessions and had been unable to demonstrate any significant changes in subjective levels of pain or function. She was compliant with her home strength and stability program. Id.

On May 29, 2014, Porter saw CNP Grimsrud for her depression. She was on Bupropion and Viibryd and did not think they were helping. AR470, dup. AR559. She endorsed high irritability, emotional lability, and depression. AR471. On examination, she was well groomed, her speech was organized and articulate, she had appropriate eye contact and effect, and expressed no abnormalities in thought content, perception or process. Id. CNP Grimsrud

asthma and chronic obstructive pulmonary disease. Side-effects include runny nose, sneezing, throat irritation, sinus pain, headache, nausea, vomiting, diarrhea, choking or difficulty swallowing, and multiple other side-effects. https://medlineplus.gov/druginto/meds/a699063.html, accessed May 4, 2018.

assessed allergic rhinitis, depressive disorder NEC, and esophageal reflux.  She initiated Abilify 2 mg a day, and said Porter would be seen in 3 months or sooner if needed.  Id.

Her laboratory report on this date showed elevated thyroid stimulating hormone and low Vitamin D, low hemoglobin, mean corpuscular volume, mean corpuscular Hgb, and mean corpuscular Hgb concentration, with elevated red cell distribution width.  AR478. Her calcium level and albumin were low, and alkaline phosphatase was elevated.  AR479.

On June 2, 2014, Porter saw Dr. Daniel Hofmann at the ER for back and leg pain.  AR922.  She reported she had a history of chronic back pain treated with injections, and had a TENS unit.  She reported she had been diagnosed with neuropathy in her feet of unknown cause and had been tried on Gabapentin without relief.  She had had 3 days of exacerbation of her back pain and parasthesias in her feet.  Id.  She had a negative exam.  AR922-23.  Dr. Hofmann treated her with Toradol IM and a prescription of Tramadol.  AR923.  His clinical impression was exacerbation of chronic low back pain and exacerbation of neuropathy of the feet.  Id.

On June 8, 2014, Porter saw Patrick Tibbles, MD, at the ER, for several days of worsening cough, and other upper respiratory symptoms.  AR915.  She was said to be an ongoing smoker, "6 cigs packs per day."  Her O2 saturation was 97%.  She was using asthma medications without relief.  Her cough was severe and she was unable to sleep.  Id.  On physical exam she had very mild pharyngeal erythema and bilateral rhonchi and wheezing.  Id.  Chest x-ray was

normal.  AR916, 921.  She was given a Combivent[41] inhaler and was
admonished to stop smoking.  Dr. Tibble's impression was acute bronchitis,
acute bronchospasm, asthma exacerbation, and ongoing tobacco dependence.
AR916.  The remainder of her physical and psychological examinations were
unremarkable.  AR915.

On June 14, Porter sought ER treatment for back pain and coughing.
AR911.  She stated that she had just run out of her Tramadol and Lyrica.
AR911-12.  She smoked a half-pack a day.  AR911.  On physical examination,
she had decreased breath sounds bilaterally, her back was non-tender, her
extremities had no gross weakness or edema, and she had normal mood, affect,
judgment, and memory.  AR911-12.  She was discharged home with Lyrica and
Tramadol.  AR912.

On June 16, 2014, Porter saw CNP Zopp at community health, for cough,
body aches, and fatigue.  AR558. She reported going to the ER 2 weeks earlier.
She was placed on a Z-Pak but said she had been coughing non-stop and that
she had bad body aches and chills.  Id.  CNP Zopp noted her current
medications:  Ibuprofen, Nortriptyline, Levothyroxine,[42] Abilify, Vitamin D2
50,000 units twice a week for 8 weeks, Viibryd, Dexilant, Bupropion, Advair

---

[41] Combivent is a bronchodilator, a combination of albuterol and ipratropium
used to prevent wheezing, difficulty breathing, chest tightness, and coughing in
people with chronic obstructive pulmonary disease (COPD).
https://medlineplus.gov/druginfo/meds/a601063.html, accessed May 4,
2018.

[42] Levothyroxine (Synthroid) is a thyroid hormone used to treat
hypothyroidism.  https://medlineplus.gov/druginfo/meds/a682461.html,
accessed May 4, 2018.

Diskus, and Combivent.  Id.  The patient was a "light" tobacco smoker.  She did have a mild fever.  Auscultation revealed fine crackles anteriorly and diminished breath sounds in the bases bilaterally.  Id.  CNP Zopp assessed cough, fever, and simple chronic bronchitis.  AR559.  She planned a chest x-ray or other imaging of the chest, Prednisone 40 mg. a day for 5 days, and Tessalon Perles. Id.

On June 18, 2014, Porter saw CNP Grimsrud at community health for left hip and left pain, which she had had for 5 days.  AR557.  She complained of pain with standing and with movement of the hip.  She was on Lyrica,[43] Tramadol, and Ibuprofen through Pain Management and saw the "Rehab MDs" for injections.  Id. The musculoskeletal examination was unremarkable with some subjective pain on motion of the left hip, and a normal range of motion of all extremity joints.  Id.  CNP Grimsrud assessed hip joint pain.  Id.  She prescribed Meloxicam and instructed Porter to not take Ibuprofen/Aleve while on this medication.  AR558.

On June 30, 2014, Porter saw PA-C Kayla Czmowski at community health for possible bronchitis.  AR555.  After her 5-day Prednisone burst, most of her symptoms had resolved.  Id.  PA-C Czmowski assessed "simple chronic bronchitis," prescribed Tessalon and told Porter to increase fluids, rest and "QUIT SMOKING!"  AR556.

---

[43] Lyrica (Pregabalin) is an anticonvulsant used to relieve neuropathic pain. https://medlineplus.gov/druginfo/meds/a605045.html, accessed May 4, 2018.

On June 30, 2014, PA Walton reported that Porter was last seen at The Rehab Doctors on February 4, 2014. AR488. PA Walton noted Porter had a left L5-S1 transforaminal epidural steroid injection in January 2014, did very well, went to approximately 8 physical therapy treatments, and did not really note additional improvement. Id. Recently her pain came back and "is exactly the same as it was before." PA Walton reported her examination: the patient had some discomfort with left hip maneuvers. Compression of the SI joint was somewhat painful. Faber was restricted. SLR was very positive. Id. PA Walton assessed left L5 radiculopathy, and a hip and SI component. She planned to schedule another epidural. If Porter continued to have SI or hip maneuvers [sic], that problem would be addressed later. Id. PA Walton agreed to call in a refill of Lyrica. Id.

On July 7, 2014, Porter underwent a left L5-S1 transforaminal epidural steroid injection, administered by Dr. Anderson. AR523.

On July 9, 2014, Porter saw Ashley Rook, PAC at community health, for her continued bronchitis. AR553. She reported that she coughed so hard she got light-headed. She was still using three inhalers and Tessalon. She also had a headache. Id. She reported she was making an effort to cut back and hopefully quit smoking, but she was still an everyday smoker. AR554. She was on Prednisone 40 mg. a day for 5 days. Id. Her oxygen saturation was 97 percent. Id. Auscultation revealed mild expiratory wheezes in upper and lower lung fields, normal respiration, and no accessory muscle use. Her psychometric depression scale was negative. Id. The assessment was "simple

chronic bronchitis." Id.  _PA Rook renewed the prescription for Prednisone 40 mg for 5 days.  AR555.  She continued Tessalon and inhalers.  PA Rook encouraged continued efforts to quit smoking.  Id.

On July 14, 2014, Porter saw Clay Smith, MD, at the ER, for severe back pain involving both the lumbar and thoracic spine after vacuuming and shampooing carpet earlier that day.  AR906.  Porter continued to smoke ½ pack of cigarettes daily.  Id.  Dr. Smith ordered Toradol and prescribed a short course of Tramadol.  AR907.  His clinical impression was lumbar and thoracic back pain and atraumatic back pain.  Id.  The physical examination demonstrated no extremity edema or gross weakness, no CVA or midline back tenderness, and normal mood, affect, memory and judgment.  Id.

On July 22, 2014, the laboratory reported low hemoglobin and hematocrit, mean corpuscular volume, mean corpuscular Hgb, and mean corpuscular Hgb concentration, with elevated red cell distribution width. AR568.

On July 22, 2014, Porter sought ER treatment for shortness of breath. AR902.  Chest x-ray was normal.  Id.  AR 905.  Her lungs were clear, pulmonary vascularity was within normal limits, and pleural spaces were unremarkable with no evidence of pneumothorax or effusion.  AR902.

On July 26, 2014, Porter sought ER treatment for persistent cough, wheezing, and shortness of breath.  AR894.  She had been camping for several days and was exposed to smoke.  She had been using her inhaler and nebulizers without relief.  Id.  On exam, she did not have respiratory distress or

wheezing.  Id.  Chest x-ray was normal.  AR895, 899.  She had unremarkable extremity and psychological examinations.  Id. She was given a Combivent inhaler, Prednisone, and Azithromycin.[44]  AR895.  Dr. Tibbles' clinical impression was acute dyspnea, asthma exacerbation, acute bronchitis and longstanding tobacco dependence.  Id.

On July 28, 2014, PA Walton of The Rehab Doctors reported the L5-S1 transforaminal epidural steroid injection on July 7 helped Porter's back pain and somewhat helped her leg pain but did nothing for hip and groin pain. AR487.  Pain levels had fluctuated from 6-9 out of ten since the injection to that appointment.  She reported that she had seen an orthopedist who told her she had bone-on-bone knee arthritis and would likely require a knee replacement.  Id.  Porter had very positive hip maneuvers on the left and a non-painful knee exam.  Id.  PA Walton assessed left hip degenerative joint disease, left L5 radiculopathy, and low back pain improved.  She scheduled a left hip joint x-ray.  Id.

Porter's second medical visit on July 28 was to CNP Grimsrud for upper respiratory symptoms.  AR552.  She had received 3 5-day steroid bursts since mid-May and a Z-Pak, plus numerous inhalers and OTC medications.  She continued to smoke daily.  She complained of feeling tired or poorly.  Id.

---

[44] Azithromycin (Zithromax, Z-Pak) is a macrolide antibiotic used to treat certain bacterial infections.
https://medlineplus.gov/druginfo/meds/a697037.html, accessed May 4, 2018.

CNP Grimsrud assessed "obstructive chronic bronchitis with acute bronchitis. AR553. She counseled Porter on cessation of tobacco. Id. CNP Grimsrud discussed the case with Dr. Blower and he recommended no further antibiotics or steroids, but rather a CBC.[45] Id. CNP Grimsrud wrote, "Due to a medical condition the patient requires 2-3 liters of oxygen at night ... and also during daytime naps." AR575.

On July 28, 2014, Porter's third medical visit was to the ER where she saw Dr. Neilson. AR900-01. She complained of shortness of breath and increasing chest tightness. AR900. She was a current daily smoker with "no prior history of asthma or COPD though it is thought at this point she has some variation of an obstructive pulmonary disease." Id. Physical exam revealed diffuse biphasic wheezing but no respiratory distress. AR900-01. She was given a nebulizer treatment with significant improvement, though she still had diffuse rhonchi. AR901. She was given a second nebulizer treatment and felt significantly better. Clinical impression was bronchospasm and cough. Id. She had unremarkable extremity and psychological examinations. Id.

On July 29, 2014, Porter saw Grimsrud for medication follow-up. AR551. She reported being a "former smoker." She reported having a cough and bronchitis for several weeks, had been on two courses of Azithromycin, currently was on Prednisone and Zyrtec,[46] and said she was not feeling better.

---

[45] The court infers CBC to refer to a complete blood count.

[46] Zyrtec (Ceterizine) is an antihistamine used to temporarily relieve symptoms of hay fever or hives. https://medlineplus.gov/druginfo/meds/a698026.html, accessed May 4, 2018.

The clinical physical and psychiatric examinations were unremarkable. AR551-52. CNP Grimsrud ordered laboratory studies. AR552. The laboratory reported elevated TSH and vitamin D. AR568.

On August 11, 2014, David Griffith, MD, interpreted an MRI of the left hip. AR521-22. He found mild insertional gluteus medius tendinitis but no evidence of macrotear affecting the hip; he found a left adnexal cyst that was likely ovarian. AR522. There were no signs of entrapment neuropathy in the sciatic nerve region, no perisciatic irritation or scarring, take off of the hamstring complex was unremarkable, and there was no muscle atrophy or denervation. AR521.

On August 19, 2014, Porter saw PA Walton, who reported (cc: Jonathan Wilson, MD) that Porter had been seen a week earlier for continued hip joint pain. Her x-rays had been fairly unremarkable but an MRI indicated mild insertional gluteus medius tendonitis, and a left adnexal cyst. Symptoms of left gluteal and left groin pain were unchanged. PA Walton planned referrals to physical therapy and gynecology. AR486.

On August 22, 2014, Porter sought ER treatment for headache. AR889. She reported a history of migraines and said she had a couple a month for over a decade. The headache was behind her right eye. She was unable to tolerate bright lights. Id. She was treated with Morphine and Phenergan IM. AR890. Dr. Hill's clinical impression was acute cephalgia, and history of migraines. Id.

On August 27, 2014, Porter saw CNP Grimsrud for headaches. AR549-50. She was said to be a former smoker. AR550. She stated that she used to

42

get frequent migraines but had not had one in years.  She said that she had had this continuous headache for two weeks.  She said it was a migraine at one point and she sought ER care, and was given morphine.  Id.  Porter said The Rehab MD recently took her off Nortriptyline and that coincided with the start of headaches.  Id.  Physical and psychiatric exams were unremarkable except for headache and diminished breath sounds with scattered wheezes.  Id.  CNP Grimsrud prescribed Amitriptyline[47] 25 mg. at bedtime.  AR551.

On September 3, 2014, Dr. Pfeiffer reported a physical therapy evaluation.  AR505.  The patient complained of left hip pain and had a history of chronic pain including her low back, buttock and knee pain.  She stated she had tried injections, PT, massage, and rest, with minimal improvements in pain levels.  She reported significant stiffness and lateral hip pain that limited her standing and walking.  Crystal Walton, PA, had diagnosed gluteus medius tendinitis and referred her.  Id.

Subjectively, the patient ascended and descended stairs with pain and difficulty, could walk <10 min, tolerate sitting for 30 minutes and stand 5-10 min or less without aggravating pain.  She reported quite a bit of difficulty performing usual housework activities.  Id.  She had positive Ober's test[48],

_____

[47] Amitriptyline (Elavil) is a tricyclic antidepressant used to treat symptoms of depression.  It is also used to treat post-herpetic neuralgia and to prevent migraine headaches.  https://medlineplus.gov/druginfo/meds/a682388.html, accessed May 4, 2018.

[48] Ober's test is used in physical examination to identify tightness of the iliotibial band (iliotibial band syndrome).  https://en.wikipedia.org./wiki/Ober%27s_test, accessed May 4, 2018.

positive piriformis, SLS[49] 10 sec on R, and was unable to stand on L. AR506.

The Faber test and Trendelenburg's[50] were positive, and hip scour[51] was

positive. Hip strength ranged from 4- to 5-. Id.

Goals to be achieved by October 15, 2014, were to be able to walk

without significant pain for 15-20 minutes, stand 15 minutes, report 30%

improvement in performing daily housework activities, and be independent

with a finalized HEP. Id. DPT Pfeiffer stated that Porter presented with signs

and symptoms consistent with the referring diagnosis. DPT Pfeiffer stated that

Porter had significant tightness throughout the posterior and lateral hip

musculature, poor motor control, and stability of hips and core. AR506. This

was limiting her ability to stand, walk, and perform her regular ADLs. Rehab

potential was fair. Id. She would be seen twice a week for 6 weeks. AR507.

---

[49] SLS, i.e., single-leg stance. Performed with eyes open and arms on the hips the participant must stand unassisted on one leg and is timed in seconds from the time one foot is flexed off the floor to the time when it touches the ground or the standing leg or an arm leaves the hips.

[50] Trendelenburg test. A physical examination finding associated with various slip abnormalities (those associated with abduction muscle weakness or hip pain or congenital hip dislocation, hip rheumatic arthritis, osteoarthritis) in which the pelvis sags on the side opposite the affected side during single leg stance on the affected side during gait, compensation occurs by leaning the torso toward the involved side during stance phase on the affected extremity. https://www.physio-pedia.com/Trendelenburg_Test, accessed May 4, 2018.

[51] Hip scour test is a test for hip labrum, capsulitis, osteochondral defects, acetabular defects, osteoarthritis, avascular necrosis, and femoral acetabular impingement syndrome. https://www.pthaven.com/page/show/162468-scour-test, accessed May 4, 2018.

On September 8, 2014, Porter had 45 minutes of physical therapy and positive findings on the usual tests. (Ober's, Faber, piriformis, Trendelenburg, SLS, hip scour, and strength testing of the hip). AR503. She had high irritability with lateral leg mobilization. AR504.

On September 10, 2014, Porter had 45 minutes of physical therapy and commented, "Weather change makes my knee sore." She noted subjective reports that climbing stairs was painful and difficult and that the patient could tolerate sitting for 30 minutes. Id. Dr. Pfeiffer reported positive Ober's, piriformis, Trendelenburg's and hip scour, "SLR 10 sec on R. Unable to stand on L." AR502. She reported hip strength ranging from 4- to 5-. AR502. DPT Pfeiffer assessed slight improvement in tolerance to mobilization. Id.

On September 15, 2014, DPT Pfeiffer reported limitations and positive tests as before. She provided 45 minutes of physical therapy. AR499-500.

On September 17, 2014, DPT Pfeiffer stated that Porter continued to report IT band pain. AR497. She reported limitations and positive tests as before. AR497-98.

On September 24, 2014, PA-C Palmer reported a follow-up visit at Black Hills. AR810. Regarding her left knee, Porter reported pain across her lateral hip down to lateral knee. The Euflexxa series did not seem to affect her knee pain, which had never been in the joint but was more superior and lateral to the knee and radiated upward along the IT band over the greater trochanter in to the lumbar spine region. Id. Sometimes she got radiating pain down the right leg but it was more significant on the left. Epidural injections to her back

did not affect the pain; physical therapy had not really helped.  Id.  She experienced numbness at times clear down to her foot.  Id.

On exam, PA-C Palmer noted mildly positive SLR, tenderness all along the IT band down to the distal insertion on the lateral femoral condyle up over the greater trochanter into the sciatic notch and SI joint.  AR810.  He noted tenderness from about L-2-3, L4-5, and L5-S1.  PA-C Palmer reviewed the December 2013 lumbar MRI and said it showed disc herniation with migration of a loose piece into the lateral foramen that was impinging on the exiting L4-5 nerve root.  "Certainly this could be reproducing her discomfort."  PA-C Palmer assessed low back pain, laterally displaced disc herniation at L4-5; early degenerative arthritis of the left knee, unresponsive to Euflexxa.  He stated that Porter had "known disc herniation with foraminal impingement at L4-5 one year ago[,] not responsive to conservative care.  Id.  PA-C Palmer told Porter that he believed the leg pain was radicular and that a lumbar MRI should be repeated to re-image the lateral disc herniation at L4-5.  AR811.  He wanted her to see Robert Woodruff, MD, orthopedic surgeon at Black Hills Orthopedic & Spine Center,[52] to get his opinion about a possible lumbar microdiscectomy.  Id.

On September 26, 2014, Stephen Pomeranz, MD, interpreted a lumbar MRI.  AR519-20, dup. at AR887, et seq.  He reported a shallow disc bulge at

---

[52] https://www.bhosc.com/experts/robert-woodruff-md, accessed May 4, 2018.

L5-S1 associated with facet arthropathy, mild left foraminal narrowing, and abutment of the exiting left L5 nerve root.  AR519.

On September 26, 2014, Porter underwent a sacroiliac joint injection at Black Hills Surgery Center.  AR526.

On September 29, 2014, Porter had 45 minutes of physical therapy. AR495.  Porter reported that her sleep was improved with medication.  Id.  She ascended and descended stairs with pain and difficulty.  She could tolerate sitting for 30 minutes.  Id.  Dr. Pfeiffer listed positive findings.  AR496.  Porter had a positive Ober's test, positive piriformis, SLS 10 seconds on the right and unable to stand on the left.  Id.  Faber, Trendelenburg's, and hip scour tests were positive.  Strength testing of the hip ranged from 4- to 5.  Id.

On September 29, 2014, Porter called community health and talked to PA-C Czmowski about "significant bilateral lower extremity swelling over the past week."  AR548.  PA-C Czmowski advised her to elevate her legs and call in the morning.  Id.  On September 30, 2014, Porter sought ER treatment for complaints of lower back pain, leg and foot pain.  AR883.  She had been unable to get into her PCP and was scheduled to see Dr. Woodruff.  Id.  A limited physical examination was unremarkable.  Id.  The ER physician, Dr. Miller, reviewed the prescription drug usage through a state monitoring program and doubted this was a duplicitous attempt to get narcotics.  AR884.  He prescribed Norco and a muscle relaxant to get her through the days until her appointment with Dr. Woodruff.  His impression was exacerbation of chronic back pain, and radiculopathy.  Id.

On October 2, 2014, Porter saw Robert Woodruff, MD, at Black Hills Orthopedic & Spine Center, for an initial evaluation, upon the referral of PA-C Dan Palmer. AR808. Porter reported relevant history: pain for the last 8 years in the back and buttock, into her hip, and occasionally down the left posterior thigh. On average her pain level was 4/10, and at worst it was 10/10. "It's numbness tingling stabbing and burning achiness and pins and needles in quality." Id. Dr. Woodruff recorded, "It's worse [when] she bends twist lifts stands and does housework better when she takes breaks." She was in physical therapy less than a year ago. She had tried heat, ice, Hydrocodone, Flexeril, Meloxicam, and Ibuprofen. She had had 3 epidural injections that helped for 2-3 hours. Id. Porter told Dr. Woodruff that she quit smoking about 2 weeks ago and was using a vapor cigarette. She had weight gain from inactivity and weighed 176. Id.

On exam she had tenderness to palpation of spinous processes L4 and L5, sciatic notch tenderness on the left, and limited range of motion of the lumbosacral spine: 45 degrees flexion and 15 degrees extension. Lumbosacral spine pain was not elicited by flexion. Straight-leg-raise (SLR) test was abnormal bilaterally. Contralateral SLR was negative. Patrick-Faber test was positive on the left. Id. She had tenderness on palpation of the trochanteric bursa. AR809. Sensory abnormalities were noted in the left leg. Strength was normal. Antalgic gait was observed but she could heel and toe walk. Reflexes that were tested were normal. Id.

Dr. Woodruff reviewed Porter's September 26, 2014, MRI and compared it to her September 2013 MRI. AR809. He stated, "She has degenerative disc disease L5-S1 with Modic[53] change." She had 50% loss of height at L5-S1, a broad-based disc bulge and a left paracentral/foraminal disc protrusion that seemed to abut the L5-S1 nerve root on the left. Id. Dr. Woodruff discussed options. Since back pain was a significant part of her symptoms, she could consider fusion. Disc replacement surgery was available in Denver. She could not afford to go to Denver for disc replacement. She needed to quit smoking before deciding on her surgery. "Once she has quit ... set up an appointment with me about 2 weeks later." Id.

On October 7, 2014, DPT Pfeiffer noted that Porter saw a surgeon who was going to fuse L5/S1. AR493. She complained of pain and swelling in both feet. She had not yet seen a physician for thyroid complications. Id. Ober, Faber, Trendelenburg, and hip scour tests were positive. AR494. She had positive piriformis, "glute med and glute max tightness. SLS 10 sec on R. Unable to stand on L." Id. She was unable to finish standing exercises due to pain in both feet. Id. The treatment plan would include work on Porter's hip. Dr. Pfeiffer planned to progress to a hip/core stabilization program and motor control retraining program to assist Porter with maximizing her biomechanics and reducing chronic irritation of hip tissues. Id.

---

[53] Modic changes (MC) are bone marrow lesions on magnetic resonance imaging (MRI). http://www.thespinejournalonline.com/article/S1529-9430(15)01506-5/fulltext, accessed May 4, 2018.

On October 8, 2014, Porter saw CNP Grimsrud for complaints of bilateral pedal edema and a puffy face. AR546. She had noticed rapid weight gain the previous two weeks. AR547. Her feet were tender and her clothes did not fit. She weighed 182. Physical and psychiatric exams were unremarkable except for a few rhonchi in the lungs. CNP Grimsrud assessed abnormal weight gain and dispensed hydrochlorothiazide.[54] Id. She counseled Porter on the cessation of tobacco. Id.

On October 14, 2014, DPT Pfeiffer wrote a discharge summary from physical therapy. AR490. She noted: "ascends and descends stairs with pain and difficulty." Porter was able to walk without significant pain for less than 10 minutes. She could sit 30 minutes, and stand 10 minutes. Id. The patient reported quite a bit of difficulty performing usual housework activities. Dr. Pfeiffer reported a positive Ober's test, hip flexion to 100 degrees before pain, and positive piriformis, "glute med and glute max tightness. SLS 15 sed R. 10 sec on L." Id.

Dr. Pfeiffer reported that Porter was able to perform her HEP properly. AR491. Her Faber (Patrick) test for hip was positive. The Trendelenburg sign for "glut med weakness for tear" was positive. Hip scour was positive for stiffness. Hip strength ranged from 4- to 5/5. DPT Pfeiffer stated that the decision to discharge was based upon no improvements in pain levels and lack of ability to consistently attend therapy. Therapist and patient agreed that she

---

[54] Hydrochlorothiazide (HCTZ) is a diuretic used to control high blood pressure or edema. https://medlineplus.gov/druginfo/meds/a682571.html, accessed May 4, 2018.

should return to therapy following lumbar surgery at which time they could

work to maximize her function.  Id.

On October 21, 2014, CNP Grimsrud dispensed Levothyroxine.  AR545.

On October 24, 2014, Porter told Dr. Woodruff she was not getting any

better or any worse.  AR806.  She told Dr. Woodruff that she had quit smoking

a month before and she was ready to consider surgical options.  She said she

had about 50-50 back pain and leg pain.  She had had multiple sessions of

physical therapy with no relief.  Id.  On exam, she was in a mild amount of

discomfort, she walked with a normal gait, had intact sensation in her legs,

positive SLR on the left, and normal pulses and strength.  Id.  On the right, she

had positive Faber, thigh thrust,[55] Gaenslen's,[56] and equivocal compression

test.  On the left, she had positive Faber, Gaenslen's and equivocal

compression test.  Id.  Dr. Woodruff assessed L5-S1 degenerative disc disease

with possible bilateral sacroiliitis.  He planned bilateral SI joint injections.  Id.

> If she gets minimal relief from this, I think we can move forward
> with more confidence that the L5-S1 level is her pain generator.
> One more test that we could add would be a discogram; however, I

[55] Thigh thrust, a/k/a posterior pelvic pain provocation test is a pain
provocation test used to determine the presence of sacroiliac dysfunction.
https://www.physio-pedia.com/Posterior_pelvic_pain-provocation_test_
(aka_Thigh_Thrust_aka_Posterior_Shear), accessed May 4, 2018.

[56] Gaenslen's Test is one of the five provocation tests that can be used to detect
musculoskeletal abnormalities and primary-chronic inflammation of the
lumbar vertebrae and Sacroiliac joint (SIJ).  The subsequent tests include: the
Distraction Tests, Thigh Thrust Test, Compression Test and the Sacral Thrust
Test.  https://www.physio-pedia.com/Gaenslen_Test, accessed May 4, 2018.

don't think it would give us much useful information as the L5-S1 level is the only degenerated disc.

AR806-07.

On October 28, 2014, Porter saw Ms. Fitzgerald for a pap smear. AR542. She reported she had quit smoking 2 weeks before. She felt congested in her chest. AR543. Her medical history included ovarian cystectomy and orthopedic surgery on her knees. Id. On exam she had wheezing, rhonchi, rales and crackles. Her abdomen was very firm with tenderness to palpation of left lower quadrant, slight abdominal guarding and rigidity. Her uterus was enlarged. The psychometric depression scale was negative. Id. Mental status was normal and affect was slightly blunted. Porter underwent transvaginal ultrasound. AR544. Ms. Fitzgerald strongly encouraged her to not start smoking again and told her that her lung sounds were adventitious. AR545.

On October 30, 2014, Porter saw Steven Dary, a CNP student supervised by CNP Grimsrud at community health. AR541. This was a 3-month follow-up and medication review. Medications were Combivent, Albuterol, Nebulizer supplies, Advair Diskus, Tessalon, Ibuprofen, Meloxicam, HCTZ, Dexilant, Levothyroxine, Ergocalciferol,[57] Abilify, Viibryd, and Bupropion. Id. Porter told Mr. Dary that she recently started smoking again due to a family member smoking around her. She felt that all of her medications were working well for her and she did not report side effects. The ROS was negative. Id. The clinical physical and psychiatric examinations were unremarkable. AR542. The

---

[57] Ergocalciferol is Vitamin D, which helps absorption of calcium. https://medlineplus.gov/vitamind.html, accessed May 4, 2018.

psychometric depression scale was administered, and Mr. Dary said that Porter would be referred to a mental health counselor.  Her assessment was congenital hypothyroidism, depressive disorder, and esophageal reflux.  Id.

On November 11, 2014, Porter underwent an injection of steroid and anesthetic into the spinal canal for her diagnosis of thoracic/lumbosacral neuritis/radiculitis, unspecified.  AR531.

On December 5, 2014, Dr. Anderson administered bilateral SI joint steroid injections. AR518, dup. at AR804.

On December 19, 2014, Dr. Woodruff reevaluated Porter, who reported that her bilateral SI joint injections provided about 10% relief for 3-4 days.  AR802.  Pain levels continued at 6-8/10.  Mostly the pain was in her back and it would progress down her left leg in an L5 or S1 distribution.  She told Dr. Woodruff that she quit smoking 2-3 months ago and wanted to consider surgery.  Id.  On examination, her lumbar ROM was limited, pulses were 2+, straight-leg-raising reproduced left leg pain, and she had no motor or sensory deficits.  Her x-rays and MRI showed degenerative disc disease at L5-S1 with mild impingement of S1 nerve roots and some foraminal narrowing secondary to the bulges.  Dr. Woodruff stated that he did not think her SI joints were involved and that he could treat L5-S1 with confidence.  He discussed options, an anterior lumbar interbody fusion (ALIF), which had a higher risk of nonunion, vs. a transforaminal lumbar interbody fusion (TLIF) 360-degree

approach.  He discussed the use of bone morphogenetic proteins (BMP)[58], and she was open to this.  Id.

On January 9, 2015, CNP Murphy saw Porter for right elbow pain and tendonitis flare for 5 days.  AR539-40, dup. at AR635-36.  Right wrist movements resulted in pain in the proximal forearm, soft tissue pain in the right elbow, and painful extension, flexion, and rotation of the elbow.  AR540.  CNP Murphy wrote, "No depression."  Id.  Objectively, Porter weighed 180.  She had pain and swelling of the elbow, and supported the right forearm with the left hand.  Elbow motion abnormal.  There was no sign of infection, nodules or instability.  The patient also reported thigh muscle cramps.  Elbow x-rays showed "inconclusive occult fracture" and would be repeated in two weeks. Id.  CNP Murphy noted current conditions/problems: Abnormal recent weight gain, abdominal pain, thigh muscle cramps, depressive disorder, esophageal reflux, vitamin D deficiency, hypothyroidism, congenital; polycystic ovaries, polycystic ovarian syndrome.  Id.

CNP Murphy provided a sling, compression anklet, and elbow band for tendinitis.  Id.

---

[58] Bone morphogenetic proteins (BMP) stimulate bone growth naturally in the human body.  These proteins that exist in the body can be produced, concentrated and placed in the area of the spine for a spinal fusion to take place.  They can create a fusion without the need for any use of the patient's own bone.  This eliminates the need for harvesting bone from the patient's hip. https://www.spine-health.com/treatment/spinal-fusion/bmp-bone-morphogenetic-proteins, accessed May 4, 2018.

On January 9, 2015, Charles Voigt, MD, read right elbow x-rays and stated his impression: "Small joint effusion could be seen with occult radial head fracture." AR535.

On January 20, 2015, CNP Grimsrud reported a pre-operative history and physical exam requested by Dr. Woodruff. The patient's ECG and chest x-ray were normal. AR538, dup. AR633, et seq. She assessed tobacco use disorder, acquired hypothyroidism, vitamin D deficiency, depressive disorder, esophageal reflux, and pain in the elbow joint. AR539. On this day, the laboratory reported slightly low calcium and elevated Aspartate Amino Transferase, ALT, and alkaline phosphatase (at 155, normal range 37-98). AR637-38. The laboratory reported low Hgb, MCV, MCH, and high RDW. AR638.

On January 20, 2015, right elbow x-rays ordered due to suspicion of occult radial head fracture, showed no fracture but a small olecranon spur and soft-tissue swelling over the olecranon. AR534.

On January 20, 2015, the laboratory reported low hemoglobin, mean corpuscular volume, mean corpuscular Hgb, and mean corpuscular Hgb concentration, with elevated red cell distribution width; slightly low calcium and slightly elevated aspartate amino transferase and ALT, and alkaline phosphatase 155 (normal range 37-98). AR566.

On February 4, 2015, Dr. Woodruff wrote "To Whom It May Concern," describing indications for surgery. He stated that he had been seeing Porter for 4 months and she had already undergone extensive conservative care including

PT, NSAID, pain medication, activity restriction, and epidural injections, and had made minimal progress. Her MRI was relatively unremarkable for nerve compression. However, the symptoms were almost completely back pain with referred pain down her legs rather than true radicular symptoms. Her MRI certainly supported a diagnosis of discogenic pain at L5-S1. Dr. Woodruff did not think further non-operative care would make any difference for her symptoms. He believed that fusing L5-S1 gave her the best chance of improvement in symptoms. She understood that surgery for axial back pain was not as "reproducible" as surgery for radicular pain. "However, there comes a time when we have to accept that and do what we can to improve her symptoms so that she can return to a productive lifestyle." Id.

On February 6, 2015, Dr. Woodruff's operation report stated preoperative and postoperative diagnoses the same, degenerative disc disease, L5-S1. AR795-796, dup. at AR876, et seq. Dr. Woodruff described anterior lumbar interbody fusion, L5-S1 (with Dr. David Fromm the co-surgeon, operation report at AR881-82); insertion of an intervertebral cage; anterior lumbar instrumentation; local autograft; allograft to supplement the autograft; use of bone morphogenetic protein; use of intraoperative fluoroscopy, and intraoperative neural monitoring. Id. Dr. Woodruff performed a radical discectomy. AR796. He used allograft demineralized bone matrix, mixed with local autograft and BMP, with a cage that was placed in the disc space, secured with a shim tamped into L5 and a plate tamped into S1, and locked into position. Id. Indications for the operation were extensive nonoperative

56

treatment including physical therapy, activity restrictions, anti-inflammatories, pain medications, muscle relaxers, and epidural injections.  AR795-96.  She still remained severely symptomatic.  AR796.  Her x-rays showed a severely degenerated L5-S1 disc with healthy discs at other levels.  She had minimal neural impingement.  A stand-alone anterior lumbar interbody fusion appeared to be her best solution.  Id.  She understood this included a greater risk of nonunion and that she would need to wear a restrictive brace with a thigh cuff for 6 weeks post op.  She was interested because this did not include a posterior procedure.  Id.

Thomas Denker, MD, managed arterial line placement and placement of a central line.  He stated the reasons:  the operation was "an extensive abdominal fusion procedure" and risk of blood loss was extensive and probable.  AR879.  The arterial line was placed without difficulty.  The central line was placed after the patient was intubated and on the ventilator.  Dr. Denker stated that he noted the patient's chest rising extensively because the certified registered nurse anesthetist "was actually bagging the patient, hyperventilating the patient through the machine."  Dr. Denker asked for the bag to be removed "so as to decompress the lung, not to inflate the lung."  Dr. Denker said he did not see an indication of pneumo[thorax].  He was unable to establish the central line through the left subclavian approach and switched to a left internal jugular vein approach.  AR879.  A post op chest x-ray would be taken to rule out pnuemothorax.  AR880.

On February 7, 2015, Anne Brucker-Busso, MD, reported a consult requested by Dr. Woodruff.  AR871.  Porter told her that before coming to the hospital she had begun smoking again, she was unsure how long.  She had told staff at pre surgery that she was no longer smoking but she would quit for 2 weeks at a time and then restart, about a half-pack a day.  Id.  She had COPD and could get wheezy and short of breath when she had an upper respiratory infection.  The previous evening she had one nebulizer treatment.  She had been on oxygen since surgery.  Id.  On exam, her O2 saturation was 91% on 4 liters of oxygen.  Yesterday she had bibasilar zones of postoperative atelectasis.  Dr. Busso ordered a respiratory panel, portable chest x-ray, BNP and nebulizers every 4 hours as well as Xopenex[59] every 2 hours.  If she did not respond, Solu-Medrol could be considered.  AR872.

On February 12, 2015, Dr. Woodruff wrote a discharge summary.  AR874.  On the evening of Porter's surgery she started having respiratory difficulty, was diagnosed with pneumonia, was on oxygen and IV antibiotics several days, and improved.  She was making appropriate progress from a spine standpoint.  Discharge instructions were to walk, avoid bending, twisting, or lifting over 20 pounds.  She would be on supplemental oxygen.  Id.

On February 19, 2015, Porter sought ER treatment for fatigue and nausea.  AR864.  She had undergone lumbar fusion surgery 1½ weeks before

---

[59] Xopenex (Albuterol) is a bronchodilator used in an inhaler or nebulizer to control symptoms of asthma and other lung diseases. https://medlineplus.gov/druginfo/meds/a682145.html, accessed May 4, 2018.

and had been diagnosed with pneumonia.  AR865.  Her electrolytes did not account for her feeling of weakness.  Id.  Dr. Hofmann assessed weakness, recent back surgery and recent pneumonia. AR866.

On February 20, 2015, Dr. Woodruff saw Porter.  AR791.  She was still on supplemental oxygen.  Her brace fit well.  She reported a pain level of 1/10 most days and felt she was 50% improved.  Id.  Objectively, she had intact sensation and strength, and negative straight-leg-raising.  X-rays showed a well-seated implant to improve lumbar lordosis.  The L4 endplate was now lordotic rather than kyphotic.  She was doing a good job with not smoking and hopefully could continue to do so.  Id.

On February 24, 2015, Dr. Woodruff refilled Oxycodone.  AR790.

On February 27, 2015, Porter saw CNP Grimsrud for hospital follow-up after having a lumbar fusion two weeks before.  AR632.  Her course was complicated by post-operative pneumonia.  She had stopped smoking since her hospitalization and said she was doing much better but would wake in the night gasping for air.  She was wearing a thoracic/lumbar brace.  Her oxygen saturation was 94 percent.  AR633.  CNP Grimsrud assessed hypothyroidism, vitamin D deficiency, depression and esophageal reflux.  Id.  She said she would order an overnight "pulse ox study."  Id.

On March 10, 2015, Dr. Woodruff refilled Oxycodone.  AR789.

On March 18, 2015, Porter sought ER treatment for numerous episodes of vomiting and diarrhea and subjective fever.  AR858.  On physical exam she appeared mildly dehydrated and otherwise normal.  She was treated with a liter

of normal saline bolus Zofran.  Id.  The clinic impression was suspicion of viral gastroenteritis.  AR859.

On March 20, 2015, Porter saw CNP Grimsrud for shortness of breath, and CNP Grimsrud assessed COPD.  AR632.

On March 26, 2015, Dr. Woodruff saw Porter 6 weeks post-op.  She stated she was doing 80-85% better overall.  AR788.  Pain levels were 8/10 at night and 4-5/10 during the day and she was very happy with her progress.  She continued to not smoke.  Id.  She denied radicular problems.  Objectively she had a normal gait, intact sensation and strength.  Her x-rays showed a well-seated implant and progression of interbody fusion.  She could start weaning out of her brace an hour more per day as tolerated.  She should continue taking calcium and vitamin D.  Her pain medications would be reduced to Hydrocodone at the next visit.  Id.

On April 7, 2015, Porter saw CNP Grimsrud in follow-up for her thyroid medications, and lab work.  AR630.  She reported that the antidepressants were working for her.  When she was not on them she felt different, with angry outbursts.  She wanted to continue using antidepressants.  She had started smoking again.  Id.  CNP Grimsrud assessed COPD, hypothyroidism, vitamin D deficiency, depression and esophageal reflux.  AR631.  The laboratory reported elevated TSH and Levothyroxine was increased.  AR637.

On April 21, 2015, Dr. Woodruff noted that Porter was taking Hydrocodone just at night, but was complaining of pain on her left side and below her belly button.  AR787.

On May 8, 2015, Porter returned to Dr. Woodruff 3 months after her surgery, a stand-alone ALIF at L5-S1. AR785. She said she was 80% better and rated her pain level at 6. She had started smoking a half-pack a day again 3 weeks earlier. Id. She had generalized midline abdominal pain that felt like a bruise. Strength was 5/5, sensation was intact, pulses were 2+, and cruciate leg raises are negative. Dr. Woodruff reviewed x-rays and found no loosening of implants, good interbody fusion, and no motion on flexion and extension views. Id. He ordered physical therapy, instructing the McKenzie protocol and modalities. He would see her in a year. He talked to Porter again about the importance of stopping smoking. Id.

On May 12, 2015, Porter sought ER treatment for palpitations, stating that for 2 weeks she had intermittently felt her heart racing; it felt like it was racing on arrival. AR851. Her pulse rate was 98, respiratory rate was 20, blood pressure 119/77, oxygen saturation 97%. Id. Physical examination was negative. Id. Thyroid stimulating hormone was 8.77.[60] EKG was normal. AR852. Chest x-ray was clear. Id. Labs showed stable anemia, mild hypokalemia, and probable mild hypothyroidism. Id. Dr. Neilson's clinical impression was palpitations and anxiety. AR853.

On May 13, 2015, Porter saw CNP Grimsrud. AR629. Referring to the previous evening's ER visit, "Her symptoms resolved with a neb treatment and

---

[60] Normal value is .4 to 4. https://medlineplus.gov/ency/article/003684.htm. Last checked May 4, 2018.

Xanax.[61]  They thought her symptoms were related to anxiety so she was discharged with a Xanax script and told to f/u with PCP."  Id.  Porter told CNP Grimsrud that she was sleeping better using Xanax at bedtime because of difficulty sleeping.  She said she was unable to turn off her mind.  She said she would like to be on anti-anxiety mediation that was not as strong as Xanax so she could take it during the day.  Id.  Currently she was on Wellbutrin, Viibryd, and Abilify.  Physical and psychiatric examinations were unremarkable.  AR629-30.  CNP Grimsrud assessed COPD, hypothyroidism, depression, and anxiety disorder NOS.  AR630.  She renewed Levothyroxine and increased the dose, and started Buspirone.[62]  Id.

On May 18, 2015, Porter presented to DPT Pfeiffer at the Physical Therapy Center after having had anterior lumbar interbody surgery on February 8, 2015. AR618.  Porter stated that she had opted for surgery following several bouts of failed conservative care for pain levels.  Dr. Woodruff had referred her to evaluate and treat degenerative disc disease.  Porter reported that her symptoms were better following surgery; however, she still had achiness and left knee pain.  Id.  She had 45 minutes of therapy.  Id.  She

---

[61] Xanax (Alprazolam) is a benzodiazepine used to treat anxiety disorders and panic disorder.  https://medlineplus.gov/druginfo/meds/a684001.html, accessed May 4, 2018.

[62] Buspirone (Buspar) is used to treat anxiety disorders or in the short-term treatment of anxiety symptoms.  Side-effects include drowsiness and gastrointestinal symptoms. https://medlineplus.gov/druginfo/meds/a688005.html, accessed May 4, 2018.

had additional physical therapy sessions on May 26 and 29, 2015; June 2, 8, 9, 15, 18, 24, 26 and 29; and July 8, 10, 17, 20, 2015.  AR577-616.

On June 2, 2015, Porter saw CNP Grimsrud for a cough and shortness of breath with chronic COPD.  AR627.  Porter told CNP Grimsrud that she had gone to the ER the previous night due to dyspnea, was diagnosed with bronchitis, and was discharged with a Z-Pak and steroid burst.  Her breathing was better today.  Id.  Porter also complained of difficulty sleeping although she was taking 2 tabs of Amitriptyline nightly.  She said they worked when initially prescribed.

On June 5, 2015, Porter sought ER treatment for increased shortness of breath.  AR845.  Her pulse was 103, respiratory rate 18, blood pressure 121/50, and oxygen saturation 98% on room air.  Id.  She continued to smoke.  She had been using inhalers without relief.  Id.  She had good air movement with expiratory wheezes.  Id.  Dr. Hofmann treated her with a nebulizer and prednisone.  AR846.  He noted that her laboratory results showed microcytic anemia and recommended that she start taking a multivitamin with iron.  Id.

Porter had 45 minutes of therapy on each of these dates:  June 8, 2015, June 9, June 15, June 18 and June 24.  AR594-607.

On June 25, 2015, Porter saw CNP Grimsrud in follow-up.  She was smoking.  She denied concerns with her current medications and had no concerns.  Physical and psychiatric exams were unremarkable.  AR626-27.  CNP Grimsrud assessed insomnia, anxiety disorder NOS, COPD, tobacco use

disorder, and hypothyroidism.  AR627.  The laboratory reported elevated TSH and CNP Grismrud increased Porter's Levothyroxine dose.  AR637.

On July 7, 2015, Porter sought ER treatment for sudden onset of a choking episode and said she nearly passed out.  AR837.  Since this episode she reported generalized weakness and a severe generalized headache similar to migraines she'd had in the past.  Id.  Physical exam was negative.  AR838.  A head CT was negative.  Id.  Chest x-ray was clear.  AR940.  Nathan Lon, MD, treated her with IV pain and nausea medication.  AR841.  Her headache resolved.  He assessed headache, choking episode, and near-syncopal episode.  Id.

On July 8, 2015, Porter saw MPT Fasse, for 60 minutes of physical therapy.  AR585.  She presented with a general loss of functional strength and mobility throughout her lumbar and pelvic region limiting her ability to return to her regular activity level.  AR586.

On July 10, 2015, Porter saw MPT Fasse for 60 minutes of physical therapy.  AR582.  She stated that she had been better the past 2 weeks with ambulatory pain, but that lifting and stairs continued to hurt her back.  Id.  Pain prevented sitting and standing longer than 1 hours.  She had fair TrA and multifidi strength testing and was unable to perform home exercises properly.  Id.  Objectively, she had tightness to palpation of bilateral lumbosacral spinals, and positive straight-leg-raising.  AR583.  She had moderately restricted lumbar flexion, extension, left and right side-bending.  Lumbar right lateral flexion was moderately restricted with significant pain.  Left rotation was mildly

restricted.  Strength was 5-/5 for hips and knees.  Id.  MPT Fasse assessed general loss of functional strength and mobility throughout Porter's lumbar and pelvic region limiting her ability to return to her regular activity level.  On July 15, 2015, Porter saw CNP Grimsrud for a headache lasting four days. AR624.  She was currently smoking.  AR625.  With this headache she had photophobia, phonophobia, and nausea.  Id.  CNP Grimsrud provided Toradol IM and assessed migraine headache.  Id. She prescribed Sumatriptan[63] tablets. Id.

On July 17, 2015, MPT Fasse provided 70 minutes of physical therapy. AR579.  Porter reported that she was better the past 2 weeks with ambulatory pain, but lifting and stairs continued to hurt her back.  Pain prevented sitting and standing longer than 1 hour.  MPT Fasse reported "fair" TrA and multifidi strength testing and said the patient was unable to perform home exercises properly.  Id.  He reported tightness to palpation of bilateral lumbosacral spinals, and straight-leg-raising positive for tightness.  AR580.  He reported moderately restricted lumbar flexion, extension, left and right side-bending.  He reported that lumbar lateral flexion was moderately restricted with significant pain.  Left rotation was mildly restricted.  Id.  Strength was 5-/5 for hips and knees.  MPT Fasse assessed general loss of functional strength and mobility

---

[63] Sumatriptan (Imitrex) is used to treat the symptoms of migraine headaches. https://medlineplus.gov/druginfo/meds/a601116.html, accessed May 4, 2018.

throughout her lumbar and pelvic region limiting Porter's ability to return to her regular activity level.  Id.

On July 20, 2015, Brett Forman, DPT, OCS, provided 70 minutes of physical therapy.  AR576.  Porter reported that pain prevented sitting more than one hour or standing longer than one hour.  Dr. Forman reported that TrA and multifidi strength testing was fair, and that the patient was unable to perform home exercises properly.  Id.  He reported tightness to palpation of bilateral lumbosacral paraspinals.  AR577.  Straight-leg-raising was positive for tightness.  She had moderately restricted lumbar flexion and extension, and left and right side-bending.  Id.  Lumbar right lateral flexion was moderately restricted with significant pain.  Left rotation was mildly restricted.  Hip and knee strength was 5-/5.  Id.  Dr. Forman stated his assessment: "Patient presents with a general loss of functional strength and mobility throughout her lumbar and pelvic region which is limiting her ability to return to her regular activity level.  She would benefit from post-operative therapy to reduce pain levels, improve mobility, and improve her strength and tolerance for a more active lifestyle.  6/9: Patient's motion and strength is properly progressing at this time."  The physical therapy treatment plan was for exercise, manual therapy, and neuromuscular re-education.  Id.  She would be seen twice a week for 6 to 8 weeks.  Id.

On August 7, 2015, Porter saw CNP Grimsrud for medication check, needing medication changes to something she could get through the patient medication program or on the 5-dollar list.  AR623.  Her medications were

Ibuprofen, ProAir inhaler, Abilify, Xanax, Sumatriptin for migraine, Ondansetron, Levothyroxine, Bupropion, Combivent, Albuteral, HCTZ, Meloxicam, Dexilant, and Viibryd. Id. Porter stated that she had had a lot of anxiety lately but could not afford Alprazolam. Id. She said Buspirone helped some but not completely. Amitriptyline was too expensive at its current dosage. She had difficulty sleeping due to anxiety and stress. She was smoking. Id. Physical and psychiatric exams were unremarkable. AR623-24. CNP Grimsrud assessed anxiety disorder NOS, insomnia and COPD. AR624. She adjusted Porter's medications. AR624.

On October 8, 2015, Porter sought ER treatment for back pain. AR832. Pain was described as constant and aching. Id. She reported smoking 2-3 cigarettes a day. Id. She was initially tachycardic (pulse 121) but this improved. Brooke Eide, MD, assessed musculoskeletal pain, gave her pain medications and discharged her. AR833.

On October 14, 2015, Porter saw CNP Grimsrud to ask if she could get a medication for anxiety to replace Alprazolam and Wellbutrin because these were not available through the medication assistance program. AR943-44. She also complained of ongoing cough and wheezing but had been taking antibiotics and a Prednisone burst and thought she was better. AR944. She reported anxiety, emotional lability, depression, and sleep disturbance. Id. CNP Grimsrud assessed insomnia, generalized anxiety disorder, COPD and depression. Id.

On October 19, 2015, Porter tried to move a pot of boiling water and spilled it onto her anterior thighs. AR827. She was taken by ambulance to the emergency room. Id. She was treated with Fentanyl, Morphine, Toradol, and Silvadene ointment for second-degree burn on her right thigh and first-degree burn on her left thigh and leg. AR828.

On November 5, 2015, Porter saw Dr. Hapcic for her scald burns from 4 to 6 weeks prior when a boiling pot of spaghetti doused her pants. AR950. Examination showed healing in process. Id.

On November 19, 2015, Porter saw Mr. Murphy at community health for an upper respiratory infection. She had started smoking again, had been diagnosed with COPD in February 2015, and did not want to get pneumonia again. AR940. Her O2 saturation was 99%. Id. Her lungs were clear but respiration rhythm and depth were moderately shallow. AR941. She had wheezing and rhonchi. Id. CNP Murphy assessed chronic obstructive pulmonary disease, unspecified; nicotine dependence, current smoker; and acute bronchitis. Id. She prescribed Tessalon Perles and also provided Silvadene cream to treat Porter's burns. Id.

On December 1, 2015, Porter saw Grimsrud for congestion. AR946. She was smoking. Id. She had recently been treated with a course of Cephalexin and her symptoms improved but she never actually got better she said. Id. On exam, lung auscultation revealed decreased breath sounds and wheezing. Id. CNP Grimsrud assessed COPD and UARI and prescribed Cipro and a nebulizer machine. Id.

**E. Claimant and Lay Witness Statements**

On September 25, 2013, Porter completed a "Disability Report" with her on-line application. She named a person DDS could contact "who knows about your medical conditions:" Amber Mashek, XXXX Avenue, Rapid City, SD 57701, Tel 605-XXX-XXX. AR231.

Conditions alleged were back and knee problems, neuroma, depression, and acid reflux. AR231-32.

Porter reported that she stopped working because of her conditions on September 1, 2011. AR233.

She stated that she received a GED in January 1996 and did not attend special education. She listed past work as a child care provider January 2008 to September 2011, 8 hours a day, 5 days a week, for $50 a day. AR233. She listed her tasks in this job: she watched, fed, and taught children. She lifted children weighing up to 20 pounds. AR234.

She listed her medications: Bupropion, Dexelant, Nortriptyline, and Viibryd. She stated that Dr. Cote had treated "all physical conditions" from January 2011 to August 2013. AR235. She stated that Jennifer Theilan at Community Health treated her depression and acid reflux. AR236.

On October 28, 2013, Porter completed a handwritten "function report." She stated she lived in a house with her son. She wrote, "I am on weight limits and have pain with excessive walking, squatting, kneeling and standing to [sic] long." AR239.

Porter described her daily activities: "get up and get my son up for school and little by little do house work and go to appointments." She had pets and fed them and let them outside when needed. AR240. "My 17 y/o son helps with bathing, feeding and letting them out when he is not in school." Asked what she could do before she became disabled, Porter stated "I could clean houses and do day care." AR240. Asked if her conditions affected sleep, she wrote, "have a hard time falling asleep and staying asleep and being comfortable." AR240.

She indicated she had no problems with personal care. AR240. She indicated that she did not need reminders to take care of personal care needs or take medicine. AR241.

She wrote that she prepared "microwavable meals, sandwiches or my son feeds himself majority of the time." She prepared meals once a week and it took an hour, with frequent breaks. AR241. Asked about house and yard chores, Porter said she sat down to fold clothes and took frequent breaks to do dishes. "Son does them majority." AR241. She did laundry every 3 days and this took about three hours. Asked if she needed help doing these things, she wrote, "son washes and I rinse or he just does them." AR241.

Porter stated that she did not do yard work because of the extent of movements and lifting. She said she went outside twice a day, was able to drive and go out alone. She shopped twice a month in stores for groceries and home necessities, and her son helped with the lifting. It took about an hour.

Porter said she was able to pay bills, count change, handle a savings account, and use a checkbook or money order. AR242.

Porter stated that she read three or four times a day. AR243. She talked to her mother on the phone every other day or her kids when they called. AR243. Asked to describe changes in her social activities, she stated "I don't socialize with anyone like I used to and I don't go any place unless I have to." AR244.

She circled activities and postures affected by her conditions: lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, and completing tasks. AR244. She explained: "I can't kneel down because I can't put pressure on left knee. Liftin [sic] I have a 10 lb weight limit. Bending I have pain. Can't stand to [sic] long or it causes pain." AR244.

Porter said she could walk down the driveway before resting, and needed to rest 10 minutes before she resumed walking. Asked how long she could pay attention, she wrote that she got side-tracked easily. Asked, do you finish what you start? She said, "No." She could follow a recipe "OK I guess." AR244.

Porter said she got along very well with authority figures. AR245. She said she had never been fired for not getting along with others. "I am on antidepressents that help." She said changes in routine made her very irritated. AR245. She used her knee brace, prescribed in 2009, daily and at bedtime. AR245.

Porter reported her medications and side-effects:  Hydrocodone, drowsiness; Nortriptyline, drowsiness; Bupropion, drowsiness; Viibryd, drowsiness; and Dexilant, no side-effects.  AR246.

Under "Remarks" she wrote: "It has got to the point to where I have to take many breaks or do nothing at all.  Due to pain and numbness and tingling in legs."  AR246.

Porter, by Attorney Myler, completed an undated "Disability Report – Appeal," stating that there had been no change in her conditions since her first disability report.  AR248.  He listed medical providers:  Dr. Cote, Dr. Wilson, Community Health, ProMotion, The Physical Therapy Center, and Dr. Anderson.  AR249-51.  Medications were Bupropion, Dexelant, Nortriptyline, and Viibryd.  AR251.  She stated, "I have to do things slowly.  I have to limit how much weight I carry and how far I can walk."  AR252.

On May 25, 2014, Porter completed a handwritten function report.  AR257.  In response to the question, how do conditions limit ability to work, she stated:

> I have a weight limit of no more than 20 lbs.  If I walk or stand excessively I start hurting in my feet, legs and back.  They start throbbing, aching and sometimes from my lower back down to my feet I start getting a tingling and numbness feeling . . . . I have to then sit for 20-30 minutes.  If I sit much longer I start to feel tingling again in my feet and legs and I get stiff and sore.  Taking so many breaks makes me upset because it means it will take me longer to get things accomplished and get upset.  This makes me feel worthless.  When I start to feel this way I find it difficult to find the motivation or will power to get restarted and then I feel even worse.

AR257.

Porter described her daily activities.

> I get up and get dressed the[n] take my 17 yr old son to school.
> (About once a week I can't get out of bed to take him so he walks
> and I lay there until I can get up).  Two days a week I go to
> physical therapy when I am not there I try to do what I can at
> home so that things don't.

AR258.

Porter described her personal care: Bathe, hair care – "sometimes when depressed I don't feel like taking care of myself."  "Putting my shoes on and tying them is difficult sometimes." AR258.  Asked if she needed reminders, Porter wrote, "My boyfriend calls and asks if I have taken my medication or not."  AR259.  She prepared food that did not require her to stand at the stove. AR259.  She did "light cleaning, laundry and dusting if I can sit.  My son does the heavy cleaning and my oldest son comes over to do lawn maintenance."  It took 20-30 minutes to do dishes and laundry but she rested in between and sometimes her son finished for her.  AR259.

She went outside one to three times a day, could drive a car, and "I can go out on my own but I don't like to be by myself so I usually have someone with me." AR260.  She shopped for food once a month for one to two hours and sometimes used the electric chair to shop.  AR260.

Her interests were reading, TV, fishing and camping.

> I read in bed because it hurts less to lay down.  I just reposition
> myself every so often . . . . I can't fish much anymore because I
> can't walk and/or carry equipment to the site.  I don't camp much
> anymore because it is too hard on me.  I don't enjoy movies as
> much because I can't sit through it.

AR261.

Socially, she talked on the phone daily and saw friends and/or family two or three times a week when they came to visit. AR261. "I don't go places very often. Sometimes to my son's house or friends house about once a month. . . . .If I go somewhere it is with people I know and trust and I carry on conversations [sic] . . . . I don't like going anywhere without someone so I almost always have someone go with me." AR261.

Porter stated, "I stay more secluded than I use to." AR262. She reported restrictions: "weight restriction 20 lb. Sitting more than 20-30 min. Standing or walking more than 10-20 minutes. Completing tasks is affected by needing to take frequent breaks. Depression affects motivation and ability to do things as well as ability to concentrate." AR262. She stated that she could walk a half block, then rest 5-10 minutes. "I don't walk to [sic] much further due to feet back and knees. I also get winded and have to use my inhaler if I push it." AR262. "Climbing stairs, kneeling, squatting hurt my left knee. I cause a lot of pressure and pain. I have to be careful when I reach or bend so that my back doesn't tweak." AR264.

Asked how long she could pay attention, Porter responded, "I don't know – sometimes I really struggle." AR262. She stated that she did not finish things she started. AR262. She said she could follow a recipe. She did not know how well she followed spoken instructions because that did not happen often. AR262.

Porter stated that she did not handle stress well. "My medications help manage the stress. If I get too overwhelmed I cry." AR263. Asked how well

she handled changes in routine, Porter wrote, "Throw's me off and causes extra stress. I have trouble getting back on task." AR263. She stated that she would be "starting Abilify soon to help with depression." AR264.

Asked if she had noticed unusual fears, Porter responded "Being alone – I worry about being hurt a lot. I worry about paying bills." AR263.

For pain relief she used a heating pad, ice packs, TENS unit, and knee brace. She said she lost her knee brace and could not afford another. AR263.

In her third disability report, Porter stated that she took medications to help manage pain and that her back and knees hurt constantly. AR265. She added new conditions to her claim: asthma and COPD. AR265.

She listed medications: Abilify for depression, Benzonatate for cough, Bupropion for depression, Combivent for asthma, Dexalent for acid reflux, Levothyroxine for a thyroid condition, Lyrica for "Diabetes related pain," Meloxicam for arthritis, Nortriptyline for pain, Tramadol for pain, Vetolin for asthma and COPD, and Viibrid for depression. AR268. She noted no side effects on this report. Id.

She described the effect of her conditions on activities: when cleaning she stopped frequently to rest. "The pain I am in constantly sometimes prohibits me from doing things. If I over do it even a little bit, then I am out of commission for two plus days." She stated that she was "home bound due to breathing issues and pain in my back and knees and hips." AR269.

In a pre-hearing form she stated, "I cannot squat due to my left knee prevents me from squatting. It swells & hurts. There is hardly any carlige [sic]

in my knee." AR280.  In her pre-hearing form she reiterated the daily activities and limitations essentially as stated in her disability and function reports. AR280-81.

**F.    Opinion Evidence**

On December 19, 2013, a DDS non-examining consultant, Bich Duong, MD, signed an assessment form.  AR104-05, 113-14.  Dr. Duong said, "clmt age 43 w GED and physical RFC for light work w occasional limitations to climb ramps, ladders, ropes, stairs and scaffolds.  MRFC w moderate limitations.  Clmt can do other simple unskilled work."  AR104-05, 113-14.

On July 17, 2014, a DDS non-examining consultant Eugene Heller, MD, opined physical RFC for light work, with a 4-hour stand and/or walk limitations and capacity to sit 6 hours.  AR125.  Dr. Heller opined that Porter was able to frequently balance, stoop, kneel, and crouch; occasionally climb ramps/stairs, and crawl; never climb ladders/ropes/scaffolds.  He opined that Porter should avoid concentrated exposure to extreme cold and to extreme heat.  AR126.  She should avoid concentrated exposure to hazards "due to reduced agility and pain meds."  AR125-27.  Dr. Heller provided rationale: "Clmt has low back discomfort due to an L5 radiculopathy.  She has responded well to injection therapy.  She still has a reduced range of motion that has caused her problems.  The back pain is not worsening and treatment is good."  AR127.

On December 9, 2013, DDS non-examining psychologist, Junko McWilliams, Ph.D., opined on Porter's condition in reference to the paragraph

"B" criteria found in 20 CFR § 404.1520a(c)(3), 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.00C. AR101. He opined Porter had "mild" restriction of activities of daily living and social functioning; "moderate" difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. Id.

Dr. McWilliams opined Porter's mental RFC was not significantly limited with two exceptions: She had moderately limited ability to carry out detailed instructions, and moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He opined "Limitations do not preclude her from performing the simple mental demands of competitive work on a reg. basis." AR103. Dr. McWilliams stated the most informative factors in assessing Porter's credibility were her ADLs, precipitating and aggravating factors, and medication treatment. AR102. He found her "partially credible. Able to do ADLs and house work with pain, ROM and strength normal." Id.

On July 17, 2014, a DDS non-examining psychologist, Mark Berkowitz, Psy.D., opined on Porter's condition in reference to the paragraph "B" criteria. AR136. He opined "mild" restriction of activities of daily living and social functioning; "moderate" difficulties maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. Id.

Dr. Berkowitz opined Porter's mental RFC was not significantly limited with two exceptions: She had moderately limited ability to carry out detailed

instructions, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR139-40. He stated depressive disorder was "first identified 04/25/13. 7/13 note found Clmts total score on beck's depression inventory was 12, placing clmt in the 'mild' mood disturbance category." AR140. Dr. Berkowitz noted:

> Clmt wakes easily, no high irritability, social w/d or loss of interest. Clmt not feeling tired or poorly. Clmt well groomed, speech well organized and articulate, answered questions and readily divulged information. There was appropriate eye contact and no abnormal movements noted. Affect appropriate, no abnormalities in thought content, perception or process noted. Assessment depression w anxiety and clmt encouraged to seek add'l attention if worsened. . . . .

AR140.

Dr. Berkowitz opined, "Claimant does not appear limited to only simple work. Allegations are partially credible. Claimant is able to persist at tasks that can be learned in up to three months on the job…." AR128. Dr. Berkowitz noted the following factors that were the most informative in assessing Porter's credibility of her statements: the individual's ADLs, precipitating and aggravating factors, and medication treatment. AR137. He found her "partially credible" and noted she was "able to do ADLs and house work with pain, ROM and strength normal." Id.

## G.    ALJ's Decision

In a decision dated January 22, 2016, ALJ Kilroy found Porter not disabled or entitled to disability benefits. AR14-23. The ALJ found Porter had not engaged in substantial gainful activity since her alleged disability onset

date of June 5, 2013, that she had severe impairments, but they did not satisfy the per se disability requirements in Appendix 1 Listing of Impairments, and he proceeded to assess Porter's RFC.  AR16-18.

ALJ Kilroy determined Porter had the RFC for light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except she is able to be on her feet up to four hours in an eight hour day, and sit for an hour at a time and up to eight hours in an eight hour day.  She can lift twenty pounds occasionally and ten pounds frequently, seldom climb ladders and scaffolds, and crawl, and can perform all other postural activities on an occasional basis.  She should avoid concentrated exposure to extreme cold and vibrations.  AR18.

ALJ Kilroy determined Porter could not perform her past relevant work as a childcare attendant.  AR22.

With the assistance of a Vocational Expert (VE), ALJ Kilroy determined Porter could perform other work based on her age, education, work experience, and RFC.  AR22-23.  Specifically, ALJ Kilroy determined Porter was not disabled or entitled to disability benefits because she could perform other sedentary and light occupations, including the representative sample the VE identified at the hearing:  sedentary—food & beverage order clerk; light—sewing machine operator, and office helper.  AR23.

## H.    Issues Before This Court

1.    Whether the ALJ misstated the alleged onset date and failed to properly determine the potential onset date of disability influencing the rest of the sequential evaluation?

2. Whether the ALJ's failure to identify severe impairments at step two requires reversal and remand?

3. Whether the ALJ's failure to develop longitudinal evidence pursuant to 20 C.F.R. § 404.1512(d) and to order consultative examinations by acceptable medical sources to diagnose psychological and pulmonary impairments was harmful error?

4. Whether the ALJ's residual functional capacity ("RFC") assessment failed to comply with legal standards and was unsupported by substantial evidence on the record as a whole?

5. Whether the ALJ's step five decision failed to comply with legal standards and was unsupported by substantial evidence on the record as a whole?

## DISCUSSION

### A.     Standard of Review.

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis,

not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

**B.      The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

> **Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821

(8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett 777 F.2d at 1320, n.2. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997). "This shifting of the burden of proof to the Commissioner is

neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.      Did the ALJ Err in Determining the Alleged Disability Onset Date?**

The ALJ stated June 5, 2013, was Ms. Porter's "alleged disability onset" date. AR16. Ms. Porter asserts this to be error. She states she alleged her impairments rendered her unable to work as of September 1, 2011. Ms. Porter infers that the field office fixed June 5, 2013, as her alleged onset date with the legal doctrine of *res judicata* in mind because of her prior disability application. If this is what occurred, Ms. Porter alleges this to be error because the Commissioner was required to consider whether new evidence was new and material, in which case *res judicata* would not apply. The new evidence Ms. Porter points to is the evidence of her lumbar fusion surgery which occurred on February 6, 2015.

### 1.      Why Does the Disability Onset Date Matter?

Ms. Porter's argument brings into consideration the differences between Title II disability benefits and Title XVI benefits. SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II

84

benefits." Ms. Porter applied for both types of benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. Title II benefits may include a 12-month period of benefits retroactive to the date of application; Title XVI benefits are not retroactive to the application date. SSR 83-20; 20 C.F.R. §§ 404.316, 416.501. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).

Here, Ms. Porter applied for benefits August 27, 2013. Therefore, Title XVI benefits can only begin as of August 27, 2013, so long as Ms. Porter establishes her disability on or before that date.[64] However, since Title II benefits can be retroactive up to 12 months prior to the application date, if Ms. Porter can establish she was disabled at some time prior to August 27, 2012, she would potentially be entitled to retroactive disability benefits. The

---

[64] The onset date is the date of filing for Title XVI claims and the exact onset date is generally not necessary to determine. See SSR 83-20.

issue as to the correct alleged onset date, then, applies only to Ms. Porter's application for Title II benefits. It would not affect the amount of benefits payable to her under Title XVI (unless the onset date were after August 27, 2013).

One may become disabled (1) prior to filing an application for disability benefits, (2) while one's application is pending, or (3) after one's application is finally denied. In the first situation, as to Title II benefits, if one was disabled prior to the time one filed an application for disability benefits, one may receive retroactive benefits dating back to the date one became disabled up to a maximum of 12 months' worth of retroactive benefits. 20 C.F.R. § 404.621(a)(1). If one were disabled for more than 12 months before the date of application, one could receive 12 months' worth of retroactive benefits. Id. If one were disabled 3 months prior to applying, one could receive 3 months' worth of retroactive benefits. Id.

In the second situation, if one were not yet disabled at the time benefits were applied for but became disabled while one's application was pending, benefits will be awarded for the first month in which one actually met all the requirements for being disabled. 20 C.F.R. § 404.620(a)(1). So if one applied for benefits in January, but first became disabled in September, benefits would be awarded beginning in September notwithstanding the January application date. Id.

In the third situation, if one becomes disabled after the ALJ issues a decision following a hearing, the original application no longer remains in effect

86

and the claimant must file a new application for benefits (barring appeal of the first decision). 20 C.F.R. § 404.620(a)(2).

The onset date of disability also may affect the monthly benefit amount awarded under Title II. The monthly amount under Title II is based on one's earnings, and months with zero earnings are not included in the calculation if one were disabled in those months. See 20 C.F.R. § 404.211. Therefore, it is to a claimant's advantage to establish disability during a period one did not have any earnings, even if disability benefits cannot be awarded going that far back because the time period under consideration is more than 12 months prior to the date of application for disability benefits. In Ms. Porter's case, she had no earnings in 2012-13 and earnings that did not constitute SGA in 2014. If she can establish she was disabled as of 2011, these zero- and low-earnings years (2012-14) will not go into the calculation of her monthly benefit amount and, therefore, result in a higher monthly benefit figure. Id.

## 2.     The Law Applicable to Determining Alleged Onset Date

### a.     Onset Date After Denial of an Earlier Application

A distinction must be made between determining an alleged onset date when a claimant files an initial application for disability benefits, and determining alleged onset date where a first application for benefits was denied and the claimant then files a second application. The latter is the situation presented by Ms. Porter's case.

As discussed above, if one becomes disabled after the ALJ issues a decision following a hearing on one's first application, that initial application no

longer remains in effect and the claimant must file a new application for

benefits (again, barring an appeal of the first decision).  20 C.F.R.

§ 404.620(a)(2).  This would logically lead to the conclusion that the alleged

onset date for the second application could be no earlier than the day after the

ALJ issued its unfavorable decision on the first application.  That is exactly the

situation presented here.

The Commissioner's internal policy guidance bears out this

interpretation.  If an onset date is determined to be in the period previously

adjudicated on the first application for benefits, the first Title II application may

be reopened (but only under circumstances not present in Ms. Porter's case).

See POMS DI 25501.220C2c; POMS DI 27510.005A, D.[65]  Hence, after the first

ALJ issued its unfavorable decision, Ms. Porter could have (1) sought to reopen

that case, or (2) she could have appealed the case to the Appeals Council and

ultimately to this court, or (3) she could have reapplied.  She chose to do the

latter.  Each choice had consequences.

Where a claimant contends her condition worsened after the (first) ALJ

issued its decision, if the claimant chooses to appeal, the court will only

consider the record that was before the (first) ALJ when that ALJ issued its

---

[65] The court notes Ms. Porter never asserts she asked the Commissioner to
reopen her original application.  It does not appear that there are
circumstances justifying reopening Ms. Porter's previously adjudicated claim.
See POMS DI 27510.005D.  See also 20 C.F.R. §§ 404.987-404.996.  In any
case, even if Ms. Porter's second application for benefits could be construed to
be a request to reopen her first application so as to allow her to submit new
evidence, the Commissioner's decision *not* to reopen a case is not subject to
judicial review.  Califano v. Sanders, 430 U.S. 99, 107-08 (1977).

decision.[66] Rice v. Comm'r. of Soc. Sec., 114 F. Supp. 3d 98, 109-10 (W.D.N.Y. 2015).

If the claimant instead chooses to reapply for benefits, new evidence which was not part of the first administrative record may be introduced and considered, but barring circumstances which would justify reopening the case, the disability onset date for the second application cannot be set for any earlier than the day after the first ALJ's decision. See 20 C.F.R. § 404.620(a)(2); POMS DI 27510.005A ("Adjudicators' consideration on the subsequent claim is limited to the period after the period adjudicated by a prior final determination or decision. . ."). See also POMS DI 25501.250(A)(3) (if a prior adverse determination cannot be reopened, the Commissioner cannot establish the established onset date earlier than the day after the last adverse determination). See also 3 Soc. Sec. Law & Prac. § 39:10 (Mar. 2018 Update) (if one files a subsequent claim for disability and the alleged onset date is in a previously adjudicated period (i.e. the period covered by the first application), the Commissioner must reopen if possible. If it is not possible to reopen, the

---

[66] An exception to this rule is where new and material evidence is presented to the Appeals Council and made a part of the record. In such cases, the court on appeal considers the new evidence and hazards a guess as to what the ALJ would have decided had the ALJ had the benefit of the new evidence before it. Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992); Browning v. Sullivan, 958 F.2d 817, 822-23 (8th Cir. 1992). Ms. Porter did present new and material evidence to the Appeals Council, but it was a medical record from January, 2017 as to her left knee (AR8). This exception would not expand the scope of the alleged disability onset date to prior to June 5, 2013.

disability onset date is the date after the previous ALJ issued its unfavorable decision).

The reapplication rule has sometimes been equitably tolled, but only in rare situations such as where the Commissioner denied disability applications based on secret rules and reasons which the applicants had no way of knowing existed. <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1038-39 (2d Cir. 1995). Or where the Commissioner destroyed claimants' disability application files after having been put on notice that continued litigation would ensue regarding those files. <u>Id.</u> The court has not been made aware of any circumstances which would justify equitable tolling in Ms. Porter's case. And, although she makes a passing reference to "if" the Commissioner destroyed her first case file, she never asserts that "if" as an actual fact.

If Ms. Porter had appealed her first application for benefits to this court and the court remanded, she would potentially be eligible for benefits dating back to the date of her first application and the 12 months preceding that application so long as she showed she was disabled during that period. <u>Johnson v. Sullivan</u>, 922 F.2d 346, 356-57 (7th Cir. 1990). However, she did not appeal the denial of benefits on her first disability application. Instead, she reapplied. That reapplication had consequences—namely the legal imposition of an onset date of June 5, 2013. <u>See</u> 20 C.F.R. § 404.620.

### b. *Res Judicata*

Ms. Porter claims the Commissioner improperly applied the doctrine of *res judicata* to her case without following the rules for doing so. That argument

is a red herring.  *Res judicata* is not the same as adopting a disability onset date that starts the day after a prior adjudication.  *Res judicata* encompasses two concepts:  issue preclusion and claim preclusion.  <u>Plough ex rel Plough v. West Des Moines Community Sch. Dist.</u>, 70 F.3d 512, 514-15 (8th Cir. 1995). Issue preclusion prevents a party who was part of a cause of action from relitigating an issue or a finding of fact in a subsequent cause of action in which the party also participates.  <u>Id.</u>  Claim preclusion prevents the relitigation of an entire claim on which final judgment was rendered and the preclusion goes to not only the parties in the first action, but also to parties who were in privity with those parties and preclusion extends not only to the claims litigated, but to those claims that *could have been* litigated in the first case.  <u>Id.</u>

In the administrative context specifically involving Social Security disability claims, the Commissioner applies *res judicata* to discharge a subsequent claim when a claimant does not avail herself of the appeals process on her first application and then files a second or subsequent application and provides no new facts or evidence.  <u>See</u> POMS GN 04040.010.  As the Commissioner states, when the agency is presented with "the same person, the same issue and the same facts and we have already issued a decision to that person which has become final (no appeal filed timely), then *res judicata* protects SSA from having to consider the same claim (on which it has already issued a decision) again and again, potentially ad infinitum."  <u>Id.</u>  The Commissioner goes on to note that "if anything has changed, the adjudicator

should not apply *res judicata* but should adjudicate the second claim in the usual manner." Id.

It is clear the Commissioner did not apply *res judicata* to Ms. Porter's claim because if she did, Ms. Porter's claim would have been dismissed immediately without the usual adjudicatory processes. Id. *Res judicata* clearly does not apply in this case because Ms. Porter's second application presented new evidence which was not part of the record in her first application.[67] Finally, unless a constitutional claim is urged (Ms. Porter does not so urge herein), the Commissioner's application of *res judicata* has been held not subject to judicial review. See Hennings v. Heckler, 601 F. Supp. 919, 921-22 (N.D. Ill. 1985) (citing Carter v. Heckler, 712 F.2d 137, 142 (5th Cir. 1983)). The court rejects Ms. Porter's assertion that the ALJ improperly applied the doctrine of *res judicata* to her claim. Instead, the record shows her second claim was processed in the usual manner.

**c.    Determination of Onset Date Without Consideration of the Fact That There Was a Prior Application**

Aside from *res judicata*, Ms. Porter alleges the ALJ should have determined her disability onset date by evaluating three factors: (1) Ms. Porter's statements as to when her disability began, (2) the work history, and (3) the medical evidence. See Docket No. 21 at p. 1 (citing POMS, HALLEX and SSR 83-20). This is the analysis which would apply if Ms. Porter

---

[67] This is apparent from the fact that the first ALJ issued its decision June 4, 2013, and the vast majority of the medical records in the administrative record post-date June 4, 2013.

had never filed a prior application for benefits. Of these three factors, the Commissioner's policy guidance identifies the medical evidence as "the primary element in the onset determination." See SSR 83-20. Ms. Porter asserts she submitted new material evidence of failure of numerous conservative treatment attempts, leading to the lumbar fusion in February, 2015. Even if one applies these 3 factors rather than using the day after the first ALJ's decision as directed by § 404.620, the ALJ's determination of June 5, 2013, as the disability onset date is supported by substantial evidence.

First, Ms. Porter's own statements are a mixed bag and do not point to a single date. In a disability report September 25, 2013, Ms. Porter did indeed state that she became unable to work on September 1, 2011. AR233. However, in her disability application dated August 27, 2013, she stated she was unable to work because of her disabling condition on June 5, 2013. AR212, 214. At the ALJ hearing, the ALJ asked Ms. Porter's lawyer (Ms. Porter's authorized agent) whether he agreed that the alleged onset date was June 5, 2013, the day after the previous ALJ had issued his decision. AR60. The attorney stated he agreed with that date. Id. Ms. Porter testified at the ALJ hearing she had last worked full time in 2012. AR64. When her lawyer asked her if she meant to say 2010, she responded, "yeah, somewhere in there." AR64. The year 2010 is not borne out by the work records, nor is the year 2012.

The second factor, the work history, does support an alleged onset date of September 1, 2011. AR221. Ms. Porter's earnings records show earnings up

through 2011; then there is a gap until 2014 when she earned $1,154, which is not at the SGA level. Id. There were no earnings in the record after this.

Third, the medical and other evidence—the primary factor--is notable in that the evidence Ms. Porter alleges is "new and material" is largely *after* the alleged onset date of June 5, 2013. The lumbar fusion occurred in February, 2015, for example. AR874-79. The only medical evidence prior to June 5, 2013, does not concern Ms. Porter's lumbar spine or hip. There is a disputed statement of fact that Ms. Porter had a cervical imaging series which showed straightening of the cervical spine and degenerative changes at C5-C6. AR776-77. Then there are a series of medical appointments in March, April, and May, 2013, where Ms. Porter complained of left knee pain and received injections for the same. AR564-65, 823-25. Then there are two medical records, one in April and one in May, 2013, regarding complaints of depression and seeking help for smoking cessation. AR561-62, 563-64.

This constitutes the entirety of the pre-June 5, 2013, medical evidence in the record. It does not show, as Ms. Porter claims, "failure of numerous conservative treatment attempts, which failure led to lumbar fusion in February 2015." See Docket No. 21 at p. 2. All those conservative treatment attempts with regard to Ms. Porter's back and the eventual lumbar fusion are documented in medical records *after* June 5, 2013. See e.g. AR316, 319, 326-28, 331, 338, 360, 362-64, 366-67, 372, 374-75, 386-87, 433-35, 438, 441, 462, 486-88, 490-500, 502-06, 508-09, 518-23, 526, 531, 557-58, 722-23, 758, 802, 806-11, 883-84, 906-07, 911-12, 922 (medical records concerning

back/hip issues from August, 2013, to December, 2014). None of the pre-June 5, 2013, medical records have anything to do with Ms. Porter's lumbar spine condition. <u>See</u> AR561-62, 563-64, 564-65, 823-25, 776-77.

If the ALJ *had* considered an onset date of September 1, 2011, there was precious little information to go on. From this perspective, the court cannot see how the ALJ's purported error in failing to consider an earlier onset date prejudiced Ms. Porter because the pre-June 5, 2013, evidence in this record would not have established she was disabled prior to that date. Therefore, even applying the three-factor test Ms. Porter urges should have been applied, the ALJ's determination of June 5, 2013, as the disability onset date is supported by substantial evidence.

**E.     Did the ALJ Err at Step Two in Determining Severe Impairments?**

Ms. Porter asserts error at step two. She states the ALJ should have found the following conditions to also be medically determinable severe impairments: (1) mental impairments, (2) left knee, (3) sacroiliitis, and (4) myofascial pain syndrome. The Commissioner alleges any error at step two was harmless because the ALJ continued on with the analysis through steps three through five and considered all of Ms. Porter's impairments at these latter stages. Ms. Porter alleges the ALJ's step two error was not harmless precisely because the ALJ did *not* consider the four conditions listed above at steps four and five.

### 1.    Applicable Law and ALJ Findings

It is the claimant's burden to demonstrate a severe medically determinable impairment at step two, but that burden is not difficult to meet and any doubt about whether the claimant met her burden is resolved in favor of the claimant.  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); and Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28).  An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.  See 20 C.F.R. § 404.1522(a).  Basic work activities include, but are not limited to:  walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).

Whether failure to identify a severe impairment at step two is harmless error or grounds for reversal is a murky issue in the Eighth Circuit.  In Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), the claimant alleged the ALJ failed to identify a severe impairment of borderline intellectual functioning at step two.  The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe.  Id.  The court held the ALJ's failure to identify the impairment as severe was not harmless error. Id.  The court reversed and remanded the case to the commissioner for further proceedings.  Id.

As noted in <u>Lund v. Colvin</u>, 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of <u>Nicola.</u>  Some courts have interpreted it to mean that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued the sequential analysis.  <u>See</u> <u>Lund</u> 2014 WL 1153508 at *26 (gathering cases).  Other courts have declined to interpret <u>Nicola</u> as establishing a *per se* rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis.  <u>Id.</u>  The central theme in the cases which hold reversal is not required is that "an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC."  <u>Id.</u>

More recently, this district court has interpreted <u>Nicola</u> to require reversal for failure to properly identify a severe impairment at step two, when that impairment is diagnosed and properly supported by sufficient medical evidence.  <u>See</u> <u>Quinn v. Berryhill</u>, 2018 WL 1401807 at *6 (D.S.D. Mar. 20, 2018) (error at step two not harmless where ALJ failed to identify medically determinable impairments).  In <u>Quinn</u> the court acknowledged the district court split within the Eighth Circuit as described in <u>Lund</u>, but decided that in Quinn's case, the error was not harmless.  <u>Id.</u> at p. 14.

### 2.     Mental Impairment

Ms. Porter alleged she was impaired due in part to depression.  AR231-32.  The ALJ did not find Ms. Porter had any severe mental impairments at step two.  AR16-17.  Ms. Porter alleges this was error.

A DDS non-examining psychologist, Junko McWilliams, Ph.D., rendered an opinion on Ms. Porter's mental impairments, concluding she suffered from affective disorder/depressive disorder and that it constituted a severe impairment, but was well-controlled by medication.  AR97-105.  Another DDS non-examining psychologist, Mark Berkowitz, Psy.D., also opined Ms. Porter's mental impairments were severe and concluded she had mild restrictions of activities of daily living and social functioning, and moderate difficulties with concentration, persistence, or pace and no episodes of decompensation of extended duration.  AR131-42.

These opinions from Dr. McWilliams and Dr. Berkowitz are the only opinions from qualified mental health professionals in the record and both agree she had a severe mental impairment.  The ALJ accorded "little weight" to these opinions.  AR17.  The step two issue as to Ms. Porter's mental impairments, therefore, depends very much on whether the ALJ was justified in according "little weight" to these professionals' opinions.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

--whether the opinion is consistent with other evidence in the record;

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined the claimant;

--whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed,

399 F.3d at 920 (quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995)).

The length of the treating relationship and the frequency of examinations of the

claimant are also factors to consider when determining the weight to give a

treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating

physician evidence is itself inconsistent,'" this is one factor that can support

an ALJ's decision to discount or even disregard a treating physician's opinion.

<u>House</u>, 500 F.3d at 744 (quoting <u>Bentley</u>, 52 F.3d at 786; and citing <u>Wagner</u>,

499 F.3d at 853-854; <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir.

2005)). "The opinion of an acceptable medical source who has examined a

claimant is entitled to more weight than the opinion of a source who has not

examined a claimant." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 (8th Cir. 2006)

(citing 20 C.F.R. §§ 404.1527); <u>Shontos v. Barnhart</u>, 328 F.3d 418, 425 (8th

Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998).

When opinions of consulting physicians conflict with opinions of treating

physicians, the ALJ must resolve the conflict. <u>Wagner</u>, 499 F.3d at 849.

Generally, the opinions of non-examining, consulting physicians, standing

alone, do not constitute "substantial evidence" upon the record as a whole,

especially when they are contradicted by the treating physician's medical

opinion. <u>Wagner</u>, 499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016

(8th Cir. 2004) (citing <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)).

However, where opinions of non-examining, consulting physicians along with

other evidence in the record form the basis for the ALJ's decision, such a

conclusion may be supported by substantial evidence. <u>Harvey</u>, 368 F.3d at

1016.  Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation.  <u>Flynn v. Astrue</u> 513 F.3d 788, 792 (8th Cir. 2008)(citing <u>Casey</u>, 503 F.3d at 691-692).  The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small.  <u>Hamilton v. Astrue</u>, 518 F.3d 607, 610 (8th Cir. 2008).

Here, the ALJ's given reasons for according "little weight" to the opinions of Dr. McWilliams and Dr. Berkowitz were fleeting and conclusory, contained in the following two sentences:

> There was no evidence that the claimant had any problems in this area [maintaining concentration, persistence and pace].  She reported that she took care of young children, could manage her finances, follow instructions, read and did puzzles, and examinations consistently showed that she her [sic] memory was normal and she had no abnormalities in her thought content, perception, or process (B3F/3; B9F/4; B16F/10, 15, 21, 23, 27; B19F/7, 9, 45, 72; B25F/2).

AR17.

In this case, Dr. McWilliams and Dr. Berkowitz are the only acceptable medical sources who are also mental health experts who have rendered opinions as to Ms. Porter's mental impairments.  Ms. Porter's caregivers at Community Health do not constitute "acceptable medical sources" under the Commissioner's current regulations.  An examination of the record, including the exhibits specifically cited by the ALJ, reveal many records that do not support the ALJ's characterization of a conflict between the medical records and the consulting mental health experts' opinions.  All but one of the records

cited by the ALJ are from Community Health (B3F, B9F, B16F, and B19F); the one anomaly is a record from the emergency room at the hospital (B25F).

The Community Health records typically have two sections pertinent to mental impairments; the two sections are labeled "psychological" and "psychiatric." The "psychological" section is where the caregiver recorded symptoms such as depression, anxiety, anhedonia, insomnia, and emotional lability. The content of the "psychological" section of each medical record varied from one treatment date to the next.

The "psychiatric" section, however, was identical on each record and consisted of the following passage repeated over and over:

> Well groomed individual. Speech is well organized and articulate. Seated comfortably, answers questions and readily divulges information. Appropriate eye contact, and no abnormal movements are noted. Appropriate affect. No abnormalities in thought, content, perception or process noted.

See, e.g. AR560. It was apparently to this identical "psychiatric" section of the records that the ALJ was citing since so many of the records cited by the ALJ do not support the ALJ's assertion when one reads the "psychological" portion of the record.

The medical records concerning Ms. Porter's mental impairments show the following. The ALJ cited exhibit B16F/27, which was the second page of a treatment note from April 25, 2013, containing the identical "psychiatric" assessment recited above. See AR563-64. But page 1 of the April 25 treatment record stated Ms. Porter came to the clinic complaining of moodiness and anxiety issues and wanted to be evaluated for bipolar disorder. AR563.

102

Ms. Porter described erratic moods and also complained of anhedonia and social withdrawal.  Id.  Ms. Porter scored a 33 on Beck's Depression Inventory.[68]  Id.  The caregiver, Jennifer Thielen, recorded that Ms. Porter reported feelings of hopelessness.  Id.  The "psychological" portion of the treatment note stated Ms. Porter exhibited high irritability, depression with feelings of hopelessness, anhedonia and social withdrawal.  Id.  Ms. Porter was prescribed Zyban (bupropion).  Id.

On May 31, 2013, Ms. Porter had a follow-up appointment for her depression medications.  AR561-62.  She had been taking Zyban for over a month at this point and reported she did not think it was working well.  AR561.  She reported crying frequently, being very irritable, and that her moods were up and down.  Id.  The caregiver, Jennifer Thielen, recorded that Ms. Porter was exhibiting signs of anxiety, high irritability, depression with feelings of hopelessness, anhedonia, social withdrawal and loss of interest in family and friends.  Id.  The "psychiatric" portion of the record contained the

---

[68] The Beck Depression Inventory is a 21-item, self-reported rating inventory that measures characteristic attitudes and symptoms of depression.  See www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression.aspx, last checked April 26, 2018. Each of the 21 listed symptoms is ranked by the patient from 0-3 with 0 meaning the symptom is absent and 3 meaning the symptom is severe.  The score on the inventory can range from a minimum of 0 to a maximum of 63, with higher scores indicating greater symptom severity.  A score above 20 is indicative of depression.  Scores of 0-13 indicate minimal depression; 14-19 mild depression; 20-28 moderate depression; and 29-63 severe depression.  66 Occupational Medicine 2016, at pp. 174-75, Oxford Academic, Oxford University Press.  See https://academic.oup.com/occmed/article-pdf/66/2/174/8703388/kqv087.pdf, last checked April 26, 2018.

identical block quote from above.  AR562.  Ms. Porter was told to continue taking Zyban and an additional prescription for Viibryd was given.  Id.

Six weeks later at a recheck on July 5, 2013, Ms. Porter reported her mental health medications were "working wonderfully."  AR328.  She scored an 11 on the Beck test.  Id.  For the next nine months, Ms. Porter had several medication checks and she uniformly reported doing well on her current mental health medications with minimal feelings of depression and with stable mood.  AR326, 362-63, 372, 473, & 475

The ALJ cited exhibit B16F/23 (AR560), which was page 2 of a treatment note that began on AR559 and was dated May 23, 2014.  Page 2 (page 23 of exhibit B16F) contained the identical "psychiatric" assessment recited above.  But page 1 of the May 23 treatment note recorded that Ms. Porter was on this occasion exhibiting high irritability, emotional lability, and depression.  AR559.

On May 29, 2014, an exhibit cited by the ALJ, Ms. Porter told her certified nurse practitioner, Kimberly Grimsrud, that she did not feel her depression medications (Zyban and Viibryd) were working.  AR471 (exhibit B9F/4).  CNP Grimsrud recorded that Ms. Porter was exhibiting high irritability, emotional lability, and depression on this date.  Id.  Grimsrud prescribed Abilify for Ms. Porter.  Id.  The "psychiatric" portion of the May 29, 2014, record contained the identical passage quoted above as to "well groomed," etc.

On October 30, 2014, a CNP student saw Ms. Porter.  AR541-42. Ms. Porter reported on this occasion that all her medications were working well

and that she was not having any symptoms.  Id.  She reported having no anxiety, no depression, and no sleep disturbances.  Id.  The student recommended Ms. Porter be referred to a mental health counselor for depression, a recommendation Ms. Porter does not appear to have taken.  Id.

Six months later on April 7, 2015, Ms. Porter reported at a recheck appointment that her antidepressants were working for her.  AR630.

Six weeks later, on May 12, 2015, Ms. Porter went to the emergency room with racing heart symptoms.  AR851, 629.  She had lately been battling COPD issues.  The staff treated her with a nebulizer treatment and a Xanax tablet, after which her heart rate calmed down.  Id.  The emergency room physician, Dr. Donald Neilson, recorded clinical impressions of palpitations and anxiety.  AR853.

Another exhibit cited by the ALJ was B19F/9 (AR629), which was a follow-up visit at the clinic on May 13, 2015, after the above-described emergency room visit the night before.  Ms. Porter described not being able to turn off her mind.  AR629.  Caregiver Kimberly Grimsrud recorded that Ms. Porter exhibited high anxiety and emotional lability on this visit.  Id.

On August 7, 2015, at a medicine check appointment, Ms. Porter reported feeling "a lot of anxiety" and that she had "difficulty sleeping due to anxiety."  AR623-24.  She stated could not afford Alprazolam (aka Xanax), so

she asked for a replacement anxiety drug.  Id.  She received new prescriptions for amitriptyline, Wellbutrin, Lyrica, and Buspirone.[69]  Id.

Ms. Porter repeated her request for a Xanax replacement on October 14, 2015.  AR943-44.  New prescriptions for Effexor and Vistaril were instituted.  AR944. Xanax and Wellbutrin (aka Zyban, aka buproprion) were discontinued.  Id.

To be fair, a few of the record citations by the ALJ do, on those occasions, show Ms. Porter was not experiencing any anxiety, depression, insomnia or emotional lability.  See, e.g. Exhibit B3F/3 (AR326); B16F/10 (AR547); B16F/15 (AR551-52); and B19F/7 (AR626).  It is striking, though, that so many of the exhibits cited by the ALJ as being contrary to the opinions of Dr. McWilliams and Dr. Berkowitz actually *support* rather than contradict those opinions.

Other evidence in the record aside from medical evidence is summarized as follows.  At the hearing before the ALJ on December 30, 2015, Ms. Porter testified that sometimes her pain or her depression made her feel like not leaving her house.  AR73.  She acknowledged she took mental health medications and that they helped with her depression and anxiety some days.  AR76-77.  The remainder of Ms. Porter's 26 pages of testimony regarded her

---

[69] Ms. Porter had previously received prescriptions for these drugs at different times, but was apparently not taking them as of August 7, 2015.  Compare list of medications at the beginning of appointment, AR623, with list of medications going forward at the end of the appointment, AR624.

lower body physical impairments (lumbar spine, hip, and left knee) and her COPD and the effect those impairments had on her functioning. AR62-88.

Her September 25, 2013, disability report stated that depression affects her motivation and concentration, and that she could not handle stress or changes in routine. AR245, 262-63. Ms. Porter repeatedly stated her antidepressant medications worked well in controlling her mental symptoms. AR76-77, 245, 328, 326, 473, 475, 541-42, & 630. But there were many other times she experienced significant symptoms despite taking mental health medications. AR471, 560-62, 623-24, 629, and 851. It is more the usual course than not for mental impairments to wax and wane and the ALJ must take this into consideration. Nowling v. Colvin, 813 F.3d 1110, 1123-24 (8th Cir. 2016). The whole of the record evidence supports, rather than contradicts, the opinions of both Dr. McWilliams and Dr. Berkowitz that Ms. Porter suffered from a severe mental impairment.

The court places little to no credence on the identical "psychiatric" portion of each Community Service treatment record. This recitation appears to be a rote electronic entry routinely made and not tailored to circumstances presented. Even if one were to assume that "psychiatric" recitation was an individual assessment of Ms. Porter's condition at each clinic visit, all that can be concluded from it was that Ms. Porter was not hallucinating and was otherwise in touch with reality. Mental impairments take many forms. The fact that a claimant is not psychotic does not equate with a conclusion that the claimant suffers from no mental impairments.

Nor can the court conclude that the ALJ's recitation of Ms. Porter's activities of daily living are contrary to the opinions of Dr. McWilliams and Dr. Berkowitz. Particularly troublesome is the ALJ's assertion that Ms. Porter cared for "young children" as part of her daily activities. The record reflects Ms. Porter had one "child," a young man of 17 years, who did a significant amount of household work for Ms. Porter. Her "care" of the 17-year-old consisted of waking him up in the morning and driving him to school most days except when Ms. Porter was unable to drive due to her impairments. AR258.

Her past work experience included providing child day care services up to the year 2011, including a non-SGA work attempt in 2012. But Ms. Porter's earliest recorded medical record documenting her mental impairments is April, 2013. Thus, she never cared for "young children" at any time when the record indicates she was suffering mental impairments.

Given the totality of the record, the court concludes the ALJ erred when it held Ms. Porter's mental impairments were not a severe impairment at step two. As noted above, the showing required at step two is not an onerous one. The only opinions in the record from qualified mental health professionals concluded that Ms. Porter *did* have a severe mental impairment. And the records from her treating caregivers (non-accepted medical sources) are consistent with those opinions. Furthermore, Ms. Porter's daily activities do not preclude a finding of a severe mental impairment at step two. Finally, it is not "harmless error" for the ALJ to have failed to consider mental impairments

severe at step two because those impairments do not show up anywhere in the ALJ's RFC formulation, as discussed subsequently in this opinion. Nicola, 480 F.3d at 887. The court will remand for the ALJ to reconsider its step two conclusions as to whether Ms. Porter's mental impairments were severe.

### 3. Left Knee

Remembering that the earliest possible disability onset date for this, Ms. Porter's second disability application, is June 5, 2013, the court examines the records related to her left knee. Ms. Porter experienced chronic pain in her left knee following surgery in 2008. Her pain was substantiated by crepitance and a positive grind test as well as x-rays showing degenerative changes in the patellofemoral joint and mild medial joint space narrowing. AR821. In the fall of 2013, she was documented to have impaired strength in both flexion and extension of her left knee. AR409. Ms. Porter underwent physical therapy, injections of cortisone, and took pain medication. See, e.g. AR414-15, 417, 419, 421, 423, 818, 821-22. She described her knee pain as "markedly better" following injections, but the pain eventually recurred. See, e.g. AR820. On November 27, 2013, following physical therapy and left knee injections, Ms. Porter reported she experienced significant pain ascending and descending stairs, she could not walk more than 5 minutes without experiencing significant pain, and she could not squat without pain. AR511-12. Because Ms. Porter was not making any progress with her knee in physical therapy, she was discharged. Id.

On January 24, 2014, Ms. Porter reported she had been using a TENS unit on her knee, had been doing physical therapy, and had gotten a round of knee injections, all of which she said controlled her symptoms. AR812. Objectively, her tenderness involving the knee was markedly improved. Id. Ms. Porter was instructed to continue with home exercises and the TENS unit. Id. She was also told she could receive another series of knee injections in May or June if the pain recurred. Id.

On September 24, 2014, Ms. Porter reported knee pain, but said it was not emanating from the knee joint, but rather seemed to emanate from her lumbar spine and radiate down her leg. AR810. The doctor agreed that the leg pain was radicular (it was radiating from the back), not originating in the knee itself. AR810-11. Other medical records also suggest Ms. Porter's knee pain might at times be caused or impacted by the bulging disc in her lumbar spine. AR814.

Ms. Porter reported to her physical therapist on May 18, 2015, post-back surgery that she continued to experience left knee pain. AR618. However, her knee extension and flexion strength were normal on May 18, 2015, at the beginning of her physical therapy. Id. Ms. Porter received physical therapy from May 18, 2015, to July 20, 2015, and her knee strength continued to be normal through the end of her round of therapy. AR577, 619. Unlike the first therapy visit, there is no record Ms. Porter complained of left knee pain on any of her other 15 physical therapy visits over these two months. AR576-617.

Her physical therapy during this two-month span included squats on a stability wall for sit-to-stand training. AR577-609.

After the ALJ hearing, Ms. Porter submitted to the Appeals Council an MRI of her left knee taken on January 17, 2017. AR8. This MRI showed similar degenerative changes to the knee and involvement of the patellofemoral joint. AR8. However those conditions were also documented in 2013. AR821, 825. The 2017 MRI did show fluid on the joint and a partial-thickness tear of the distal biceps femoris tendon, which was not in the earlier images. AR8. However, the inquiry is whether Ms. Porter was disabled at any time between her onset date (June 5, 2013), and the date of the ALJ's decision (January 22, 2016). The Appeals Council rejected the 2017 MRI because it did not document conditions in Ms. Porter's left knee during that relevant time frame. AR2. The court agrees. The MRI is more than 1 year outside the relevant time consideration and the new conditions (fluid and tear) could easily have occurred outside the relevant time.

In summary, the record shows Ms. Porter was receiving intensive treatment of her left knee in 2013. By January, 2014, she reported her symptoms were controlled by a combination of home exercises, injections, and the TENS unit. From January, 2014, to May, 2015, Ms. Porter never reported any knee pain which she related to her knee joint and then there is only a single such report—May 18, 2015. Although Ms. Porter received extensive physical therapy between May 18, 2015, and July 20, 2015 (15 sessions), she never again reported knee pain. Her strength in her knee for both flexion and

extension were normal during this time period (AR577, 619), whereas in 2013 they had been impaired (AR409). Furthermore, the second half of her physical therapy in 2015 included routinely doing wall squats. Ms. Porter points to the November, 2013, record indicating she could not squat without pain and argues the ALJ should have found her left knee condition was a severe impairment at step two. The court cannot agree.

Although the November, 2013, records are indicative of a severe impairment, the post-January, 2014, records substantially support the ALJ's conclusion the knee condition no longer interfered with daily activities. Indeed, the almost complete absence of medical records relevant to the left knee after January, 2014, supports this conclusion. An impairment must last for at least 12 months. See 20 C.F.R. § 404.1505(a). If Ms. Porter's left knee condition was a severe impairment from June 5, 2013, to November 24, 2013, it did not last 12 months in the disability period under consideration. And although her knee condition in general was a chronic condition, having lasted for many years, it is not only the duration of the condition itself which the ALJ had to consider, but the duration *in which it was a severe impairment.* Here, substantial evidence in the record supports the ALJ's step two decision that the left knee was not a severe impairment during the period from June 5, 2013, to December 30, 2015. Nevertheless, as discussed below, the ALJ was required to consider any functional limitations imposed by Ms. Porter's nonsevere knee condition when formulating her RFC.

### 4.     Sacroiliitis

Ms. Porter alleges the ALJ erred by not finding she suffered from the severe impairment of sacroiliitis at step two.  Sacroiliitis is inflammation of the sacroiliac joint, the joint formed by the union of the sacrum and the ilium (where the pelvis connects to the lower spine).  <u>See</u> https://www.spine-health.com/video-what-sacroiliitis, last checked April 26, 2018.  "Itis" is a Latin suffix that denotes inflammation, so patients with sacroiliitis usually complain about pain in their buttocks or lower lumbar spine.  <u>Id.</u>  Prolonged standing or stair climbing can worsen the pain.  <u>See</u> https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/sys-20350747, last checked April 26, 2018.  Sacroiliitis often results in low back pain and pain that extends down one or both legs.  <u>Id.</u>  Sacroiliitis is difficult to diagnose because it is often mistaken for other causes of low back pain.  <u>Id.</u>  Chronic pain from sacroiliitis, as with chronic pain from any other condition, can cause depression and insomnia.  <u>Id.</u>

Dr. Woodruff mentioned a *possible* diagnosis of bilateral sacroiliitis on October 24, 2014, when Ms. Porter revisited him after receiving conservative treatment and feeling her pain was unimproved.  AR806.  She told Dr. Woodruff she wanted surgery instead.  <u>Id.</u>  Instead of ordering surgery immediately, Dr. Woodruff ordered bilateral sacroiliac joint injections to determine if the source of Ms. Porter's pain was indeed sacroiliitis.  <u>Id.</u>  He noted that if the sacroiliac joint injections did not significantly relieve Ms. Porter's pain, he would have more confidence that the source of her pain

was *not* sacroiliitis, but rather the degenerated disc at the L5-S1 level in her spine.  AR807.

On December 5, 2014, Dr. Anderson injected both of Ms. Porter's sacroiliac joints with steroids.  AR804.  Afterward, Ms. Porter reported to Dr. Woodruff that she experienced only a 10 percent improvement in her pain and only for 3-4 days after the injection.  AR802.  She continued to rate her pain in her back and down her left leg as a 6-8 out of 10.  Id.  Based on this trial injection, Dr. Woodruff rejected the possibility that the source of Ms. Porter's pain was sacroiliitis and instead settled "with confidence" on the degenerated disc at the L5-S1 level as the source of Ms. Porter's pain.  Id. Ms. Porter continued to insist on surgery and Dr. Woodruff agreed at this point and put the wheels in motion for surgery to be scheduled.  Id.

Based upon this sequence of events, this court concludes that Ms. Porter never had sacroiliitis.  Dr. Woodruff entertained that diagnosis as a possible source of her low back and leg pain, instituted an experiment in the form of sacroiliac joint injections to test his hypothesis, and as a result of that failed experiment, excluded sacroiliitis as the source of Ms. Porter's pain.  AR802, 806-07.  He instead settled "with confidence" on his conclusion that the source of Ms. Porter's pain was the degenerated disc at the L5-S1 level.  AR302. Based on this history in the administrative record, the ALJ did not err in failing to find that sacroiliitis was one of Ms. Porter's severe impairments at step two. The court notes that the ALJ *did* find at step two that Ms. Porter suffered from the severe impairment of left hip tendonitis.  Therefore, this finding set the

stage for consideration of hip impairments in formulating Ms. Porter's RFC at step four.

**5.     Myofascial Pain Syndrome**

Ms. Porter also alleges the ALJ failed to consider her myofascial syndrome as a severe impairment at step two.  Indeed, the ALJ never mentioned myofascial syndrome—diagnosed by Dr. Cote--for good reason.  Ms. Porter never alleged she suffered from myofascial syndrome as a disabling condition.  She alleged impairments due to her lumbar disc disease, left knee, left hip tendonitis, sacroiliac joints, a neuroma, depression and anxiety, acid reflux, and COPD.  See AR61, 232, 293-96.  Even Ms. Porter's present counsel, when outlining Ms. Porter's impairments before the agency, never identified myofascial syndrome as an alleged impairment.  See AR293-96.  Furthermore, although present counsel argued to the Appeals Council that the ALJ overlooked certain impairments, counsel never alleged the ALJ overlooked myofascial syndrome.  AR302.

This administrative record contains the transcript from the ALJ hearing Ms. Porter had on her first application for disability benefits which was denied and never appealed.  AR30-54.  Although Dr. Cote is mentioned several times in the transcript, it is never discussed that Dr. Cote diagnosed Ms. Porter with myofascial syndrome.  Id.  Furthermore, the only impairments Ms. Porter alleged were her lower back condition and her left knee—she did not allege myofascial syndrome as an impairment even in her first application.  See AR32-33, 45.

The sole mention of myofascial syndrome in the administrative record is an August 23, 2013, record from Dr. Christina Cote.  AR316-23.  Ms. Porter saw Dr. Cote on this occasion complaining of chronic left hip and left low back pain over the last 8 months.  AR318.  Ms. Porter described that she had recently moved into a new house and had been busy unpacking and cleaning, including mopping, which made her pain worse.  Id.  She described the pain lasting for up to 4 days if she overdid it.  Id.  Examination of Ms. Porter's back, including low back, by Dr. Cote revealed no tenderness, spasms, or bony abnormalities and, contradictorily, no pain.  AR319.  Dr. Cote diagnosed myofascial pain syndrome and prescribed Pennsaid topical drops and nortriptyline to be taken once a day at bedtime for 90 days.  Id.

Myofascial pain syndrome is chronic pain where trigger points in the patient's muscles cause pain in the muscle.  See https://mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/symptoms-causes/sys-20375444, last checked April 25, 2018.  The syndrome typically occurs after a muscle has been contracted repetitively or injured.  Id.  Discogenic pain, diagnosed by Dr. Woodruff, is pain originating from a damaged vertebral disc, particularly due to degenerative disc disease.  See https://spine-health.com/glossary/discogenic-pain, last checked April 25, 2018.  Thus, both Dr. Cote and Dr. Woodruff were addressing Ms. Porter's complaints of low back pain radiating into her legs.  Dr. Woodruff believed it to originate from degenerating vertebral discs (AR799), and Dr. Cote believed it to originate from trigger points in Ms. Porter's back muscles (AR319).  Both

physicians documented and diagnosed lower back pain radiating into hips and legs.

The ALJ was not tasked with resolving which medical explanation for Ms. Porter's back pain was most persuasive, but rather with determining whether that condition—by whatever name—constituted a severe impairment. When the ALJ determined that Ms. Porter had a severe impairment of degenerative disc disease, in this court's assessment, that included both the diagnosis of discogenic pain and the diagnosis of myofascial pain as both were explanations or labels for Ms. Porter's low back and hip/leg pain. The ALJ did not err by failing to also find myofascial pain syndrome to be a severe impairment at step two.

**F.** **Did the ALJ Fail to Develop the Record as to Pulmonary and Psychological Impairments?**

Ms. Porter alleges the ALJ failed to develop the record in several ways. First, she alleges 20 C.F.R. § 404.1512(b) required the ALJ to obtain 12 months' worth of medical records prior to the date she applied for disability benefits (August 27, 2013). Because the record contains records going back only to February, 2013, Ms. Porter alleges the ALJ did not fulfil its duty.

She also alleges that the ALJ should have developed the record by ordering consultative examinations to assess her mental impairments and her COPD. With regard to the mental impairments, Ms. Porter notes that the medical records regarding her depression and anxiety were authored by physician assistants or certified nurse practitioners, while the Commissioner's regulations, 20 C.F.R. § 404.1513, require mental diagnoses to be rendered by

117

licensed physicians and psychologists.  Here, Ms. Porter asserts the record established mental and pulmonary impairments, but no diagnoses.  She argues the ALJ should have ordered consultative exams to develop the diagnostic evidence.

### 1.    Duty to Obtain 12 Months' of Pre-Application Records

First, as to the argument that the ALJ should have obtained medical evidence dating back to August, 2012, § 404.1512(b) states the Commissioner will, before making a determination as to disability, obtain the claimant's complete medical history for at least 12 months preceding the month in which application was made, *unless* the claimant alleges her disability began less than 12 months before the filing date.  See 20 C.F.R. § 404.1512(b)(1).  Here, as the court discussed above, when Ms. Porter chose to reapply for benefits rather than pursue an appeal of the denial of benefits on her first application, the consequence of that choice was that she was "stuck" with a disability onset date of June 5, 2013.  Therefore, the "unless" clause from § 404.1512(b)(1) is operative here—Ms. Porter alleged a disability onset date of June 5, 2013, which is less than 12 months before the August, 2013, filing date.

When the claimant alleges in a disability application that she became disabled less than 12 months prior to her application--such as in this case--the Commissioner's duty is to "develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier."  See 20 C.F.R. § 404.1512(b)(1)(ii).  Here, by operation of law (§ 404.620), Ms. Porter alleged her disability began on

June 5, 2013. The ALJ had a duty to obtain medical records dating back to June 5, 2013. The ALJ did not have reason to believe her disability began earlier because there was a final decision from another ALJ on June 4, 2013, that was not appealed which held Ms. Porter was not disabled. Therefore, the ALJ's duty to develop the record in terms of obtaining past medical records dates back to June 5, 2013, the alleged date of onset. Here, the ALJ fulfilled its duty because there are medical records dating back to February, 2013.

## 2. Consultative Examination on Mental Impairments

The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in Social Security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing. The ALJ possesses no interest in denying benefits and must act neutrally in developing the record.

Snead, 360 F.3d at 838 (citations omitted). See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel); and 20 C.F.R. § 404.1512(b). If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

However, this is true only for "crucial" issues. <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005). A claimant must show that the ALJ's failure to fully develop the record resulted in prejudice to her before remand will be warranted. <u>Id.</u> Where the failure to develop concerns a "central and potentially dispositive issue" which the ALJ failed to explore, remand is required. <u>Snead</u>, 360 F.3d at 839. But the ALJ's "duty is not never-ending and an ALJ is not required to disprove every possible impairment." <u>McCoy</u>, 648 F.3d at 612.

The ALJ may exercise its duty to develop the record in numerous ways, such as requesting medical records in existence but not yet part of the administrative record. Another specific tool available to the ALJ to develop the record is the consultative exam—an exam at the Commissioner's expense with a professional of the Commissioner's own choosing. 20 C.F.R. § 404.1512(b)(2). The Commissioner has promulgated numerous regulations relating to the consultative exam. <u>See e.g.</u> 20 C.F.R. §§ 404.1512(b)(2), 404.1518 – 404.1519j.

The ALJ "may" decide to purchase a consultative exam when the information the ALJ needs cannot be obtained from the claimant's medical sources and one of the following circumstances is present: (1) the additional evidence is not contained in the records before the agency, (2) the evidence cannot be obtained from the claimant's treating sources for reasons beyond the claimant's control, (3) highly technical or specialized knowledge needed by the ALJ is not available from treating sources, or (4) there is an indication the claimant's condition has changed in a way likely to affect the severity of the

impairment, but the change in condition is not established in the records before the agency.  See C.F.R. § 404.1519a.

Ms. Porter alleges a consultative exam was required pursuant to § 404.1519a(b)(1)—in order to supply the diagnosis necessary for a decision. She further asserts, relying on Byes v. Astrue, 687 F.3d 913 (8th Cir. 2012), and Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000), that the Commissioner was required to have that diagnosis rendered by an *examining* psychologist or psychiatrist.  Since neither Dr. McWilliams nor Dr. Berkowitz examined Ms. Porter, and since no other diagnosis exists in the record from an examining psychologist or psychiatrist, Ms. Porter alleges the ALJ erred by not ordering a consultative exam.

In Byes, the issue on appeal was whether the ALJ's determination that Byes did not suffer from a severe mental impairment was supported by substantial evidence in the record.  Byes, 687 F.3d at 916.  A licensed psychologist examined Byes at the request of the ALJ and suspected, but did not substantiate, diagnoses of borderline intellectual functioning or learning disabilities.  Id.  The Eighth Circuit affirmed the denial of benefits because Byes' job requirements over a period of many years belied an intellectual impairment severe enough to render Byes unable to work and because Byes' activities of daily living showed his impairment, if any, did not preclude work. Id.  Specifically, Byes held jobs that required him to write reports and use technical skills, he was able to pay his bills, count change, handle his own finances, maintain a large garden, and work as a carpenter and mechanic.  Id.

The <u>Byes</u> court distinguished Byes' case from <u>Dozier v. Heckler</u>, 754 F.2d 274 (8th Cir. 1985), and <u>Gasaway v. Apfel</u>, 187 F.3d 840 (8th Cir. 1999).[70] <u>Byes</u>, 687 F.3d at 917.  In <u>Dozier</u>, there was little evidence of a specific condition available to the ALJ, causing the court to reverse and remand.  <u>Id.</u> (citing <u>Dozier</u>, 754 F.2d at 275-76).  In Byes' case, the evidence of Byes' work and daily activities was substantial and was contrary to a finding of a severe mental impairment.  <u>Id.</u>

In <u>Gasaway</u>, there was "ample unequivocal" evidence that Gasaway suffered from mental retardation, had a verbal IQ of 69, and attended special education classes in school.  <u>Id.</u> (citing <u>Gasaway</u>, 187 F.3d at 843).  This caused the Eighth Circuit to reverse and remand for further development of the record as to Gasaway's intellectual impairment where the ALJ gave no indication that it "evaluated and rejected, or even noticed, the possibility that Ms. Gasaway might be mentally impaired in some way."  <u>Id.</u>  The court contrasted the ample and unequivocal evidence from <u>Gasaway</u> with the suspicion, but not confirmation, of the existence of a mental impairment in Byes' case.  <u>Id.</u>

The other case relied upon by Ms. Porter, <u>Nevland</u>, involved a former postal worker who alleged disability, in part, on mental impairments described variously as dysthymia, major depression, adjustment disorder, anxiety, panic disorder, obsessive compulsive disorder, and attention deficit hyperactivity

---

[70] The <u>Byes</u> court also distinguished a third case, <u>Thompson v. Sullivan</u>, 878 F.2d 1108 (8th Cir. 1989), as completely inapplicable because the primary issue in that case had to do with SGA.  <u>Byes</u>, 687 F.3d at 916-17.

disorder.  <u>Nevland</u>, 204 F.3d at 854.  There were numerous treatment records

in the administrative record from Nevland's therapist and mental health doctor,

including descriptions of counseling sessions and medications prescribed.  <u>Id.</u>

at 854-55.  Nontreating nonexamining consultants had reviewed Nevland's

medical records and opined as to his mental RFC, but none of Nevland's

caregivers had rendered opinions about Nevland's ability to function in the

workplace.  <u>Id.</u> at 858.  The court, noting that usually opinions of nontreating

nonexamining doctors do not constitute substantial evidence, reversed and

remanded with instructions to obtain a mental RFC opinion from Nevland's

treating physicians or to obtain a consultative psychiatric or psychological

exam as to Nevland's mental RFC.  <u>Id.</u>

Ms. Porter insists that <u>Byes</u> and <u>Nevland</u> stand for the iron-clad

proposition that there must always be a diagnosis from a qualified examining

psychologist or psychiatrist when a mental impairment is alleged.  The court

does not read those cases to stand for that proposition.  Even <u>Nevland</u>, which

remanded because no treating doctor rendered an opinion as to mental RFC,

qualified its statement by the adverb "usually."  <u>Nevland</u>, 204 F.3d at 858.

This court reads <u>Nevland</u>, <u>Byes</u>, <u>Gasaway</u>, and <u>Dozier</u> to stand for the

proposition that further development of the record is required where there is

insufficient medical and other evidence from which to formulate an RFC;

further development is not required where there *is* sufficient evidence to render

an opinion as to RFC.

Here, there is a treatment record from one physician—an accepted medical source (the May visit to the emergency room for racing heartbeat symptoms)—diagnosing possible anxiety disorder. There are also extensive records from Community Health detailing Ms. Porter's mood, affect, medications, and functioning. There is also extensive information about Ms. Porter's activities of daily living in the record. And there are the opinions from the nontreating nonexamining doctors McWilliam and Berkowitz. However, as in Nevland, there is no treating source opinion as to Ms. Porter's mental RFC.

The regulations regarding consultative exams use the word "may." 20 C.F.R. §§ 404.1517, 404.1519a. Thus, even if the stated circumstances justifying a consultative exam are present, the ALJ "may," but is not required to, conduct a consultative exam. Id. Even in the Gasaway case, the court merely remanded with instructions to "further develop the record" as to Gasaway's mental impairment; the court did not specifically require the ALJ to purchase a consultative exam. Gasaway, 187 F.3d at 844. Likewise, the Nevland court did not mandate a consultative exam, but also left open the possibility of obtaining an RFC opinion from one of Nevland's treating doctors. Nevland, 204 F.3d at 858.

The question in this case is a close one. Were the issue of development of the record on mental impairments a stand-alone issue, the court might not remand. However, as noted above, the court has already concluded a remand is necessary as to the step two issue regarding Ms. Porter's mental

124

impairments.  The court rejects Ms. Porter's invitation to remand with

instructions that the ALJ must purchase a consultative exam as to her mental

impairments, but it does remand.  The ALJ should develop the record regarding

Ms. Porter's mental RFC by obtaining a mental RFC opinion from one of her

medical care providers,[71] or by other means, including purchasing a

consultative exam.

### 3.      Consultative Examination on COPD

The administrative record is replete with detailed records showing

Ms. Porter struggled with COPD and its effects on her functional abilities.  The

first medical record documenting impaired breathing was February 3, 2014,

when Ms. Porter sought emergency room care for cough and congestion.

AR711.  She was diagnosed with bronchitis and reactive airway disease and

prescribed an Albuterol inhaler, Phenergan with Codeine, and a 5-day dose of

Prednisone with Zithromax.  Id.  Reactive airway disease (RAD) is not a clinical

term and for that reason is somewhat controversial among medical

professionals.  See https://healthline.com/health/reactive-airway-disease, last

checked April 24, 2018.  RAD describes any one of a group of conditions,

---

[71] Although the caregivers at Community Health are not "accepted medical
sources" (see 20 C.F.R. § 404.1502(a)), they are competent under the
Commissioner's regulations and policy guidance to render opinions as to the
severity of Ms. Porter's mental impairments and as to how those impairments
affect her ability to function.  See SSR06-03p.  This SSR was rescinded as of
March 27, 2017, but it remains applicable to claims such as Ms. Porter's which
were filed prior to March 27, 2017.  The court notes that SSR06-03p was fully
applicable also at the time the ALJ issued its decision on January 22, 2016.

including COPD and asthma, that feature reversible airway narrowing due to an external stimulation.  Id.

On March 13, 2014, Ms. Porter again reported to the emergency room with complaints of feeling weak, run down, persistent cough and persistent problems breathing.  AR704.  Her lungs were clear, her chest x-ray negative, and she responded well to a duo nebulizer.  AR705, 708.  Another chest x-ray on March 29, 2014, showed no abnormalities.  AR703.

On April 19, 2014, Ms. Porter went to the ER again with respiratory complaints.  AR693.  She was diagnosed with acute bronchitis and tobacco use.  AR694.  She was treated with an Albuterol inhaler, a cough medicine (Tessalon Perles), and an antibiotic.  AR693.  On April 22, 2014, Ms. Porter reported she was not feeling better.  AR473.  She was given a nebulizer treatment and prescribed Prednisone and an Advair Diskus in addition to her other respiratory medications.  AR473-74.  On May 13, 2014, she continued to report a sore throat cough.  AR560.

On June 8, 2014, Ms. Porter again went to the ER for several days of worsening cough and other upper respiratory symptoms.  AR915.  She exhibited pharyngeal erythema and bilateral rhonchi and wheezing.  Id.  A chest x-ray was normal.  AR916, 921.  She was diagnosed with acute bronchitis, acute bronchospasm, asthma exacerbation and ongoing tobacco dependence.  AR916.  She was prescribed a Combivent inhaler.  Id.

On June 14, 2014, Ms. Porter again went to the ER complaining of coughing and back pain. AR911. She exhibited decreased breath sounds bilaterally and was prescribed pain medication. Id.

On June 16, 2014, Ms. Porter saw a community health worker for cough, body aches, chills, and fatigue, reporting that she was coughing up thick yellow and green mucous. AR558. Although she reported her ER visit two weeks earlier, the record is silent as to her ER visit two days before. Id. Ms. Porter was running a fever on this occasion and auscultation (listening with a stethoscope) revealed fine crackles anteriorly and diminished breath sounds in the bases bilaterally. Id. Crackles are brief, discontinuous popping lung sounds like wood burning in a fireplace and may indicate fluid or pulmonary edema. See https://www.easyauscultation.com/causes?coursecaseorder=2&coursed=201, last checked April 24, 2018. She was diagnosed with simple bronchitis and given Prednisone for 5 days and cough medicine. AR559. A check-up on June 30, 2014, indicated most of Ms. Porter's respiratory issues had resolved. AR555-56.

On July 9, 2014, Ms. Porter again saw community health workers for bronchitis. AR553. She exhibited mild wheezing in her lungs. AR554. She was again diagnosed with simple bronchitis. Id. Her inhalers, cough medicine, and Prednisone were continued. AR555.

On July 22, 2014, Ms. Porter reported to the ER complaining of shortness of breath. AR902, 905. Her lungs were clear on this occasion and

her chest x-ray was normal.  Id.  On July 26, 2014, she again came to the ER for coughing, wheezing and shortness of breath after being exposed to campfire smoke while camping.  AR894.  She was again prescribed a Combivent inhaler, Prednisone, and an antibiotic.  AR895.

Two days later on July 28, 2014, she again sought medical care for respiratory symptoms. AR552.  She was diagnosed with obstructive chronic bronchitis with acute bronchitis.  AR553.  Because she had been on antibiotics and steroids since mid-May, the doctor recommended no further antibiotics or steroids, but rather a complete blood count.  Id.  At this time, Ms. Porter required 2-3 liters of oxygen at night and during daytime naps.  Id.

Later that same day, Ms. Porter reported to the ER complaining of shortness of breath and chest tightness.  AR900-01.  She exhibited diffuse biphasic wheezing and was given two nebulizer treatments with significant improvement.  AR901.  The diagnosis was bronchospasm and cough.  Id.

The next day, July 29, Ms. Porter saw a health care worker for medication follow-up.  AR551.  Laboratory studies were ordered which showed elevated TSH (related to thyroid hormone) and vitamin D.  AR568.

On August 27, 2014, Ms. Porter sought medical care for a migraine headache and was not seeking care for respiratory symptoms.  AR549-50.  However, her physical examination revealed diminished breath sounds and scattered wheezes.  Id.  Similarly, on October 8, 2014, Ms. Porter sought medical care for sudden weight gain, not respiratory symptoms, but her exam revealed a few rhonchi in her lungs.  AR547.

On October 28, 2014, Ms. Porter had an appointment for a pap smear, but also reported congestion in her chest. AR542. Exam revealed wheezing, rhonchi, rales and crackles in her lungs. AR543.

On February 6, 2015, Ms. Porter had back surgery, after which she developed postoperative pneumonia. AR872, 874. She told medical staff she had COPD and could get wheezy and short of breath when she had an upper respiratory infection. AR871. She had been given one nebulizer treatment and had been on oxygen since the surgery. Id. Her oxygen saturation was 91 percent after 4 liters of oxygen. Id. She was nebulized every 4 hours while in the hospital and given a bronchodilator. AR872. Two weeks post-surgery she was still on supplemental oxygen. AR791. One week later, she reported she would wake at night gasping for air. AR632-33. Her oxygen saturation level was 94 percent on this date. AR633.

On March 20, 2015, Ms. Porter reported to community health with shortness of breath. AR632. She was assessed with COPD. Id.

On May 12, 2015, Ms. Porter reported to the ER with symptoms of intermittent heart racing over a two-week period. AR851. Her pulse rate was 98,[72] her respiratory rate was 20, her blood pressure was 119/77, and her oxygen saturation level was 97 percent. AR851-52. She was diagnosed with palpitations and anxiety. Id. The next day, Ms. Porter followed up at

---

[72] For the sake of reference, other records show Ms. Porter's normal resting pulse rate when she was not complaining of racing heartbeat was 82 beats per minute. See AR318.

community health and said her symptoms had resolved with a nebulizer treatment and a Xanax tablet. AR629.

On June 2, 2015, Ms. Porter saw community health, reporting she had gone to the ER the night before and was diagnosed with bronchitis and given antibiotics and a steroid burst. AR627. She indicated her breathing was better today. Id.

On June 5, 2015, Ms. Porter again reported to the ER for breathing problems. AR845. Her pulse was 103,[73] her respiratory rate 18, her blood pressure was 121/50, and her oxygen saturation was 98 percent. Id. She indicated she had been using inhalers with no relief. Id. She was treated with a nebulizer and prednisone. Id.

On October 14, 2015, Ms. Porter was seen at community health and complained of ongoing cough and wheezing, but said she had been taking antibiotics and a Prednisone burst, which made her better. AR944.

On November 19, 2015, Ms. Porter reported to community health with upper respiratory symptoms. AR940-41. Her oxygen saturation was 99 percent and her lungs were clear, but her respiration rhythm and depth were moderately shallow. Id. She was assessed with COPD and given cough medicine. Id.

On December 1, 2015, Ms. Porter reported congestion. AR946. Exam revealed decreased breath sounds and wheezing. Id. She was assessed COPD and given Cipro and a nebulizer machine. Id.

---

[73] See Footnote 68, *supra* for Ms. Porter's normal resting pulse rate.

In her disability reports, Ms. Porter primarily reported limitations linked to pain, tingling, and numbness in her back and knee and postural limitations due to her vertebral fusion. She did indicate she was limited to walking 5-10 minutes before resting due to her feet, back and knees, adding that if she "pushes it" she might get "winded" and have to use her inhaler. AR262. She also stated she was "home bound due to breathing issues" coupled with her back, knee and hip pain. AR269.

The question before the court is: given the above extensive medical records concerning Ms. Porter's pulmonary health, what more information would have been gleaned from ordering a consultative exam? Ms. Porter points to the fact that her chest x-rays were "negative," "normal," and "clear" and her oxygen saturation levels were normal. Ms. Porter appears to suggest that the difficulty she described with breathing was really indicative of an undiagnosed anxiety condition. Docket No. 19 at pp. 17-18 and 18 n.24.

The American Lung Association explains that COPD is primarily diagnosed through the use of spirometry, a pulmonary function test. See www.lung.org/lung-health-and-diseases/lung-disease-lookup/copd/diagnosing-and-treating/how-is-copd-diagnosed.html, last checked April 24, 2018. This consists of having a patient blow through a mouthpiece and tubing attached to a machine that measures the amount of air the patient blows out and how fast it is blown. Id. Thus, x-rays and oxygen saturation are not the primary methods of diagnosing COPD, though they are secondary methods. Id. See also https://www.mayoclinic.org/diseases-

conditions/copd/diagnosis-treatment/drc-20353685.  The Mayo Clinic indicates COPD is commonly misdiagnosed.  Id.

The ALJ found at step two that Ms. Porter's COPD was a severe impairment.  AR17.  The ALJ went on to hold that Ms. Porter's COPD did not meet or equal a listed impairment at step three.  AR18.  The ALJ characterized this condition as undergoing exacerbations, but that between exacerbations, Ms. Porter's lungs were clear and her breathing unlabored.  AR21.  The ALJ also noted Ms. Porter continued to smoke tobacco despite repeated and frequent exhortations by numerous medical personnel to stop.  Id.  Ultimately, the ALJ incorporated no functional restrictions in Ms. Porter's RFC on account of her COPD.  AR18.

The court cannot say that the ALJ failed in its duty to develop the record as to Ms. Porter's COPD.  The records reflect that Ms. Porter did experience respiratory exacerbations, sometimes exacerbations that extended for several months.  But there were also months-long periods where she did not complain of symptoms, did not seek treatment, and where exams showed her lungs were clear.  And Ms. Porter herself attributed little functional limitations to her COPD, mentioning it only in passing.  Given the discretionary nature of consultative exams—the ALJ "may" order one even if circumstances exist justifying an exam—the record is not such in this case that the court can say the ALJ abdicated its duty to develop the record by failing to order a consultative exam.  Nor will the court mandate that the ALJ purchase a consultative exam on remand.

**G.     Was the ALJ's RFC Assessment Supported by Substantial Evidence?**

Ms. Porter alleges the ALJ's assessment of her RFC is not supported by

substantial evidence in the record for nine reasons:

1.     the ALJ failed to account for disrupted routine or absenteeism
       from work that would result from physical therapy appointments.

2.     the ALJ failed to consider the loss of functional strength and
       mobility throughout the lumbar and pelvic region preventing
       regular activity as documented by physical therapists.

3.     the ALJ failed to consider the functional impact of Ms. Porter's
       COPD.

4.     the ALJ failed to consider the impact of documented knee arthritis
       and iliotibial band pain.

5.     the ALJ failed to consider Ms. Porter's myofascial syndrome
       documented by Dr. Cote, whose records are not in the
       administrative record.

6.     in discounting Ms. Porter's reports of pain due to lack of objective
       medical evidence, the ALJ failed to take into account
       Dr. Woodruff's statement that the MRI of Ms. Porter's spine
       supported a diagnosis of discogenic pain.

7.     the ALJ substituted its own opinion for that of the DDS
       psychologists' opinions that Ms. Porter was moderately impaired in
       her ability to concentrate, persist, and pace herself.

8.     the ALJ failed to properly assess Ms. Porter's psychological
       limitations because there was no mental RFC from an examining
       psychologist as required by Nevland.

9.     the ALJ improperly assigned great weight to the opinions of DDS
       physicians as to Ms. Porter's physical RFC.

The Commissioner responds that the mere existence of a diagnosis or

condition is not sufficient to support a corresponding limitation in RFC.

Rather, the Commissioner argues, RFC is a formulation reserved for the ALJ's

exclusive province and it requires that *functional limitations* that arise from

133

impairments be considered.  The Commissioner notes Ms. Porter's assertion of error does not state what additional functional limitations should have been incorporated into her RFC.  As to the absenteeism argument, the Commissioner argues that brief medical appointments do not require Ms. Porter to miss an entire day's work.  Regarding Ms. Porter's COPD, the Commissioner notes Ms. Porter did not follow the many medical recommendations to quit smoking, thereby justifying the ALJ's implicit determination that her COPD was "something she could live with or [that] was not debilitating."  See Docket No. 20 at p. 18.  Furthermore, if a claimant's condition will improve by following a doctor's recommendations or changing a detrimental habit, the Commissioner asserts the claimant is not disabled.  Id. at p. 19.

### 1.    The Law Applicable to Formulation of RFC

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[74] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's

_____

[74] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which

real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th

Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184

("RFC is an assessment of an individual's ability to do sustained work-related

physical and mental activities in a work setting on a regular and continuing

basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 2. Physical RFC

Regarding Ms. Porter's physical RFC, she alleges the ALJ failed to

properly consider her functional limitations imposed by her knee, back and hip

conditions; failed to consider absenteeism for physical therapy appointments;

failed to consider her myofascial pain syndrome; improperly discounted her

reports of pain as unsupported by objective medical evidence; failed to consider

the impact of Ms. Porter's COPD; and improperly accorded great weight to

nontreating nonexamining medical sources over the opinions of treating

medical sources.

### a. Back, Hip, Myofascial Pain Syndrome, Complaints of Pain, and Absenteeism for Physical Therapy Appointments

As discussed above with regard to the errors alleged at step two,

myofascial pain syndrome and discogenic pain were diagnoses embraced

respectively by Dr. Cote and Dr. Woodruff to explain Ms. Porter's low back

pain. AR319, 799. Myofascial pain syndrome originates from trigger points in

the patient's muscles, whereas discogenic pain originates from a damaged

vertebral disc, particularly due to degenerative disc disease. Both Dr. Cote and

Dr. Woodruff were addressing Ms. Porter's complaints of low back pain

radiating into hips and legs.  In formulating Ms. Porter's RFC, the ALJ was not tasked with resolving *which* medical explanation for Ms. Porter's back pain was most persuasive, but rather with determining what *functional limitations* were imposed by Ms. Porter's back and hip pain. Similarly, Dr. Woodruff considered that Ms. Porter's hip joints might be the source of her pain, but ultimately eliminated that hypothesis and settled on a diagnosis of discogenic—back— pain.  Thus, when Ms. Porter alleges the ALJ failed to consider Dr. Cote and Dr. Woodruff's diagnoses, this really constitutes one issue.

The ALJ discounted Ms. Porter's subjective complaints of pain, asserting there was no objective evidence supporting her complaints.  This ignores Dr. Cote's diagnosis of myofascial pain syndrome and Dr. Woodruff's diagnosis of discogenic pain, based upon objective medical imaging of Ms. Porter's spine.

Of course, both of these diagnoses occurred *prior* to Ms. Porter's L5-S1 vertebral fusion surgery on February 6, 2015.  The ALJ paints with a broad and inaccurate brush when it suggests that the surgery was a panacea for Ms. Porter's back condition.

The record reflects that the back surgeon, Dr. Woodruff, saw Ms. Porter a handful of times in the three months following her surgery.  AR785-91  At the three-month mark, May 8, 2015, he released her to attend physical therapy to increase her strength and mobility in her lower back and stated he would see her again in one year.  AR785.  Ms. Porter then underwent a series of 15 physical therapy sessions between May 18, 2015, and July 20, 2015.  AR577- 618.

On the date of her last physical therapy appointment in the record, she was given an assessment by Dr. Brett Forman. At that time, she exhibited tightness bilaterally in her lumbosacral paraspinal muscles. AR577. She stated her pain was such that it prevented her from sitting or standing for more than one hour. Id. Straight-leg raising was positive for tightness. Id. Her lumbar flexion, extension, right- and left-side bending were moderately restricted. Id. Dr. Forman summarized that Ms. Porter exhibited a general loss of functional strength and mobility throughout her lumbar and pelvic region which limited her ability to return to regular activity. Id. Dr. Forman recommended further physical therapy to reduce pain, improve mobility, improve strength and tolerance for a more active lifestyle. Id. He recommended exercise, manual therapy and neuromuscular re-education. Id. He recommended Ms. Porter be seen twice a week for 6 to 8 weeks. Id.

Despite this recommendation, in the five months between July 20, 2015, and the date of the ALJ hearing on December 30, 2015, there are no further physical therapy records in the administrative record. On October 8, 2015, Ms. Porter reported to the emergency room with complaints of back pain and received a prescription for pain medication. AR832-33. This consists of her only back-related medical record following her first round of post-surgery physical therapy for her back.

One might infer from the fact Ms. Porter sought no further medical treatment (save the October 8 visit) for her back pain that she her back pain had resolved. One might infer from the fact that Ms. Porter did not follow the

recommendation for additional physical therapy that her pain had resolved to the point she felt she did not need additional therapy.  However, there is no need to speculate.  This case is being remanded for other reasons.  If there are additional medical records relating to the progress of Ms. Porter's back following her surgery, the court orders the ALJ to develop the record by obtaining those records.  Furthermore, as of July 20, 2015, Ms. Porter still had residual strength and mobility deficits in her lower back (AR577) that are not reflected in the ALJ's physical RFC.  The court orders the ALJ on remand to reconsider these deficits in Ms. Porter's lower back and incorporate any resulting functional limitations into Ms. Porter's physical RFC.

Ms. Porter argues on appeal that the ALJ failed to consider absenteeism for physical therapy appointments in determining whether she could maintain a job.  This is relevant for the period from June 5, 2013, to July 20, 2015, where the record reflects numerous medical and physical therapy appointments.

However, for the period from July 20, 2015, to December 30, 2015, the record reflects that Ms. Porter was no longer attending physical therapy.  The ALJ did not err in failing to taking into account absenteeism for physical therapy appointments during this later time frame because, by the time of the hearing, that was no longer an issue.  After development of the record on remand, if it appears there were significant medical appointments that would have raised an issue as to absenteeism, and if it appears that absenteeism

would be ongoing, the court directs the ALJ to factor that into its step five analysis.

### b. Left Knee

The medical records regarding Ms. Porter's left knee are summarized above in the discussion of alleged error at step two. To reiterate, Ms. Porter experienced chronic pain in her left knee following surgery in 2008 that continued through November 27, 2013. Her pain was substantiated by crepitance and a positive grind test as well as x-rays showing degenerative changes in the patellofemoral joint and mild medial joint space narrowing. AR821. She had impaired strength in both flexion and extension in her left knee in October, 2013. AR409.

On January 24, 2014, Ms. Porter had been using a TENS unit on her knee, had been doing physical therapy, and had gotten a round of knee injections, all of which she reported controlled her symptoms. AR812. Objectively, her tenderness involving the knee was markedly improved. Id. Ms. Porter was instructed to continue with home exercises and the TENS unit. Id. She was also told she could receive another series of knee injections in May or June if the pain recurred. Id.

On September 24, 2014, Ms. Porter reported knee pain, but said it was not emanating from the knee joint, but rather seemed to emanate from her lumbar spine and radiate down her leg. AR810. The doctor agreed that the leg pain was radicular (it was radiating from the back), not originating in the knee itself. AR810-11.

Ms. Porter reported to her physical therapist post-back surgery that she continued to experience left knee pain. AR618. However, her knee extension strength and flexion strength were normal on May 18, 2015, at the beginning of her physical therapy and continued in that status to the end of her round of therapy. AR577, 619. Unlike the first therapy visit, there is no record Ms. Porter complained of left knee pain on any of her other 15 physical therapy visits. AR576-617. Her physical therapy during this two-month span included squats on a stability wall for sit to stand training. AR577-609.

In summary, the record shows Ms. Porter was receiving intensive treatment of her left knee in 2013. By January, 2014, she reported her symptoms were controlled by a combination of home exercises, injections, and the TENS unit. From January, 2014, to May, 2015, Ms. Porter never reported any knee pain which she related to her knee joint and then there is only a single such report—May 18, 2015. Although Ms. Porter received extensive physical therapy after May 18, 2015, she never again reported knee pain. Furthermore, the second half of her physical therapy in 2015 included routinely doing wall squats.

Ms. Porter points to the November 27, 2013, record indicating she could not squat without pain and argues the ALJ should have incorporated this limitation into his physical RFC formulation. The post-November, 2013, records show Ms. Porter sought no further medical attention for her knee after January 24, 2014, and she engaged in squats repeatedly during physical therapy for her back in the early summer of 2015.

Nevertheless, the ALJ was required when formulating RFC to consider all of Ms. Porter's impairments, severe and nonsevere. It does not appear that the ALJ considered Ms. Porter's knee impairment in determining her RFC. For example, the RFC contains no limitations in kneeling, stair climbing or stair descending, all activities Ms. Porter consistently reported difficulties with and which were documented by her physical therapy providers. On remand, the ALJ is directed to consider what, if any, functional limitations are imposed by Ms. Porter's nonsevere knee impairment.

### c. COPD

As to Ms. Porter's COPD, this impairment and the concomitant functional limitations it imposed are adequately documented in the record. Furthermore, there is evidence in the record that exposure to environmental smoke or fumes exacerbates Ms. Porter's COPD. AR894 (medical treatment for breathing issues sought after Ms. Porter was exposed to campfire smoke). Yet the ALJ incorporated no limitations in Ms. Porter's physical RFC due to her COPD. The ALJ apparently concluded Ms. Porter had an unlimited ability to be exposed to fumes, odors, dusts, gases, smoke and poor ventilation. This conclusion is not supported by substantial evidence in the record.

The ALJ made reference to the fact that Ms. Porter's caregivers repeatedly advised her to quit smoking, but that she either could not or would not heed that advice. The reader is left to imagine what significance this comment had to the ALJ's analysis because the ALJ never explicitly tells the reader how this fact was used.

A claimant's failure to follow recommended medical treatment may bear on the credibility of the claimant's described symptoms.  <u>See</u> SSR 82-59 and SSR 16-3p.  However, before the ALJ uses failure to follow treatment adversely against the claimant, the ALJ is required to notify the claimant of the issue so as to give the claimant an opportunity to explain why she did not follow the prescribed treatment.  SSR 16-3p.  In addition, the ALJ must find that if the claimant had followed the recommended treatment, it would have restored the claimant's ability to work.  SSR 82-59.  Neither of these requirements were satisfied by the ALJ's reference to Ms. Porter's continued cigarette smoking.  Therefore, her smoking does not remove COPD limitations from the physical RFC formulation.

Similarly, if nicotine addiction is considered a species of drug addition, its presence in the record does not automatically result in disregard of the symptoms.  "A claimant is not entitled to disability benefits where alcoholism or drug addiction materially contributes to the claimant's disability."  42 U.S.C. § 423(d)(2)(C).  Where medical evidence of a claimant's drug addiction exists, the Commissioner must determine if the addiction is a material factor in the claimant's disability.  <u>See</u> <u>Rehder v. Apfel</u>, 205 F.3d 1056, 1059-60 (8th Cir. 2000); 20 C.F.R. § 404.1535 (2002).  If the Commissioner determines that the claimant would still be disabled absent drug addiction, the claimant is entitled to benefits.  <u>Hildebrand v. Barnhart</u>, 302 F.3d 836, 838 (8th Cir. 2002).  Here, the ALJ engaged in no but-for analysis concerning whether Ms. Porter would still be disabled absent her nicotine addiction.

Finally, although there are repeated references in the medical records that Ms. Porter was advised to stop smoking, the record does not contain a clear link between her COPD and her smoking—no doctor or other caregiver stated or opined that her pulmonary symptoms were caused by her smoking. Kelley v. Callahan, 133 F.3d 583, 589-90 (8th Cir. 1998) (rejecting ALJ's credibility analysis based on claimant's smoking where there was no evidence in the record showing that smoking was the cause of claimant's symptoms or that her complaints would be relieved by quitting smoking). And the record reflects Ms. Porter experienced pulmonary issues during some periods when she allegedly was not smoking. For example, she repeatedly stated she quit smoking during the immediate months after her back surgery. See AR632, 788, 791. However, during this nonsmoking period, she sought medical care for shortness of breath. See AR632 (complaining of shortness of breath March 20, 2015), and AR788 (stating she continued not to smoke on March 26, 2015).

However, there is also some suggestion that Ms. Porter's smoking cessation (as reported to her physicians) was either a lie or was extremely short-lived, especially pre-surgery. Dr. Woodruff indicated he would perform surgery only if Ms. Porter quit smoking, so she reported to him on December 19, 2014, that she had quit smoking for 2 to 3 months. AR802. When she contracted pneumonia after her surgery in the hospital, she informed medical staff on February 7, 2015, that she had started smoking again prior to surgery; that she had tried to quit and would do so for 2 weeks, then restart. AR871. This only points out the need for further explanation of this issue. Therefore,

on this record, the ALJ was not justified in wholly disregarding Ms. Porter's COPD functional limitations when formulating her physical RFC even taking into account her continued smoking.

### d. Nontreating Nonexamining Physicians' Opinions

Ms. Porter asserts in her brief that the ALJ erred in assigning "great weight" to the opinions of nontreating nonexamining physicians Dr. Eugene Heller and Dr. Bich Duong that Ms. Porter was capable of light work with some postural and environmental limitations. That is literally the whole of Ms. Porter's argument. See Docket No. 19 at p. 23. She does not expand on this and explain why Dr. Heller and Dr. Duong's opinions were wrong. She does not explain how or if those opinions conflict with other treating physicians' opinions.

In her reply, Ms. Porter asserts that the "record also contained a treating specialist's opinion of limitations. According to Porter's attorney, Dr. Cote opined that Porter could sit a half-hour at a time for total of two to three hours in a work day, stand 30 minutes at a time for two or three total hours in a work day, and 'probably there would be unscheduled breaks.'" See Docket No. 21 at p. 8. The support for Ms. Porter's argument, which is never linked back to the ALJ's treatment of the opinions of Dr. Heller and Dr. Duong, is wrong on many levels.

First, the citation to the record Ms. Porter gives is AR33. See Docket No. 21 at p. 8. This is a citation to the transcript from the first ALJ hearing on Ms. Porter's first, failed application for benefits which she abandoned without

appealing.  Evidence from that first application is, as determined above, "water under the bridge."  It is no longer relevant.  Furthermore, the citation is not to a medical record or medical opinion from Dr. Cote.  Instead, it is a citation to Ms. Porter's first attorney *describing* the contents of Dr. Cote's RFC assessment in Ms. Porter's first application.  This is much too attenuated to constitute evidence in this, Ms. Porter's second application for several reasons, not the least of which is the referenced opinion was at least 2 years old at the time of the second ALJ hearing and Ms. Porter had a lumbar fusion surgery since that opinion was rendered, substantially impacting her lower back condition.

Ms. Porter has not adequately supported her argument that the ALJ erred in its treatment of the consulting doctors' opinions.  However, Ms. Porter did adequately support her argument that the ALJ failed to consider the functional limitations imposed by her COPD, left knee, and back conditions.  In addressing these issues on remand, the ALJ will, of necessity, have to discuss whether the opinions of Drs. Heller and Duong are congruent with, or contradict, the record evidence.

### 3.    Mental RFC

The court has already concluded the ALJ erred in failing to determine that Ms. Porter's mental conditions constituted severe impairments at step two. There is no evidence the ALJ considered this/these severe impairments in formulating Ms. Porter's mental RFC at step four.  In fact, as already determined above, the ALJ erroneously rejected the only opinions by acceptable medical sources about Ms. Porter's mental RFC.  Because of these errors, this

147

court has already decided this case must be remanded for further development of the record as to Ms. Porter's mental impairments and the treatment of the opinions of Dr. McWilliams and Dr. Berkowitz. Remand is also warranted as to Ms. Porter's mental RFC. The court accordingly reverses and remands for a renewed determination of Ms. Porter's mental RFC at step four, taking into account whatever additional evidence is developed and evaluating the opinions of the two consulting experts according to the Commissioner's own regulations.

## H.    Did the ALJ's Step Five Decision Comply with the Law?

Ms. Porter alleges the ALJ erred at step five in two ways. First, although the ALJ based its decision on testimony from the vocational expert (VE) that Ms. Porter could do other jobs, the hypothetical to the VE describing Ms. Porter's functional limitations was incorrect (for the same reasons Ms. Porter has alleged the ALJ erred in formulating her RFC). The court agrees and reverses and remands for the ALJ to consider anew the step five issue once the ALJ has developed the record and formulated a proper RFC based on the above-discussed issues.

The second way Ms. Porter alleges the ALJ erred was in determining the number of jobs available. The VE testified Ms. Porter could do jobs of sewing machine operator, office helper and food and beverage order clerk. AR90. The VE further testified there were 143,000, 83,000 and 215,000 of each of these jobs, respectively, which were available "nationally." Id.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d) "Disability" defined

(1) The term "disability" means—
> (A) Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

\* \* \*

(2) For purposes of paragraph (1)(A)—
> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ***For purposes of the preceding sentence*** (with respect to any individual), ***"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.***

<u>See</u> 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which exists in the national economy" is a term of art in Social Security law. It does not mean work in the entire United States. Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country." <u>Id.</u> (emphasis added). Now, what does that definition mean exactly?

The Commissioner has to show that jobs exist in Ms. Porter's "region" or in "several regions of the country." We know from the statutory language that

149

"region" does *not* mean "immediate area," but defining what a term does not mean is not all that helpful in defining what it *does* mean.

The Commissioner's regulation, 20 C.F.R. § 404.1566, is likewise unhelpful. It does not define "region." Id. It says that "region" is not equal to "immediate area." Id. at (a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region. This sentiment is paralleled in the Commissioner's regulation where it states: "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.' We will not deny you disability benefits on the basis of the existence of these kinds of jobs." 20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part." Webster's New World Dictionary, at 503 (1984). "A subdivision of the earth or universe." OED (3d ed. Dec. 2009). We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b). The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole. The court concludes, as it must, that "nationwide" does not truly mean "nationwide."

Such is the nature of agency law. Instead, at step five, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation). Id.

In Johnson v. Chater, 108 F.3d 178, 178 (8th Cir. 1997), the claimant appealed the issue whether the VE's testimony was sufficient to prove that there were jobs existing in substantial numbers in the national economy. The VE had testified that Johnson could perform sedentary, unskilled work such as being an addresser or document preparer. Id. at 179. The VE said that there were 200 such positions in Iowa and 10,000 such positions nationwide. Id. Johnson took issue with whether 200 positions in his home state of Iowa constituted "substantial" numbers of jobs. Id. at 180 n.3. The court rejected Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." Id. at 180.

The facts in Johnson stand in stark contrast to the facts in Ms. Porter's case. In Johnson, the VE testified to the number of jobs available in the claimant's *region* (in that case, his state), and also the number of jobs available in the whole country. Id. at 179. Here, the VE testified *only* to the number of jobs available "nationally." AR90. As established above, both § 423(d)(2)(A) and § 404.1566 require more specificity than that. The ALJ and the VE must find that substantial numbers of jobs are available in Ms. Porter's region or in several regions. See Harris, 356 F.3d at 931 (the ALJ must find at step five

that claimant is "capable of performing work that exists in significant numbers within the *regional and national* economies.") (emphasis added).

The burden on is on the Commissioner at step five of the sequential analysis. <u>Johnson</u>, 108 F.3d at 180. Therefore, the absence of valid evidence of substantial numbers of jobs in Ms. Porter's "region" or in "several regions" is an absence of evidence that cuts against the Commissioner. While this court might hazard a guess that there are substantial numbers of office helper jobs available in South Dakota, or in the region consisting of South Dakota, North Dakota, Wyoming and Montana, or in several other regions in the country, this court is not allowed to guess about facts that might have been able to have been adduced at the agency level. The failure of proof requires remand to the agency to further develop the facts at step five.

## I.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Porter requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the

Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified, developed, and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Any one of the errors in the record might not, by itself, warrant

153

remand, but the culmination of each of the errors convinces the court that remand is in order.  See Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (stating, "[s]everal errors and uncertainties in the opinion, that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying [disability benefits] to require further proceedings below.").  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing facts, law and analysis, this court hereby

ORDERS that plaintiff Kimberly Porter's motion to reverse the Commissioner [Docket No. 18] is granted.  This case is remanded to the agency pursuant to 42 U.S.C. § 405(g), sentence four for further proceedings in accordance with this opinion.

DATED May 9, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge